1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

The Honorable Ronald B. Leighton

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

WILLIAM OSTLING, individually and as
Personal Representative of the Estate of
DOUGLAS OSTLING, deceased; JOYCE
OSTLING; and TAMARA OSTLING;

                    Plaintiffs,

      v.

CITY OF BAINBRIDGE ISLAND, a political
subdivision of the State of Washington; JON
FEHLMAN; and JEFF BENKERT;

                Defendants.

NO.  3:11-cv-05219-RBL

**ROBERTS DECLARATION IN
OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

16

Nathan P. Roberts declares and states as follows:

17

     I am an attorney of record for the Ostling Family, Plaintiffs herein.  I make this

18

declaration in opposition to Defendants' motion for summary judgment.  I am over the age of

19

eighteen and am competent to testify to the matters set forth herein.

20

//

21

//

22

//

23

//

ROBERTS DECLARATION - 1 of 2
(No. 3:11-cv-05219-RBL)

**CONNELLY LAW OFFICES**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

True and correct copies of the following materials are attached hereto as exhibits:

**Ex.     Description**

1.      Computer Aided Dispatch (CAD) Event Summary

2.      Deposition of BIPD Officer Defendant Jeffrey Benkert, pp. 26, 27, 74, 78, 79, 88, 89, 109, 110, 121, 122

3.      Deposition of BIPD Officer David Portrey, pp. 11, 12, 13, 14, 16, 17, 18, 76, 85

4.      Deposition of Richard O. Cummins, M.D., M.P.H., M.Sc., pp. 32, 80

5.      BIPD General Orders Manual, Section 11.030 ("Rendering Aid Following Use of Force"

6.      Bainbridge Island Fire Department & EMT Record

7.      Curriculum Vitae of Richard O. Cummins, M.D., M.P.H., M.Sc.

8.      Deposition of BIPD Lt. Chris Jensen, pp. 8, 9, 10, 11, 17, 18, 19, 23, 24, 25

9.      Deposition of BIPD Chief Defendant Jon Fehlman, pp. 33, 34, 86, 88, 89, 94, 124, 129, 130, 131

10.     Facebook Page of Defendant Jeffrey Benkert

11.     BIPD General Orders Manual, Section 13.135 ("Dealing with the Mentally Ill")

12.     Still Images from Video Depositions of Officers Benkert and Portrey

I declare under penalty of perjury of the laws of the State of Washington that the foregoing is true and correct to the best of my knowledge and belief.

Signed this 5th day of March, 2012, at Tacoma, Washington.

_____
Nathan P. Roberts, WSBA No. 40457

ROBERTS DECLARATION - 2 of 2
(No. 3:11-cv-05219-RBL)

**CONNELLY LAW OFFICES**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax



EXHIBIT 1

# Event Chronology -- P100173408

☑ System Comments

| Time | Date | Terminal | Operator | Action |
|------|------|----------|----------|--------|
| 8:39:50 PM | 10/26/2010 | p13 | 9908 | EVENT CREATED: 7700 SPRINGRIDGE RD NE BI : /HANSEN RD NE , Nm=(NP) OSTLING, DOUGLAS M , Addr=7700 SPRINGRIDGE RD NE ANI/ALI , Ph=(206) 780-8883 |
| | | | | Ag=BIPD/BIPD, Beat=BIPD, Status=A, Pri=30, Hold Type=0, Primary Unit=P820, Primary Member=820, Current=F, Open Current=F, Type=UNKNO3-Unknown Problem |
| 8:39:50 PM | 10/26/2010 | comm4 | 9908 | EVENT COMMENT.........** LOI search completed at 10/26/10 20:39:50 |
| | | | | MALE YELLING |
| | | | | "WHAT ARE YOU!!" |
| | | | | "WHAT IS THAT!?" |
| | | | | OVER AND OVER |
| | | | | WONT ANSWER QUESTIONS |
| 8:39:58 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........JUST YELLING OVER AND OVER |
| 8:40:01 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........VERY LOUD |
| 8:40:54 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........WHEN ASKED TO STOP YELLING |
| 8:40:58 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........HE SAID I DONT CARE! |
| 8:41:23 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........SAYING "ANSWER MY QUESTIONS" |
| 8:41:32 PM | 10/26/2010 | p5 | 9971 | P820, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=820 |
| 8:41:34 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........CORRECTION: YELLING |
| 8:41:50 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........YELLING "YOU ARE USELESS" |
| 8:41:54 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........CALLER DISCONNECTED |
| 8:42:11 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........** |
| 8:42:24 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........WHEN CR ASKED IF IT WAS DOUGLAS..HE STOPPED YELLING FOR A SECOND |
| 8:42:28 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........THEN CONTINUED OVER AND OVER |
| 8:42:46 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........DID ADV CALLER WE WOULD SEND LE OUT TO CHECK ON HIM..BUT COULDNT GET A WORD IN |
| | | | | EDGEWISE |
| 8:43:41 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........FYI---THE LEVEL OF YELLING SOUNDED SIMILAR TO AN EXCITED DELERIUM STATE |
| 8:44:43 PM | 10/26/2010 | p5 | 9971 | P859, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=859 |
| 8:46:28 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........CAD HX***FROM HX 10/1...AID CALL MALE IN MID-60S WITH CANCER HAVING RAPID HEART |
| | | | | RATE...TRANSPORTED ALS....THIS HAD BEEN CALLED IN THEN BY HIS WIFE JOYCE OSTLING |
| | | | | 206-842-4073*** |
| 8:49:56 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........DIFFICULT TO LOCATE PREVIOUSLY....DIRECTIONS SHOWED...GOING SOUTH ON SPRINGRIDGE |
| | | | | FROM FLETCHERBAY PAST HANSEN...IT WILL BE 3RD DRIVEWAY ON YOUR LEFT (EAST SIDE) |
| | | | | PAST HANSEN....#'S ON MAILBOX...SIGN BEHIND MAILBOX READS "THE WOODSMAN"...LONG |
| | | | | DRIVEWAY...GREY-BRO RESIDENCE ITS AT THE VERY END OF THE DRIVEWAY |
| 8:51:59 PM | 10/26/2010 | p5 | 9971 | P859, CL, AR STANDING BY FOR 820, Emp=859 |

P859, ER, AR STANDING BY FOR 820, Emp=859

| Time | Date | Terminal | ID | Event |
|---|---|---|---|---|
| 8:51:59 PM | 10/26/2010 | comm4 | 9971 | EVENT COMMENT.........** LOI search completed at 10/26/10 20:51:59 |
| 8:52:01 PM | 10/26/2010 | p5 | 9971 | P859, AR, AR STANDING BY FOR 820, Emp=859 |
| 8:52:16 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........P859 IN AREA..WILL WAIT FOR 820 AT THE HEAD OF THE DRIVEWAY |
| 8:52:37 PM | 10/26/2010 | p5 | 9971 | P820, AR, 7700 SPRINGRIDGE RD NE BI:, Emp=820 |
| 8:52:40 PM | 10/26/2010 | p5 | 9971 | P820, ER, 7700 SPRINGRIDGE RD NE BI:, Emp=820 |
| 8:53:48 PM | 10/26/2010 | p5 | 9971 | P859, CL, 7700 SPRINGRIDGE RD NE BI:, Emp=859 |
| | | | | P859, ER, 7700 SPRINGRIDGE RD NE BI:, Emp=859 |
| 8:53:49 PM | 10/26/2010 | comm4 | 9971 | EVENT COMMENT.........** LOI search completed at 10/26/10 20:53:49 |
| 8:53:54 PM | 10/26/2010 | p5 | 9971 | P859, AR, 7700 SPRINGRIDGE RD NE BI:, Emp=859 |
| | | | | P820, AR, 7700 SPRINGRIDGE RD NE BI:, Emp=820 |
| 8:54:25 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........P859 -- BOTH UNITS ARRIVING |
| 8:57:46 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........P859--STILL OUT |
| 8:59:01 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........UNIT---EMERGENCY TRAFFIC |
| 8:59:04 PM | 10/26/2010 | p14 | 9956 | EVENT COMMENT.........CHECKING.... |
| 8:59:15 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........859---SHOTS FIRED |
| 8:59:16 PM | 10/26/2010 | p14 | 9956 | EVENT COMMENT.........WSP BEING ADV'D |
| 8:59:25 PM | 10/26/2010 | p5 | 9971 | EVENT UPDATED: 7700 SPRINGRIDGE RD NE BI : /HANSEN RD NE , Nm=(NP) OSTLING, DOUGLAS M , Addr=7700 SPRINGRIDGE RD NE ANI/ALI , Ph=(206) 780-8883 |
| | | | | EVENT COMMENT.........** Event Type changed from UNKNO3 to HELP at: 10/26/10 20:59:25 |
| | | | | ** >>>> by: OP 71 on terminal: p5 |
| | | | | ** Event Priority changed from 3 to 1 at: 10/26/10 20:59:25 |
| | | | | ** >>>> by: OP 71 on terminal: p5 |
| 8:59:26 PM | 10/26/2010 | p5 | 9971 | Ag=BIPD/BIPD, Beat=BIPD, Status=A, Pri=10, Hold Type=0, Primary Unit=P820, Primary Member=820, Current=F, Open Current=F, Type=HELP-Priority OFFICER Back-up |
| | | | | EVENT COMMENT.........** KITSAP event X100000216 created |
| 8:59:36 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........859--NEED HELP...MAN WITH AN AXE |
| 8:59:43 PM | 10/26/2010 | p5 | 9971 | N074, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=74 |
| 8:59:49 PM | 10/26/2010 | p5 | 9971 | P813, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=813 |
| 8:59:52 PM | 10/26/2010 | p4 | 9979 | EVENT COMMENT.........BC ON BPD |
| 9:00:31 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........859-- WHITE MONUMENT MARKER WITH THE ADDRESS |
| 9:01:19 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........*********FOR AID**820--MALE HAS BARRICADED HIMSELF IN AN UPSTAIRS ROOM IN THE |
| | | | | GARAGE,,,UNK IF ANYONE HAS BEEN HIT...REQ AID STAGE FOR THIS |
| 9:01:23 PM | 10/26/2010 | p5 | 9971 | P813, ER, 7700 SPRINGRIDGE RD NE BI:, Emp=813 |
| 9:01:24 PM | 10/26/2010 | p13 | 9908 | EVENT UPDATED: 7700 SPRINGRIDGE RD NE BI : /HANSEN RD NE , Nm=(NP) OSTLING, DOUGLAS M , Addr=7700 SPRINGRIDGE RD NE ANI/ALI , Ph=(206) 780-8883 |
| | | | | EVENT UPDATED: 7700 SPRINGRIDGE RD NE BI : /HANSEN RD NE , Nm=(NP) OSTLING, DOUGLAS M , Addr=7700 SPRINGRIDGE RD NE ANI/ALI , Ph=(206) 780-8883 |
| | | | | Ag=BIPD/BIPD, Beat=BIPD, Status=A, Pri=10, Hold Type=0, Primary Unit=P820, Primary Member=820, Current=F, Open Current=F, Type=HELPB-Priority OFFICER Backup-BLS |
| | | | | EVENT COMMENT.........** Event Type changed from HELP to HELPB at: 10/26/10 21:01:24 |

|  |  |  |  | ** >>>> by: OP 8 on terminal: p13 |
|  |  |  |  | ** Event Type changed from HELP to HELPB at: 10/26/10 21:01:24 |
|  |  |  |  | ** >>>> by: OP 8 on terminal: p13 |
| 9:01:25 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........** BIFD event F100025076 created |
| 9:01:32 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........813--CALL 805 AT HOME TO ADVISE |
| 9:01:50 PM | 10/26/2010 | p5 | 9971 | L113, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=113 |
| 9:01:54 PM | 10/26/2010 | p5 | 9971 | L084, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=84 |
| 9:01:58 PM | 10/26/2010 | p5 | 9971 | L113, ER, 7700 SPRINGRIDGE RD NE BI:, Emp=113 |
|  |  |  |  | N074, ER, 7700 SPRINGRIDGE RD NE BI:, Emp=74 |
| 9:02:05 PM | 10/26/2010 | p5 | 9971 | P605, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=605 |
| 9:02:06 PM | 10/26/2010 | p5 | 9971 | P612, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=612 |
| 9:02:09 PM | 10/26/2010 | p5 | 9971 | V667, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=667 |
| 9:02:11 PM | 10/26/2010 | p5 | 9971 | S602, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=602 |
| 9:02:15 PM | 10/26/2010 | p5 | 9971 | S903, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=903 |
| 9:02:33 PM | 10/26/2010 | p5 | 9971 | P135, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=135 |
| 9:02:37 PM | 10/26/2010 | p5 | 9971 | P1105, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=1105 |
| 9:02:44 PM | 10/26/2010 | p5 | 9971 | S1102, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=1102 |
| 9:02:47 PM | 10/26/2010 | $Y057 | 57 | Y057, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=57 |
| 9:03:17 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........A21 WILL ADVISE OF STAGING LOCATION |
| 9:03:22 PM | 10/26/2010 | $N074 | 74 | N074, ER, 7700 SPRINGRIDGE RD NE BI:, Emp=74 |
| 9:03:54 PM | 10/26/2010 | p1 | 9974 | P859, ~, 7700 SPRINGRIDGE RD NE BI:, Emp=859 |
| 9:03:54 PM | 10/26/2010 | p2 | 9981 | P820, ~, 7700 SPRINGRIDGE RD NE BI:, Emp=820 |
| 9:04:15 PM | 10/26/2010 | p4 | 9979 | EVENT COMMENT.........WSP--3 UNITS ENROUTE FROM PORT ORCHARD AND ONE FROM OUR OFFICE |
| 9:04:17 PM | 10/26/2010 | p15 | 9934 | EVENT COMMENT.........3 KCSO SOUTH UNITS...AND 2 SGT ER |
| 9:04:30 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........805 ADV'D AND ER |
| 9:05:08 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........** Cross Referenced to Event # P100173417 at: 10/26/10 21:05:08 |
|  |  |  |  | ** >>>> by: OP 8 on terminal: p13 |
|  |  |  |  | CROSS REFERENCED TO EVENT=P100173417 |
| 9:05:13 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........820 TO 813--DRIVE WAY SOUTH OF THE ADDRESS 7734 |
| 9:05:42 PM | 10/26/2010 | p5 | 9971 | P820, CU, Comm=Alarm Timer Extended: 0, 7700 SPRINGRIDGE RD NE BI:, Emp=820 |
| 9:05:43 PM | 10/26/2010 | p5 | 9971 | P859, CU, Comm=Alarm Timer Extended: 0, 7700 SPRINGRIDGE RD NE BI:, Emp=859 |
| 9:06:17 PM | 10/26/2010 | p5 | 9971 | P813, AR, 7700 SPRINGRIDGE RD NE BI:, Emp=813 |
| 9:06:18 PM | 10/26/2010 | $L084 | 84 | L084, AM, 7700 SPRINGRIDGE RD NE BI:, Emp=84 |
| 9:06:43 PM | 10/26/2010 | p5 | 9971 | P822, DP, 7700 SPRINGRIDGE RD NE BI:, Emp=822 |
| 9:07:27 PM | 10/26/2010 | p1 | 9974 | V667, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=667 |
| 9:07:28 PM | 10/26/2010 | p1 | 9974 | S602, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=602 |
| 9:07:29 PM | 10/26/2010 | p1 | 9974 | P612, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=612 |
| 9:07:30 PM | 10/26/2010 | p1 | 9974 | P605, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=605 |
| 9:07:55 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........A21--STAGING ON SPRINGRIDGE..1 BLK SOUTH OF FLETCHER BAY |
| 9:08:00 PM | 10/26/2010 | comm4 | 9908 | EVENT COMMENT.........** LOI search completed at 10/26/10 21:08:00 |
| 9:09:58 PM | 10/26/2010 | p2 | 9981 | S903, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=903 |

| | | | | |
|---|---|---|---|---|
| 9:10:21 PM | 10/26/2010 | p2 | 9981 | P1105, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=1105 |
| 9:10:22 PM | 10/26/2010 | comm4 | 9908 | EVENT COMMENT.........** LOI search completed at 10/26/10 21:10:22 |
| 9:10:24 PM | 10/26/2010 | $P822 | 822 | P822, AR, 7700 SPRINGRIDGE RD NE BI:, Emp=822 |
| 9:10:25 PM | 10/26/2010 | comm4 | 9908 | EVENT COMMENT.........** LOI search completed at 10/26/10 21:10:25 |
| 9:10:29 PM | 10/26/2010 | p2 | 9981 | S1102, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=1102 |
| 9:10:55 PM | 10/26/2010 | p13 | 9908 | EVENT UPDATED: 7700 SPRINGRIDGE RD NE BI : /HANSEN RD NE , Nm=(NP) OSTLING, DOUGLAS M , Addr=7700 SPRINGRIDGE RD NE ANI/ALI , Ph=(206) 780-8883 |
| 9:11:42 PM | 10/26/2010 | p14 | 9956 | EVENT COMMENT.........WSP STILL ER... |
| 9:13:49 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........P813 -- SITUATION SAME |
| 9:14:39 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........P859 -- ONLY NEED ABOUT 3 OR 4 UNITS |
| 9:15:40 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........P820 -- GOT A LADDER ATTEMPTING TO LOOK INTO THE UPSTAIRS |
| 9:16:31 PM | 10/26/2010 | p2 | 9981 | Y057, ER, 7700 SPRINGRIDGE RD NE BI:, Emp=57 |
| 9:16:46 PM | 10/26/2010 | p2 | 9981 | S805, DP, Comm=NT, 7700 SPRINGRIDGE RD NE BI:, Emp=805 |
| 9:16:47 PM | 10/26/2010 | p2 | 9981 | S805, ER, Comm=NT, 7700 SPRINGRIDGE RD NE BI:, Emp=805 |
| 9:17:46 PM | 10/26/2010 | p2 | 9981 | L113, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=113 |
| 9:17:50 PM | 10/26/2010 | p2 | 9981 | N074, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=74 |
| 9:17:59 PM | 10/26/2010 | p2 | 9981 | Y057, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=57 |
| 9:18:16 PM | 10/26/2010 | p2 | 9981 | P135, UC, Comm=Preempt, 7700 SPRINGRIDGE RD NE BI:, Emp=135 |
| 9:18:19 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........A800---PUT ME ON THE SCREEN..ER |
| 9:18:30 PM | 10/26/2010 | p13 | 9908 | A800, DP, Comm=NT, 7700 SPRINGRIDGE RD NE BI:, Emp=800 |
| 9:18:31 PM | 10/26/2010 | p13 | 9908 | A800, ER, Comm=NT, 7700 SPRINGRIDGE RD NE BI:, Emp=800 |
| 9:19:03 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........P820 -- UPSTAIRS APT DOOR IS LOCKED |
| 9:20:17 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........P820 -- ATTEMPT TO CT RP FROM ORIGINAL CALL |
| 9:20:48 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........OP081 -- CALLING INS |
| 9:21:16 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........VM ON CALL INS |
| 9:21:19 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........P820 ADVD |
| 9:22:27 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........P820 -- PUSHED OPEN DOOR SO A RAM WOULD BE ADEQUATE |
| 9:23:40 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........805>UNITS ON SCN..SWAT COMING..HOLD ENTRY FOR THEM |
| 9:23:57 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........P820 -- >UNITS..WE HAVE GOT THE KEYS TO THE DOOR |
| 9:24:09 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........DC21 ER NON PRIORITY..ADVD OF STAGING LOCATION |
| 9:25:02 PM | 10/26/2010 | comm4 | 9908 | EVENT COMMENT.........** LOI search completed at 10/26/10 21:25:02 |
| 9:30:44 PM | 10/26/2010 | p15 | 9934 | X814, DP, Comm=NT, 7700 SPRINGRIDGE RD NE BI:, Emp=814 |
| 9:30:45 PM | 10/26/2010 | p15 | 9934 | X814, ER, Comm=NT, 7700 SPRINGRIDGE RD NE BI:, Emp=814 |
| 9:30:50 PM | 10/26/2010 | p2 | 9981 | P823, DP, Comm=NT, 7700 SPRINGRIDGE RD NE BI:, Emp=823 |
| 9:30:50 PM | 10/26/2010 | p15 | 9934 | EVENT COMMENT.........X814 ER..AND SWITCHING TO ONE |
| 9:30:51 PM | 10/26/2010 | p2 | 9981 | P823, ER, Comm=NT, 7700 SPRINGRIDGE RD NE BI:, Emp=823 |
| 9:31:47 PM | 10/26/2010 | p2 | 9981 | A800, AR, 7700 SPRINGRIDGE RD NE BI:, Emp=800 |
| 9:33:55 PM | 10/26/2010 | p2 | 9981 | S805, AR, 7700 SPRINGRIDGE RD NE BI:, Emp=805 |
| 9:40:29 PM | 10/26/2010 | p15 | 9934 | EVENT COMMENT.........068/091 WILL BE ER... |
| 9:42:18 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........S903 -- SPRINGRIDGE/HANSON BLKNG THE ROAD |
| 9:43:37 PM | 10/26/2010 | comm4 | 9981 | EVENT COMMENT.........** LOI search completed at 10/26/10 21:43:37 |
| 9:45:36 PM | 10/26/2010 | $P823 | 823 | P823, UE, Emp=823 |
| | | | | P823, UU, Emp=823 |

| | | | | |
|---|---|---|---|---|
| 9:45:37 PM | 10/26/2010 | $P823 | 823 | P823, UC, Comm=New equipment list for Unit [P823] :, 7700 SPRINGRIDGE RD NE BI:, Emp=823 |
| 9:46:26 PM | 10/26/2010 | $P823 | 823 | P823, AR, 7700 SPRINGRIDGE RD NE BI:, Emp=823 |
| 9:46:46 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........B/C NORTH ALL NORTH UNITS NOT ON THIS DETAIL MOVE TO LE4 AND SIGN IN...ALL UNITS |
| | | | | ON SPRINGRIDGE REMAIN ON NORTH FREQ... |
| 9:47:24 PM | 10/26/2010 | p2 | 9981 | Disposition Assigned=J |
| 9:48:18 PM | 10/26/2010 | p5 | 9971 | X814, AR, 7700 SPRINGRIDGE RD NE BI:, Emp=814 |
| 9:56:17 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........139 & 82 ARE W/ 67 |
| 10:00:51 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........S020--REMAIN ON ET,,,,,,NO TONES |
| 10:14:00 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........DC21--M21 WILL BE MOVING UP |
| 10:14:39 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........S020--HAVE AID MOVE UP TO THE END OF THE DRIVEWAY |
| 10:15:01 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........81 TO 20--THEY ARE ALREADY HERE..ABOUT 100 FEET FROM THE DRIVE |
| 10:15:06 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........20 AK..THATS GOOD THERE |
| 10:15:22 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........LARGE AMOUNT OF BLOOD |
| 10:16:21 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........UNIT----SUSPECT IS DOWN JUST OFF THE DOOR AT DINING ROOM...ACCESS TO THE LEFT..I |
| | | | | CAN COVER HIS LEFT HAND CANNOT SEE HIS RIGHT |
| 10:16:27 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........67--RIGHT BEHIND THE DOOR |
| 10:16:36 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........S020--HAVE AID COME DOWN THE DRIVEWAY |
| 10:16:59 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........S023--HAVE AID GO ALL THE WAY TO THE HOUSE |
| 10:17:02 PM | 10/26/2010 | p11 | 9984 | EVENT COMMENT.........M21 ADV'D |
| 10:17:08 PM | 10/26/2010 | p11 | 9984 | EVENT COMMENT.........TO GO THE HOUSE |
| 10:19:07 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........20--UPDATE FOR AID...UNRESPONSIVE,...GUNSHOT WOUNDS |
| 10:19:27 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........M21 ADVD |
| 10:21:55 PM | 10/26/2010 | p15 | 9934 | Disposition Assigned=J |
| 10:24:48 PM | 10/26/2010 | comm4 | 9981 | EVENT COMMENT.........** LOI search completed at 10/26/10 22:24:48 |
| 10:25:11 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........S903 -- I HAVE MOVED TO SPRINGRIDGE/SOLANA LN (VIA LE4) |
| 10:25:24 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........S903 -- AND BACK ON REGULAR NORTH |
| 10:26:19 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........NORMAL TRAFFIC |
| 10:27:00 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........OK TO HAVE NORTH UNITS ON LE4 RETURN TO NORTH FREQ |
| 10:30:10 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........903 TO 805--MEDIA ARRIVING |
| 10:30:33 PM | 10/26/2010 | p5 | 9971 | P823, AM, 7700 SPRINGRIDGE RD NE BI:, Emp=823 |
| 10:36:34 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........** Case number K10011941 has been assigned |
| | | | | ** >>>> by: OP 71 on terminal: p5 |
| | | | | CASE NUMBER ASSIGNED=K10011941 |
| | | | | Disposition Assigned=default |
| 10:40:49 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........DC21--ALL FIRE UNITS AVAIL |
| 10:40:56 PM | 10/26/2010 | p13 | 9908 | EVENT COMMENT.........** CLOSING FIRE CALL ** |
| 10:41:06 PM | 10/26/2010 | p13 | 9908 | Disposition Assigned=ND |
| 10:48:15 PM | 10/26/2010 | p2 | 9981 | EVENT COMMENT.........L113/F115 CLR |
| 10:58:59 PM | 10/26/2010 | p5 | 9971 | EVENT COMMENT.........D049 ER |
| 11:11:10 PM | 10/26/2010 | p15 | 9934 | EVENT COMMENT.........D045 ER |



EXHIBIT 2

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

WILLIAM OSTLING, individually and     )
as Personal Representative of the     )
Estate of DOUGLAS OSTLING,            )
deceased; JOYCE OSTLING; and          )
TAMARA OSTLING,                       ) No. 3:11-cv-05219
                                      )
                Plaintiffs,           )
                                      )
            vs.                       )
                                      )
CITY OF BAINBRIDGE ISLAND, a          )
political subdivision of the State    )
of Washington; JON FEHLMAN; and       )
JEFF BENKERT,                         )
                                      )
                Defendants.           )


VIDEOTAPED DEPOSITION OF JEFFREY D. BENKERT

January 2, 2012

Seattle, Washington




Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square        2208 North 30th Street, Suite 202
600 University St.      Tacoma, WA 98403
Suite 2300              (253) 627-6401
Seattle, WA 98101       (253) 383-4884 Fax
(206) 340-1316          scheduling@byersanderson.com
(800) 649-2034          www.byersanderson.com.


Serving Washington's Legal Community since 1980

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 2

```
 1                         APPEARANCES

 2
             For the Plaintiffs:
 3

 4                      Nathan P. Roberts
                        John R. Connelly, Jr.
 5                      Julie Kays
                        Connelly Law Offices
 6                      2301 North 30th Street
                        Tacoma, WA 98403
 7                      253.593.5100
                        253.593.0380 Fax
 8                      nroberts@connelly-law.com
                        jconnelly@connelly-law.com
 9                      jkays@connelly-law.com

10

11           For the Defendants:

12
                        Stewart A. Estes
13                      Keating, Bucklin & McCormack, Inc.
                        800 Fifth Avenue
14                      Suite 4141
                        Seattle, WA 98104
15                      206.623.8861
                        206.223.9423 Fax
16                      sestes@kbmlawyers.com

17

18           Also present:  Reed Hardesty, WA Cities Insurance
                             Authority
19
                        Chad Reilly
20                      Videographer, Byers & Anderson, Inc.
                        Court Reporters & Video
21

22

23

24

25
```

**Jeffrey D. Benkert**
**January 2, 2012**

Page 26

```
 1        please, Counsel.

 2   A    I'm just saying it's -- there's many ways and it depends

 3        call to call.  So I can't answer it specifically

 4        without...

 5   Q    (By Mr. Roberts)  Okay.  You testified that the thing you

 6        remember from all those written materials is that you

 7        would never compromise officer safety; correct?

 8   A    That's right.

 9   Q    But that's about all you remember from the materials?

10                       MR. ESTES:  Objection to form.

11   Q    (By Mr. Roberts)  Correct?

12   A    I said that's what I remember.  It's always in there.

13   Q    Okay.

14   A    One of the things that is always in there, every single

15        one of those articles.  But that can be said about most

16        police magazine articles.

17   Q    What else did you learn from those written materials

18        about how to deal with people with mental illness,

19        besides not compromising officer safety?

20   A    Again, the same things I just listed:  remain calm,

21        reinforce your logic, do not enter into any of their

22        possible delusions.  You do not reinforce those.  Things

23        like that.

24   Q    And when you mentioned never compromising officer safety,

25        what do you understand that to mean?
```

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

1    A    Just maintain your own awareness.

2    Q    Anything else?

3    A    Just continually look for things that make you unsafe.

4    Q    And then you try to avoid those things; correct?

5    A    That's right.

6    Q    From your training, do you believe that dealing with the

7         mentally ill requires special police skills and ability?

8                        MR. ESTES:  Objection to form and

9         foundation.

10   A    No.

11   Q    (By Mr. Roberts)  Do you believe that mentally ill

12        persons are less predictable than others?

13   A    Not necessarily.

14   Q    Do you believe that mentally ill are more or less likely

15        to react violently towards law enforcement?

16   A    Not necessarily.

17   Q    Do you know one way or the other whether they're more or

18        less likely to react violently towards law enforcement?

19   A    No.

20   Q    You don't know?

21        Do you believe it's important to deal with the

22        mentally ill in a constructive and humane manner?

23                       MR. ESTES:  Objection to form.

24   A    It's important to do that to everybody.

25   Q    (By Mr. Roberts)  And have you been trained to recognize

```
 1                          MR. ESTES:  Objection to form.

 2      A   I don't know if the door was closed with a hand.

 3      Q   (By Mr. Roberts)  Is it possible that he closed it with

 4          his body?

 5      A   Yes.

 6      Q   Would he need to be behind the door in order to do that?

 7      A   Yeah.

 8      Q   Is it possible that he wasn't coming over to attack you

 9          or your partner, but that he was coming over to close the

10          door?

11      A   It's possible.

12      Q   Did he ever raise the ax above his head?

13      A   Not that I saw.

14      Q   Did he ever hold the ax in any manner other than the

15          manner that you've already demonstrated here today?

16      A   No.

17      Q   Never?

18      A   No, not that I saw.

19                              (Exhibit No. 1 marked

20                               for identification.)

21

22      Q   (By Mr. Roberts)  Handing what you I've marked as Exhibit

23          1 to your deposition, I'm going to represent to you that

24          this is a schematic drawing of the landing that was

25          created by the Kitsap County Sheriff's Department.
```

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 78

```
 1     A    Not immediately.

 2     Q    She was in the doorway to the living room?

 3     A    I believe that's the first time I saw her, yeah.  I

 4          wasn't looking in that direction.  I was looking up the

 5          stairs.

 6     Q    And what conversations occurred at that point?

 7     A    Well, I was talking to Dave, and Mrs. Ostling was trying

 8          to get upstairs to check on Doug, and I told her that she

 9          couldn't do that.

10     Q    Did she ask why you had shot her son?

11     A    Yes.

12     Q    And she wanted to go check on him; correct?

13     A    Yes.

14     Q    And Mr. Ostling wanted to go check on him too; correct?

15     A    He didn't bring that to me, no, but I assumed he probably

16          wanted to, yeah.

17     Q    And you told them they couldn't do that?

18     A    That's right.

19     Q    Why not?

20     A    Because I did not know if my shots had been effective.

21     Q    Meaning you didn't know whether or not you had hit him?

22     A    That's right.

23     Q    At that point, were you thinking it was likely that you

24          had hit him?

25     A    Yes.
```

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 79

1    Q    Why did you think that?

2    A    Short distance.

3    Q    Do you have any idea of what part of the body you might

4         have hit him in?

5    A    No idea.

6    Q    And so if Bill or his wife Joyce wanted to go up upstairs

7         and check on their son, why couldn't they do that?

8    A    Because I did not know if he was injured.  He still has

9         an ax and he's behind a locked door.  So now I know that

10        he has a dangerous weapon back there.

11            And if he is uninjured, it's highly possible that he

12        could assume that it's the police coming in.

13   Q    You just said he was behind a locked door.

14   A    (Witness nods head.)  Mm-hm.

15   Q    How do you know the door was locked?

16   A    Officer Portrey and I went back up and tried to open it.

17   Q    And what were you going to do if it had opened?

18   A    We were going to see if he was hurt.

19   Q    Were you concerned for his welfare at that point?

20   A    I was.

21   Q    Because you thought you might have shot him?

22   A    That's right.

23   Q    But you had a key to the door; correct?

24   A    Not anymore.

25   Q    Where was the key to the door?

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 88

1    Q    What was the emergency, as you understood it?

2    A    I was there to check on his welfare, to make sure he had

3         not harmed himself or someone else.   And I couldn't do

4         that behind a closed door.

5    Q    Was there anything that led you to believe that he might

6         be at risk for harming himself?

7    A    He was in an agitated state, he initiated a 911 call, and

8         his father had advised me that he suffered from a mental

9         illness.

10   Q    Did you talk to his father at all about whether or not he

11        had ever engaged -- engaged in self-injurious behavior

12        before?

13   A    No.

14   Q    Ever attempted suicide or anything like that?

15   A    I did not.

16   Q    So you didn't have any reason to believe that he would

17        harm himself; right?

18   A    No.

19   Q    And you didn't have any reason to believe that there was

20        anyone else in the apartment; correct?

21                    MR. ESTES:   Objection to form.

22   A    I was trying to ascertain that information.

23   Q    (By Mr. Roberts)  Did you have any -- any reason to

24        believe there was anyone else in the apartment other than

25        Doug?

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 89

1    A    No.

2    Q    And the nature of the emergency you say was that he was

3         agitated?

4    A    That's right.

5    Q    And mentally ill?

6    A    According to his father.

7    Q    Anything else?

8    A    No.

9                        MR. ESTES:   And he called 911, as you

10        stated.

11   Q    (By Mr. Roberts)   After the shooting, did you and Officer

12        Portrey discuss whether you could go back into the

13        apartment using the key or by kicking the door in?

14   A    Yes.

15   Q    Tell me about those conversations.

16   A    We were going back and forth about whether we were going

17        to try and do that.

18             We know that he is armed, we know that he is

19        possibly wounded, but we also know that that is a

20        barricaded suspect situation and that you should wait for

21        additional resources.

22             So we had to decide if we were going to do that,

23        just the two of us, or not.

24   Q    What about when you had additional officers on the scene?

25        You said seven to eight within ten minutes.

```
1    A   I don't know.

2    Q   Was the finding of dishonesty in your responses to that

3        investigation pertaining to discrepancies between your

4        and your partner's statements, or between --

5    A   No.

6    Q   What was it in relation to?

7    A   The difference between my information and the

8        complainant's.

9    Q   Your testimony is that you and your partner gave the same

10       statement?

11   A   We -- in the Board of Rights hearing, yes, we did.

12   Q   How about prior to that?

13   A   I don't know.  I wasn't there for that.

14   Q   And I want to be clear about this, because you mentioned

15       a number of reasons why you would come to Bainbridge

16       Island from LAPD.  You mentioned some family reasons.

17           Was the primary reason that you were coming from

18       LAPD to Bainbridge Island because you knew you were about

19       to be fired for dishonesty?

20                       MR. ESTES:  Objection to form.

21   A   I had resigned.

22                       THE REPORTER:  I'm sorry?

23                       MR. ESTES:  Objection to form.

24   Q   (By Mr. Roberts)  And you had resigned because you were

25       about to be fired; correct?
```

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 110

 1    A    Yes.

 2    Q    Okay.  And was that the primary reason why you applied to

 3         the Bainbridge Island Police Department?

 4    A    I applied to many police departments.

 5    Q    Is that the primary reason why you applied to a number of

 6         different police departments?

 7    A    Yes.

 8    Q    Because it's your understanding that it's better for you

 9         to be applying while you're still employed than to be

10         applying after you've been terminated; correct?

11    A    It was a good decision to me at the time.

12    Q    Did you feel that the likelihood of obtaining another

13         police job would be lower once you had actually been

14         terminated for being dishonest?

15    A    It's possible.

16    Q    And, in fact, it's the case; right?

17    A    I don't know.  I got hired, so...

18    Q    Did you put anything in writing on your initial

19         application to the Bainbridge Island Police Department to

20         let them know that you were under investigation and were

21         about to be terminated for dishonesty?

22    A    I don't know if it was in writing, but the chief and the

23         deputy chief were well informed.

24    Q    At the end of the process, they were informed; correct?

25    A    No.  They were informed during the whole thing.

**Jeffrey D. Benkert**
**January 2, 2012**

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

1    A    **No.**

2    Q    Do you have an understanding as to whether either or both

3         of the shots that struck -- struck Douglas Ostling went

4         through the door before striking him?

5    A    **I don't know.**

6    Q    Is it possible that that's the case?

7    A    **Yes.**

8    Q    Is it possible that Douglas Ostling was actually behind

9         the door at the time that you opened fire on him?

10    A    **Not completely.**

11    Q    How about almost entirely?

12                      MR. ESTES:  Objection to form.  Vague.

13    A    **I don't know.**

14    Q    (By Mr. Roberts)  You don't know whether he was behind

15         the door at the time that you opened fire on him?

16    A    **I could see enough of him to know that he was there.  I**

17         **don't know what portions of him were behind the door.**

18    Q    If any?

19    A    **Right.**

20    Q    Or whether it was the majority of his body?

21    A    **Correct.**

22    Q    And whether, at that point, he was holding the ax with

23         both hands or one or trying to close the door?

24    A    **I never saw his hands come off the ax handle.**

25    Q    But you couldn't see them at the time you opened fire?

Page 122

```
 1    A    I could.

 2    Q    Both of them?

 3    A    Yes.

 4    Q    Could you see his legs at the time you opened fire?

 5    A    Yes.

 6    Q    How much of his torso could you see at the time you

 7         opened fire?

 8    A    I could see the entirety of the left side of his body.

 9    Q    Just the left side?

10    A    At least, yes.

11    Q    But you're not sure whether or not you could see the

12         right?

13    A    Correct.

14    Q    And your testimony is that he was holding the ax across

15         his chest?

16    A    When I began firing, yes.

17    Q    With his right hand near the head of the ax?

18    A    The grip never changed.

19    Q    And it's possible that that hand was in fact behind the

20         door at the time that you opened fire; correct?

21    A    That's right.

22    Q    Okay.  As well as the head of the ax; correct?

23    A    Yes.

24    Q    At the time that you responded to this incident, were

25         you -- did anyone on the Bainbridge Island Police
```

EXHIBIT 3


EXHIBIT 3

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA


| | |
|---|---|
| WILLIAM OSTLING, individually and | ) |
| as Personal Representative of the | ) |
| Estate of DOUGLAS OSTLING, | ) |
| deceased; JOYCE OSTLING; and | ) |
| TAMARA OSTLING, | ) No. 3:11-cv-05219 |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| CITY OF BAINBRIDGE ISLAND, a | ) |
| political subdivision of the State | ) |
| of Washington; JON FEHLMAN; and | ) |
| JEFF BENKERT, | ) |
| | ) |
| Defendants. | ) |


VIDEOTAPED DEPOSITION OF DAVID PORTREY

January 2, 2012

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square          2208 North 30th Street, Suite 202
600 University St.        Tacoma, WA 98403
Suite 2300                (253) 627-6401
Seattle, WA 98101         (253) 383-4884 Fax
(206) 340-1316            scheduling@byersanderson.com
(800) 649-2034            www.byersanderson.com.


Serving Washington's Legal Community since 1980

Page 2

```
 1                        APPEARANCES

 2
              For the Plaintiffs:
 3

 4                        Nathan P. Roberts
                          John R. Connelly, Jr.
 5                        Julie Kays
                          Connelly Law Offices
 6                        2301 North 30th Street
                          Tacoma, WA 98403
 7                        253.593.5100
                          253.593.0380 Fax
 8                        nroberts@connelly-law.com
                          jconnelly@connelly-law.com
 9                        jkays@connelly-law.com

10

11            For the Defendants:

12
                          Stewart A. Estes
13                        Keating, Bucklin & McCormack, Inc.
                          800 Fifth Avenue
14                        Suite 4141
                          Seattle, WA 98104
15                        206.623.8861
                          206.223.9423 Fax
16                        sestes@kbmlawyers.com

17

18            Also present:  Chad Reilly
                          Videographer, Byers & Anderson, Inc.
19                        Court Reporters & Video

20

21

22

23

24

25
```

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 11

1   A   -- basic -- basic patrol procedures.

2   Q   Okay.  As a reserve officer -- and then we'll get to the

3       provisional officer status in the moment -- do you -- are

4       you required to be familiar with the General Orders

5       Manual for the Bainbridge Island Police Department?

6   A   Yes.

7   Q   And are you familiar with that manual?

8   A   Yes.

9   Q   Are you also required to take an oath of office?

10  A   Yeah.

11  Q   Similar -- is it similar to that of a fully commissioned

12      officer?  Different?  The same?

13  A   It's the same.

14  Q   And you're familiar, too, with the -- the code of ethics

15      that's set forth in the General Procedures Manual for the

16      Bainbridge Island Police Department?

17  A   Yes.

18  Q   After the -- after graduating from the academy and then

19      your field training, as well, when was it -- what was

20      your status after that, graduating from the academy?

21  A   After graduating from the basic academy, I was hired on

22      as a provisional officer.

23  Q   And what year was that?

24  A   That was in 1996.  Yes, I believe it was 1996.

25  Q   Okay.  And then tell me about, what are the different --

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1        what's the difference in the responsibility of a

2        provisional officer as opposed to a reserve officer?

3    A   **My duties or responsibilities?**

4    Q   Mm-hm.

5    A   **My duties are that of a regular full-time police officer.**

6        **My responsibilities are -- are really no different.  If a**

7        **reserve were to respond to a call by himself, I could**

8        **respond to a call by himself -- by myself.**

9           **The duties of a reserve are limited to what they can**

10       **do just based on experience and -- whereas I've had**

11       **the -- the training, the field training.  At that point**

12       **when I became a provisional officer, I was equal to that**

13       **of a regular officer.**

14   Q   And for how long can one be a provisional officer?  Is it

15       indefinite?

16   A   **Overall, or --**

17   Q   Is it indefinite, or do you have to be reupped for

18       provisional office in some -- some capacity?

19   A   **I believe the -- I believe back in '96, it was a six-**

20       **month appointment.  And I believe the chief could request**

21       **an extension.**

22   Q   Approximately how long have you been -- whether it's

23       consistent or added up all together, how long have you

24       been a provisional officer?  How many months?  Years?

25                     MR. ESTES:  Objection to form.  Total

```
 1          years, or are you asking him to add up all the different

 2          months that he's served?

 3     Q    (By Ms. Kays)  I'm wanting to find out in total how

 4          many -- how many months and/or years you've been a

 5          provisional officer.

 6     A    I would have to guess.  A little over six years in total.

 7     Q    Was that six consistent years, or were there times where

 8          you were not granted a provisional status after having

 9          had it granted to you?

10     A    No, six total years over -- approximately six total years

11          within my 14 years as a reserve officer, I was a

12          provisional officer.

13     Q    And are those six consecutive years, one right after the

14          other?

15     A    No.  No.

16     Q    How many times has the chief asked to extend your

17          provisional appointment past the six-month period?

18     A    Which chief?

19     Q    You tell me.  How many chiefs have you had?

20     A    It would be four chiefs.

21     Q    Okay.  And why don't you give me the names of the four

22          chiefs, please.

23     A    Chief John Sutton, Chief Bill Cooper, Chief Matt Haney,

24          and Chief John Fehlman.

25     Q    How many times did Chief Sutton extend your provisional
```

```
 1        status?

 2   A    I'm not sure.

 3   Q    Okay.

 4   A    I don't -- yeah.

 5   Q    What about Chief Cooper?

 6   A    I believe it was twice.

 7   Q    And Chief Haney?

 8   A    Maybe two or three times.

 9   Q    And Chief Fehlman?

10   A    Once.

11   Q    What was the one time that he extended your provisional

12        status?  When was that?

13   A    It was, I believe, April of 2011.

14   Q    So he -- as of April of 2011, he wanted you to again

15        continue to be a provisional officer for another six

16        months?

17   A    I believe it was four months.

18   Q    Four months?  Okay.

19        Why are you not -- you said you're a reserve

20        officer, as you sit here today.  Correct?

21   A    Correct.

22   Q    Why are you no longer a provisional officer?

23   A    My extension was up, and I believe by civil service

24        rules, I can't exceed a certain amount of time in a one

25        calendar year.  So it's -- I'm limited to, I believe, a
```

```
 1    A   He just asked if -- if I'd be willing to stay on.

 2    Q   And how did you respond?

 3    A   I told him I would.

 4    Q   And how long did you -- did you remain in provisional

 5        status from April of 2011 forward?

 6    A   I believe it was August 31st.

 7    Q   Do you want to be a fully commissioned officer?

 8    A   Sometimes yes, sometimes no.

 9    Q   Why sometimes yes?

10    A   It can be a fun job.

11    Q   What makes it fun?

12    A   Friendships I have gained over the years; some of the

13        people I work with.

14    Q   Anything else?

15    A   Not off the top of my head, no.

16    Q   And I think you said "sometimes yes, sometimes no."

17        What's the "sometimes no" part?

18    A   It can be an incredibly taxing profession.

19    Q   How so?

20    A   You see a lot of things that you'd rather not see.

21    Q   Does anything in particular come to mind?

22    A   Dead bodies, horrific car accidents.

23    Q   Is there a reason why you have never applied -- or if you

24        have -- I should have started out that way:  Have you

25        ever applied to be a fully commissioned officer?
```

Page 17

1    A    Yes, I have.

2    Q    With the Bainbridge Island Police Department?

3    A    Yes.

4    Q    And when did you make that application?

5    A    I believe it was 1999, I believe.

6    Q    And was that application accepted or rejected?

7    A    It was accepted.

8    Q    It was accepted?

9    A    Yes, it was.

10   Q    And so in 1999, were you a fully commissioned officer?

11   A    No, I was not.

12   Q    What happened?

13   A    I -- I was a reserve officer.

14   Q    I thought you said that you were accepted to be a fully

15        commissioned officer in 1999.

16   A    They accepted my application.

17   Q    Okay.  And were you -- maybe we're talking about the same

18        thing; I'm just not being articulate enough.

19            They accepted your application, but did they say,

20        hey, we want you to come be a commissioned officer?

21            Do you understand what -- understanding what I'm

22        saying?

23   A    Yes, I do.

24   Q    Did they extend that position to you?

25   A    No, they did not.

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
1    Q   Do you know why?

2    A   They hired somebody else.

3    Q   And who was the person that they hired, if you know?

4    A   I can't recall.

5    Q   Was that the only time that you had applied to be a fully

6        commissioned officer with the Bainbridge Island Police

7        Department?

8    A   I believe I put an application in a year before that.

9    Q   And what happened in that instance?

10   A   My test scores on the written weren't high enough to, I

11       believe, make the list.

12   Q   And what's the -- what's the, I guess, baseline for your

13       written test score to make the list?

14   A   I don't know.

15   Q   Oh, come on.  You don't know?

16   A   I know I didn't score high enough to make the list.

17   Q   And what was your score?

18   A   They didn't tell me my score.

19   Q   They just let you shoot in the dark and -- and not know

20       what's going on?

21               MR. ESTES:  Objection to form.

22   A   I -- I don't know.  As far as I can recollect, it's not

23       like a classroom setting where they post a grade.

24   Q   (By Ms. Kays)  Okay.  In 1999, when you indicated that

25       someone else was hired instead of you by the Bainbridge
```

David Portrey
January 2, 2012

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 76

```
 1          where a possible subject is, as well, right?  I mean, are
 2          you -- when you fall back, are you losing sight where
 3          Mr. Ostling is?
 4     A    Yes.
 5     Q    Where Doug is?
 6     A    Yes.
 7     Q    You did?
 8     A    Yes.
 9     Q    When you hear the three shots, what are you seeing?
10     A    I'm looking up at the ceiling.
11     Q    Did you see where those shots or if any of those shots
12          struck Doug Ostling?
13                    MR. ESTES:  Objection.  Foundation.
14     A    I don't know at that point if the shots had struck
15          Mr. Ostling.
16     Q    (By Ms. Kays)  What's the next point where you're
17          actually looking in the direction of Doug Ostling, and
18          what do you see?
19     A    After I draw my handgun, I bring it back up to where Doug
20          was at with the ax, and I saw the door closed.
21     Q    And is this -- when you're up and you made your handgun
22          holding gesture there, is the door already shut by the
23          time you're back up?  In other words, are you seeing the
24          door open or shut when you look back at the doorway?
25     A    Well, I was never up, but when I drew my handgun and
```

**David Portrey**
**January 2, 2012**

```
 1          is something that I'm assuming that you refer to from

 2          time to time?

 3     A    From time to time, yes.

 4     Q    And with respect to dealing with mentally ill persons,

 5          what's your understanding of -- of the General Orders

 6          Manual on that?

 7     A    I am actually not familiar with -- with that section.

 8     Q    So you're not familiar with the basic principles and

 9          concepts that are set forth in there to -- as -- as to

10          how to deal with mentally ill persons?

11                    MR. ESTES:  Objection to the form.

12              If you have a specific policy provision, I guess you

13          could show it to him.

14     Q    (By Ms. Kays)  Go ahead and answer.

15     A    I am not.

16     Q    And is there any particular reason why you're not

17          familiar with that section of the Bainbridge Island

18          Police Department manual?

19     A    It's, for lack of better terms, a large manual and I'm

20          not -- I don't have everything memorized.

21     Q    What's your understanding of how you should, as an

22          officer, respond to mentally ill persons?

23                    MR. ESTES:  Objection to form.  Lack

24          of foundation.  Calls for speculation.

25     Q    (By Ms. Kays)  Go ahead.
```



EXHIBIT 4

1            UNITED STATES DISTRICT COURT

2           WESTERN DISTRICT OF WASHINGTON

3                  AT TACOMA

4   _____

    WILLIAM OSTLING, individually    )
5   and as Personal Representative   )
    of the Estate of DOUGLAS         )
6   OSTLING, deceased; JOYCE         )
    OSTLING; and TAMARA OSTLING,     )   3:11-cv-05219
7                                    )
                 Plaintiff(s),       )
8                                    )
         vs.                         )
9                                    )
    CITY OF BAINBRIDGE ISLAND, a     )
10  political subdivision of the     )
    State of Washington; JON         )
11  FEHLMAN; and JEFF BENKERT;       )
                                     )
12               Defendant(s).       )

13  _____

14           DEPOSITION UPON ORAL EXAMINATION OF

15              ROBERT O. CUMMINS, M.D.

16  _____

17                 10:07 A.M.

18               JANUARY 24, 2012

19         800 FIFTH AVENUE, SUITE 4141

20              SEATTLE, WASHINGTON

21

22

23

24

25  REPORTED BY:  PATSY D. JACOY, CCR 2348

```
 1              A P P E A R A N C E S

 2

 3     FOR THE PLAINTIFFS:

 4            NATHAN P. ROBERTS
              JULIE A. KAYS
 5            Connelly Law Offices
              2301 N. 30th Street
 6            Tacoma, WA 98403
              253.593.5100
 7            nroberts@connelly-law.com
              jkays@connelly-law.com
 8

 9     FOR THE DEFENDANTS:

10            STEWART A. ESTES
              Keating, Bucklin & McCormack, Inc., P.S.
11            800 Fifth Avenue, Suite 4141
              Seattle, WA 98104-3175
12            206.623.8861
              sestes@kbmlawyers.com
13

14     ALSO PRESENT:  NONE

15

16

17

18

19

20

21

22

23

24

25
```

1    right up here in the common femoral artery, there's the

2    branch of the superficial and the profundus or the

3    deep, and it kind of runs down.  So I don't think the

4    tract of the bullet hit the profundus, I think the main

5    artery is the superficial femoral that was hit.  And of

6    course it has branches, I mean there's this other --

7    there's the more detailed branching of the different

8    arteries I think.

9         Q.   Exhibit 3, would that be more helpful?

10        A.   I don't think so.

11        Q.   Maybe a combination of them?

12        A.   Yeah, a combination.  There's a lot of the

13   sort of secondary and tertiary branches of the three

14   that I've mentioned that are listed here.

15        Q.   And again, on Exhibit 3, could you continue

16   just circling whichever branches you believe were

17   involved.

18        A.   (Witness complying.)

19             It's interesting, that this femoral artery

20   here is not distinguished, it's -- it's not

21   distinguished from whether it's the deep or the

22   superficial.  This is the superficial, the one I

23   mentioned as being injured.

24        Q.   Okay.

25             MR. ROBERTS:   That's Exhibit 3 you were

```
 1                        EXAMINATION
 2    BY MR. ROBERTS:
 3        Q.   I want to ask just one follow-up question for
 4    the sake of clarity.
 5             Dr. Cummins, do you have an opinion on a more
 6    probable than not basis as to whether Doug Ostling
 7    would have survived and would have been in good health
 8    in the long term if he had been given access to basic
 9    EMS services within 25 minutes of his gunshot wounds?
10        A.   I think so.
11                  MR. ROBERTS:  Okay.  Thank you, that's
12    all I have.
13                  MR. ESTES:  I'll order.
14                  MR. ROBERTS:  Do you want to read,
15    Doctor?
16                  THE WITNESS:  Yeah.
17                  MR. ROBERTS:  And we'll reserve
18    signature then.
19                      (Deposition Exhibit 1 was
20                      marked for identification.)
21                      (Deposition concluded at 12:05 p.m.)
22                      (Signature was reserved.)
23
24
25
```



EXHIBIT 5

# BAINBRIDGE ISLAND POLICE
# GENERAL ORDERS MANUAL

## CHAPTER 11

## USE OF FORCE

**11.010  USE OF FORCE – LIMITATIONS**

Officers shall use only the amount of force necessary to effect the lawful purpose intended.  The use of force must be based on the level of resistance offered or threatened.

Whether on duty or off duty, all Department rules and regulations shall be followed concerning the use of force under the color of office.

Departmental personnel are authorized to carry and use authorized weapons in the performance of their official duties, in accordance with the Revised Code of Washington 9A.16.020 and 9A.16.040 and this manual.

**11.020  NON-DEADLY FORCE**

Non-deadly force lies between mere presence and deadly force.  It shall only be used to effect the lawful purpose intended.

A.      Officers shall use only the controlling techniques they have been taught in training and in the manner intended.  This includes the use of impact, control, less lethal and capture devices, plus chemical agents.

1.      Impact weapons such as batons and ASP batons used on duty must be Department authorized.
2.      Flashlights may only be used in a defensive manner.
3.      Less lethal devices may only be used after Department authorization and approved training.
4.      Chemical agents, such as Oleoresin Capsicum, used on duty must be approved and issued by the Department.  Chemical agents may be used to protect officers and citizens and to overcome resistance.  Officers shall complete department approved training prior to use.
5       The M26 & X26 Tasers are the only Department approved electronic control device.  Officers must successfully complete Department authorized training and qualifications prior to issuance or use.  Refresher training and qualifications must be passed annually.

**11.030  RENDERING AID AFTER USE OF FORCE**

After the use of any restraint technique or weapon, officers must determine any need for medical treatment and shall render or summon any aid needed.   After <u>EVERY</u> Taser application where the darts have penetrated the skin aid will be summoned to remove the probes.  Expended Taser darts will be handled as a biohazard and disposed of properly.  Photographs shall be taken of all use of force applications, preferably on site.

**11.040  DOCUMENTING USE OF FORCE**

The on-duty supervisor shall immediately be notified whenever any Officer discharges a firearm for other than training purposes, takes an action that results in or is alleged to have resulted in injury or death of another person, or applies force through the use of lethal or less-lethal weapons.

The use of physical force shall be documented by the utilizing officer by including this information within the narrative of their incident/investigation report.  The on-duty supervisor will review the report for

BAIN 07280



EXHIBIT 6

# BAINBRIDGE ISLAND FIRE DEPARTMENT - MEDICAL INCIDENT REPORT

AGENCY IDENTIFIER: 18D02

| INCIDENT LOCATION | | | DISPATCHED ALS ☐ | INCIDENT # | TODAY'S DATE |
|---|---|---|---|---|---|
| 7700 Springridge | 22 | AB BLS ☒ | 2107 | 10-26-10 |

**PATIENT INFO**

Ostline, Douglas

S) Dispatched @ 2101 to stage for BIPD, "shots fired multi injuries". BIFD staged on roadway, while staging PD st shots were fired and suspected has barricaded in upstairs, waiting for SWAT, FD advised to come into the scene @ 2219

O) pt fnd just behind door of apt @ top of skinny staircase pt sitting on the floor leaning against the wall/boxes, slumped to one side, large pool of blood noted under pt, obvious wound noted to ⊕ thigh, blood stained pants around wound, ∅ other obvious trauma noted pt had razor darts in his shirt.
pt unconc/unresponsive.
∅ pulse, ∅ respirations, skin pale, cyanotic, lips
EKG- asystole.

A) DOA

P) PE, EKG, minimal intervention due to apparent DOA time of death noted @ 2224, BIFD #73 only FD into the apt, all other FD stood by in garage or roadway

| TRANSPORTED TO ∅ | | MECHANISM | | TYPE | | NARRATIVE COMPLETED BY (SIGNATURE) | CERTIFICATION |
|---|---|---|---|---|---|---|---|
| TRANSPORTED BY ∅ | | G S | 5 0 2 | | | | PM |

| TIME | 2224 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Patient Position | ♀ | | | | | | | | | | | | | |
| Blood Pressure | / | / | / | / | / | / | / | / | / | / | / | / | / | / |
| Pulse Rate | ∅ | | | | | | | | | | | | | |
| Heart Rate (ECG) | | | | | | | | | | | | | | |
| Rhythm (ECG) | Asyst | | | | | | | | | | | | | |
| Respirations | ∅ | | | | | | | | | | | | | |
| Mental Status (GCS) | 3 | | | | | | | | | | | | | |
| Pulse Oximeter | | | | | | | | | | | | | | |

**PROCEDURES/SKILLS:**

| ☒ EXAM | ☐ BVM | ☒ ECG MONITOR | ☐ WOUND CARE | ☐ IV _____ cc. BY # _____ SITE _____ FLUID TYPE _____ AMT _____ cc |
|---|---|---|---|---|
| ☐ OXYGEN | ☐ SPLINT | ☐ 12 LEAD | ☐ BP/C-COLLAR | ☐ IV _____ cc. BY # _____ SITE _____ FLUID TYPE _____ AMT _____ cc |
| ☐ ORAL AIRWAY | ☐ C.P.R. | ☐ CARDIOVERSION | ☐ EXTRICATION ( TIME _____ ) | ☐ ETT _____ mm BY # _____ CONFIRMED W/ _____ |

| FIRST UNIT ON SCENE | ADDITIONAL UNITS | | | | PERSONNEL IN POV | FIRE REPORT ATTACHED ☐ |
|---|---|---|---|---|---|---|
| M21 | A21 | C21 | DC21 | | 44, 249 | |
| PERSONNEL | PERSONNEL | | | | PERSONNEL STANDING BY | |
| 73,83 | 86, 80, 128 | 12 | 2103 | | | |

| | TIMES OF (Taken from CAD) | Dispatched | En Route | On Scene | Depart Scene | At Destination | In Service | MUTUAL AID | | M.A. UNIT # | # OF PERS. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | TRANSFERRING UNIT (Taken from CAD) | 2101 | 2102 | 2108 | | | 2241 | GVM☐ RCVD☐ CXD ER☐ | | | |
| | MEDIC UNIT USED ON THIS RUN? | CALL TYPE (Per Protocol) | | PATIENT'S FINAL DISPOSITION | | BACKUP #8 USED ON THIS RUN? | | POLICE CASE #: | | TRAUMA BAND # | |
| | YES ☒ NO ☐ | ALS ☒ BLS ☐ | ALS ☐ BLS ☐ NO TX ☒ | | | YES ☐ NO ☒ | | | | | |
| | (BIC FOR OFF-ISLAND FIRE DEPARTMENT TRANSPORT ONLY) | | | | | FORM COMPLETED BY (PRINT) | | | | ROSTER # | DUTY OFFICER |
| | | | EU PM available? YES☐ NO☐ | | | D. Bailey | | | | 73 | |



EXHIBIT 7

# CURRICULUM VITAE

**Richard Oliver Cummins, M.D., M.P.H., M.Sc.**
**Emergency Medical Services**



## PERSONAL DATA



## EDUCATION

University of North Carolina, Chapel Hill, North Carolina, A.B., 1964-l968.
Case Western Reserve University School of Medicine, Cleveland, Ohio, M.D., l968-1972.
University of Washington, Seattle, Washington, School of Public Health and Community Medicine,
    M.P.H. in Health Services Research, l977-1979. (Robert Wood Johnson Clinical Scholar).
London School of Hygiene and Tropical Medicine, London, England, M.Sc. in Epidemiology, 1979-1981
    (Milbank Memorial Fund Scholar).

## POSTGRADUATE TRAINING

University of Virginia Internship, Medicine and Pediatrics, l972-1973.
National Health Service Corps; General Practice, Louisa, Virginia, l973-l975.
University of Virginia Hospital; Department of Medicine, Charlottesville, Virginia; Internal      Medicine
    Residency, 1975-1977

## FACULTY POSITIONS HELD

Professor, Department of Medicine, University of Washington; July 1, 1992 to present
Associate Professor, Department of Medicine, University of Washington, July 1, l985 to June 30, 1992.
Assistant Professor, Department of Medicine, University of Washington, 1981-1985.
Instructor, Department of Clinical Epidemiology and General Practice, Royal Free Hospital School of
    Medicine, London, England, l980-l981).
Instructor (on leave), Department of Medicine, University of Washington, 1979-1981.Acting Instructor,
    Department of Medicine, University of Washington, 1977-1979.

## HOSPITAL POSITIONS HELD

National Health Service Corps; Louisa, Virginia, l973-l975.
Attending Physician, Primary Care Center; Harborview Medical Center, Univ of Washington, l981-l982.
Attending Physician, Emergency Medicine Service; University Hospital, University of Washington, 1982-
    present.

## HONORS and AWARDS

John Motley Morehead Scholarship, University of North Carolina, 1964.
Phi Beta Kappa, University of North Carolina, l968.
Alpha Omega Alpha, Case Western Reserve University, l972.

CURRICULUM VITAE: RICHARD O. CUMMINS.

James Kindred Teaching Award, University of Virginia, l977.
Robert Wood Johnson Clinical Scholar, University of Washington
Milbank Memorial Fund Scholar, University of Washington, l979.
American Heart Association, Distinguished Service Award, Washington State ACLS Affiliate Faculty,
   Oct, 1990.
American Heart Association, Distinguished National Service Award, (ACLS National Chair); May 17,
   1994
American Heart Association, Volunteer of the Year Award, Washington State AHA Affiliate, July, 21,
   1994
American Heart Association, "Time, Feeling and Focus Award" National Volunteer Award, November
   18, 1994
American Heart Association:   *"National Award of Meritorious Achievement."*  (one of four given
   Nationally); June 21, 1995
Citizen CPR Foundation: *National Hans Dahll Award for Outstanding Contributions to the Field of ECC
   and CPR*; September, 2002
*Emergency Medicine Faculty: Clinical Teacher of the Year Award-2004.*  From the graduating residents
   in Emergency Medicine; UW/Madigan Army Medical Center EM Residency Program

**BOARD CERTIFICATION**
Diplomate of the American Board of Internal Medicine, June, l977 (#60678)
Diplomate of the American Board of Emergency Medicine (ABEM) ; July 15, 1996 to December, 2006 (#930960).
ABEM 10-year recertification: December, 2006 to December, 2016.

**LICENSURE**
Current:  State of Washington, l977; Number 252-09.
State of Virginia, l973;  Number 023835 (inactive).
United Kingdom, 1980 (inactive)

**PROFESSIONAL ORGANIZATIONS**
**Active:**
• Society for Academic Emergency Medicine
• National Association Emergency Medical Services Physicians
• American College of Emergency Physicians
• American Medical Association (Washington State)
• American Board of Internal Medicine (inactive)
**Past:**
• American College of Physicians
• American Heart Association
• American Medical Association
• American Public Health Association
• Society for Medical Decision Making

**EDITORIAL RESPONSIBILITIES (Past)**
• Associate Editor, Currents in Emergency Cardiac Care, American Heart Association, Dallas, TX; 1988-1999
• Associate Editor, Journal of General Internal Medicine; 1994-99
• Editorial Board, American Journal of Emergency Medicine; 1986-92
• Editorial Board, Prehospital and Disaster Medicine; 1986-90
• Editorial Board, Annals of Emergency Medicine; 1988-1993
• Advisory Panel, Journal American Medical Association  (Section on Concepts in Emergency and Critical Care);
   1985-90
• Advisory Panel, Journal American Medical Association  (Panel on Diagnostic & Therapeutic Technology
   Assessment);  1985-90

**JOURNAL PEER-REVIEW SERVICE (Past)**
• American Heart Journal
• American Journal of Emergency Medicine
• Annals of Emergency Medicine
• Canadian Medical Association Journal
• Chest
• Circulation
• Journal of the American Medical Association
• Journal of Chronic Diseases
• Journal of Emergency Medical Services
• Journal of Prehospital and Disaster Medicine
• Journal of General Internal Medicine
• New England Journal of Medicine
• Medical Decision-Making
• Resuscitation
• European Journal of Emergency Medicine
• Academic Emergency Medicine

**SPECIAL NATIONAL AND INTERNATIONAL RESPONSIBILITES (PAST)**
• Senior Science Editor; American Heart Association; Emergency Cardiovascular Care; Appointment: Dec, 1997
• Chairman, National Emergency Cardiac Care Committee; American Heart Association (Term runs 1996 to 1999)
• Member, American Heart Association National Oversite Committee, Task Force on Five-Year Business Plan
• Member, (1994-present) American Heart Association National Task Force on "Safety and Efficacy of Automated External Defibrillators"
• Vice-chairman,  National Emergency Cardiac Care Committee; American Heart Association; Dallas, Texas (1995-6)
• Chairman,  (1991-94) National Advanced Cardiac Life Support Subcommittee, American Heart Association.
• Liaison, (1992)  American Heart Association to the European Resuscitation Council
• Co-Chairman (1992)  International Liaison Committee on Resuscitation Guidelines in Emergency Cardiac Care (American Heart Association, European Resuscation Council, Australian Resuscitation Council, Resuscitation Councila of Southern Africa)
• StateCo-chairman (1992-93)  Washington State American Heart Association, ECC Committee
• Planning Committee.  American Heart Association National Fact-finding exercise.  Dallas, Texas; Sept 26-30, 1992
• Planning Committee.  American Heart Association National Guidelines Conference.  Dallas, Texas; February 22-26, 1992.
• Co-Chairperson, Emergency Cardiac Care '92 Update Conference; Seattle, Washington, April 9-11, 192.
• Member, National Advanced Cardiac Life Support Subcommittee, American Heart Association (1987-present)
• Member, National Emergency Cardiac Care Committee, American Heart Association
• Member, Board of Directors, Citizen's CPR Foundation.
• Co-Chairperson, Emergency Cardiac Care Update National Conference; Seattle, Washington, 1992.
• Co-Chairman, Utstein-II Conference on Recommended Guidelines for Uniform Reporting of Cardiac Arrest Outcome Data, December 9-11, 1991; Bagshot, Surrey, England.
• Chairman, Task Force on Automated Defibrillation Training and Education, Advanced Cardiac Life Support Subcommittee, American Heart Association

CURRICULUM VITAE: RICHARD O. CUMMINS.

- Member, Conference Planning Committee, 1992 National Conference on Guidelines for Emergency Cardiac Care and Cardiopulmonary Resuscitation, American Heart Association; Dallas, Texas.
- Chair, Committee on Emergency Medical Services Systems, 1992 National Conference on Guidelines for Emergency Cardiac Care and Cardiopulmonary Resuscitation, American Heart Association;
- Member, American Heart Association Council on Cardio-Pulmonary and Critical Care Medicine
- Scientific Advisor, First Vienna Congress on Sudden Cardiac Death; March 24-26, 1993
- Symposium Organizer, "Chain of Survival in Europe and America; First Vienna Congress on Sudden Cardiac Death; March 24, 1993
- Scientific Advisor, 6th World Congress on Disaster and Emergency Medicine; Hong Kong; 1989.
- Scientific Advisor, 7th World Congress on Disaster and Emergency Medicine; Montreal, 1991
- Symposium Organizer, Cardiology Session, 6th World Congress on Disaster and Emergency Medicine; HongKong; 1989.
- Symposium Organizer, Cardiology Session, 7th World Congress on Disaster and Emergency Medicine; Montreal, 1991
- Member, National Program Committee, Society for Academic Emergency Medicine; 1989 Annual Meeting; 1990 Annual Meeting.
- Member, Defibrillation Standards Committee, American Association for Medical Instrumentation.
- Member, Subcommittee on Standards for Automated External Defibrillators, American Association for Medical Instrumentation.
- Moderator, Scientific Papers Session, Society for Academic Emergency Medicine, 1989 Annual Meeting, 1990 Annual Meeting.
- Member, Center Devices and Radiologic Health National Committee on Defibrillator Use Problems (Chair, Subcommittee on Manuscript/Report Preparation).

**SPECIAL WASHINGTON STATE RESPONSIBILITIES (PAST)**
- State AHA ECC Committee member 1994- present
- EMS Task Force on EMS-No CPR Protocols 1992-1995
- State AHA ECC Committee Co-Chairman 1994 to 1995
- State AHA ACLS Committee Member
- Member, State AHA Board of Trustees
- Member, State AHA Research Committee

**UNIVERSITY, DEPARTMENTAL AND MEDICAL CENTER RESPONSIBILITIES (PAST)**
- Acting Director, UWMC Affiliated Residency Program in Emergency Medicine, University of Washington and Madigan Army Medical Center (
- Associate Director, Emergency Medical Services; University of Washington Medical Center.
- Senator, Department of Medicine to the Faculty Senate of the University of Washington (1989-1992)
- Member, University of Washington Medical Center, Quality Assurance Committee.
- Chairman, University of Washington Medical Center, Quality Assurance Committee. (1991-present)
- Member, Standing Committee: Introduction to Scientific Method in Science, School of Medicine.
- Member, Advisory Committee: Epidemiology Course for Medical Students
- Member, Medical Thesis Committee, School of Medicine.
- Member, Patient Care Information Subcommittee, Medical Care Information Systems Project, University of Washington Medical Center.
- Member, Quality Planning Council, University of Washington Medical Center
- Member, Physicians Focus Group on Quality Improvement, UWMC.

**RESEARCH FUNDING (PAST)**
1. Principal Investigator: "*The early use of transcutaneous pacing by emergency Medical technicians.*" Grant #HSO-5740-02 from the National Center for Health Services Research, Washington , D.C.

2.    Principal Investigator:  *"A controlled clinical trial of automated external defibrillators by Emergency Medical Technicians".*  Grant #HSO-5174 from the National Center for Health Services Research, Washington, D.C.

3.    Co-Principal Investigator: *"The use of automatic defibrillators by the companions and family members of high risk cardiac patients."* Grant #HSO-4894, from the National Center for Health Services Research, Washington, DC.

4.    Co-Principal Investigator: *"The development of a Center for the Evaluation of Emergency Medical Services"*, series of grants from the Asmund S. Laerdal Foundation (one for 3 years, and one for 5 years.)

5.    Co-Principal Investigator: *"Evaluation of a semi-automatic external defibrillators used by community responders, and family member of high risk patients".*  Grant from the Physio-Control Corporation, Redmond, Washington.

6.    Co-principal Investigator:  *"Evaluation of a solid state medical control module in a semi-automated external defibrillator".*  Grant from the Asmund S. Laerdal Foundation, Stavanger, Norway

7.    Laerdal Traveling Scholar Fellowship:  awarded 1991 from the Laerdal Foundation for Acute Medicine.  Support for Comparative evaluation of Emergency Medical Services in Europe.

8.    Principal investigator:  *"The use of automated external defibrillators for the treatment of in-hospital cardiac arrest."*  Grant support from the Physio-Control Corporation.

9.    Principal Investigator:  *"The ORCA Project:  Outcome Research in Cardiac Arrest."*  A multicenter, multidisciplinary project submitted to the Agency of Health Care and Policy Research.  (Submitted June 1, 1991 for funding to begin April l992). (Approved, Not funded)  Resubmitted June 1, 1992 (Approved  Not funded)

10.   Principal Investigator:  "A population-based registry of survivors of out-of-hospital cardiac arrest: interventions, quality of life and long-term survival" National Center, American Heart Association; Submitted July 1, 1992 for funding to begin July, 1993  [Not funded]

11.   Co-Principal investigator:  "Women and Sudden Cardiac Death:  epidemiology and survival". National Heart Lung and Blood Institute.  Submitted December, 1992 for funding to begin July 1, 1993. [Not funded]

12.   Principal investigator:  "The Quality of Survival following Out-of-Hospital Cardiac Arrest."  Seattle Medic One Foundation.  Approved:  September 23, 1993 ($40,000 for two years).

13.   Principal investigator:  "Survival from Out-of-Hospital cardiac arrest:  relationship between interventions and activity level and neuropsychological function in survivors."  Submitted July 1, 1993 to the National Grant-in-Aid program of the American Heart Association.  (Approved:  May, 1994; $150,000 over three years)

14.   Co-Principal investigator:  "Amiodarone used in refractory cardiac arrest due to VF in the Prehospital setting."  Seattle Medic One Foundation.  Approved:  October 4, 1993; $25,000 per year for three years)

15.   Co-Principal Investigator: Public Access Defibrillation Clinical Trial. National Heart Lung and Blood Institute. 1999-2004.

CURRICULUM VITAE: RICHARD O. CUMMINS.

# BIBLIOGRAPHY

## PEER-REVIEW JOURNALS

# 1978

1.  <u>Cummins RO</u>, Suratt PM, Horwitz.  Disseminated strongyloides stercoralis infection--association with ectopic ACTH  syndrome and depressed cell-mediated immunity.  Archives of Internal Medicine l978;138:1005-1006.

# 1980-1989

2.  <u>Cummins RO</u>, Smith RW, Inui TS.  Communication failure in primary care:  failure of consultants to provide follow-up information.JAMA  l980;243:1650-1652.

3.  <u>Cummins RO</u>, LoGerfo JP, Inui TS, Weiss NS.  High-yield referral criteria for post-traumatic skill roentgenography:  response of physicians and accuracy of criteria.  JAMA  l980;244:673-676.

4.  <u>Cummins RO</u>.  Clinicians' reasons for overuse of skull  radiographs.  Am J Roent l980;135:549-552.  (This article also appeared in the Am J Neuro Radiol 1980;1:339-342).

5.  <u>Cummins RO</u>.  Learning to Write. Can books help?  J Med Ed  l98l;56:128-132.

6.  Cummins RO, Jarman B, White PM.  Do general practitioners have different "referral  thresholds?"  Brit Med J  l981;282:1037-1039.

7   <u>Cummins RO</u>, Shaper AG, Walker M, Wales C.  Smoking and drinking by middle-aged British males:  Effects of social class and town of residence.  Brit Med J l981;283:1497-1502.

8.  Cook DG, <u>Cummins RO</u>, Bartley M, Shaper AG.  Health consequences of unemployment in middle-aged men in Great  Britain.  Lancet 1982;i:1290-1294.

9.  <u>Cummins RO</u>, Cook DG, Hume R, Shaper AG.  Tranquilizer use in middle-aged British males:  Association with smoking, drinking, and unemployment.  J Royal Coll Gen Pract l982;32:745-752.

10.  <u>Cummins RO</u>.  Recent  trends in salt consumption and stroke mortality:  Any help for the salt-hypertension debate?  J Epidemiology and Comm Med1982;32:745-752.

11.  <u>Cummins RO</u>, Eisenberg MS, Bergner L, Murray JA.  The sensitivity, accuracy and effectiveness of an automatic external defibrillator:  Report of a field evaluation by Paramedics.  Lancet 1984:ii:318-320.

12.  <u>Cummins RO</u>, Eisenberg MS, Bergner L, Hallstrom AP, Hearne T, Murray JA.  Automatic External Defibrillation:  Evaluations of effectiveness in the home and in emergency medical systems.  Ann Emerg Med  l984 (Part 2, Sept);13:798-801.

13.   <u>Cummins RO</u>, Knowles P.  Emergency Department advice telephone calls:  Who calls and why?  J Emergency Nursing 1984;10:283-286.

14.  Eisenberg MS, Hallstrom AP, Carter WB, <u>Cummins RO</u>, Bergner  L, Pierce J: Emergency CPR via telephone.  Am J of Public Health 1985;75:47-50.

15.    Cummins RO, Eisenberg MS.  Prehospital Cardiopulmonary   Resuscitation:  Is it effective?  JAMA 1985;253:2408-2412.

16.    Cummins RO, Eisenberg MS, Hallstrom AP, Litwin PE.  Survival of out-of-hospital cardiac arrest with early   initiation of cardiopulmonary resuscitation.  Am J of Emergency Medicine l985;3:114-118.

17.   Cummins RO, Eisenberg MS, Moore JE, Hearne TR, Andresen E, et al. Automatic External Defibrillators:  Clinical, training, psychological, and public health issues.  Ann Emerg Med 1985;14:755-7690.

18.   Cummins RO, Eisenberg MS, Hallstrom AP, Hearne TR, Graves  JR. What is a "save"?:  Outcome measures in clinical  evaluations of automatic external defibrillators.  Am Heart J 1985;110:1133-1138.

19.   Eisenberg MS, Bergner L, Hallstrom AP, Cummins RO.  Sudden cardiac death.  Scientific American l986;254:37-43.

20.    Eisenberg MS, Cummins RO.  Defibrillation performed by the emergency medical technician.  Circulation 1986;74(suppl  IV):IV-9-12.

21.    Eisenberg MS, Cummins RO, Litwin PE, Hallstrom AP. Out-of-hospital cardiac arrest:  significance of symptoms in patients collapsing before and after arrival of paramedics.  Am J Emerg Med 1986;4:116-120.

22.   Cummins RO, Eisenberg MS.  Automatic external  defibrillators: clinical issues for cardiology.  Circulation 1986;73:381-385.  (This article also appeared in Current Views from Circulation: editorials and perspectives, Sobel BE, ed. Monograph #127; Dallas, American Heart Association, 1987.)

23.    Eisenberg MS, Carter W, Hallstrom AP, Cummins RO, Litwin PE, Hearne TR.  Identification of Cardiac Arrest by Emergency Dispatchers.  Am J of Emerg Med 986;4:299-301.

24.    Moore JE, Eisenberg MS, Andresen E, Cummins RO, Hallstrom AP, Litwin PE.  Home placement of automatic external defibrillators among survivors of ventricular fibrillation.  Ann Emerg Med 1986;15:811-812.

25.    Cummins RO, Eisenberg MS, Austin D, Graves JR, Litwin PE.  Ventilation Skills of Emerg Medical Technicians:  a teaching challenge for emergency medicine. Annals Emerg Med 1986;15:1187-1192.

26.   Moore JE, Eisenberg MS, Cummins RO, Hallstrom AP, Litwin PE, Carter W.  Lay person use of automatic external defibrillation. Ann Emerg Med 1987;16:669-672.

27.    Cummins RO, Eisenberg MS, Litwin PE, Graves JR, Hearne TR, Hallstrom AP.  Automatic external defibrillators used by emergency medical technicians:  a controlled clinical trial. JAMA 1987;257:1605-1610.

28.    Cummins RO.  EMT-Defibrillation:  National Guidelines for Implementation.  Am J Emerg Med 1987;5(May):254-257.

29.  Litwin PE, Eisenberg MS, Hallstrom AP, Cummins RO.  Location of cardiac arrest and its effect on survival from cardiac arrest.  Annals Emerg Med 1987;16:787-791)

30.  Cummins RO, Stults KR, Haggar B, Kerber RE, Schaeffer S, Brown DD.  A new rhythm library for testing automatic external defibrillators:  performance of three devices. J Am Coll Cardiol 1988;11:597-602.

31.  Cummins RO, Chapman PM, Chamberlain DC, Schubach JA, Litwin PE. In-flight deaths during air travel:  how big is the problem?  JAMA 1988;259:1983-1988.

32.  Cummins RO.  Defibrillation.  Emergency Medicine Clinics of North America 1988 May;6(2):217-240

33.  Cummins RO, Austin DA, Jr., Graves JR, Hambley C.  An innovative approach to medical control: semi-automatic defibrillators with solid state memory modules for recording cardiac events.  Ann Emerg Med 1988;17:818-824.

34.  Cummins RO, Austin DA, Jr.  The frequency of "occult" ventricular fibrillation masquerading as a flat line in prehospital cardiac arrest.  Ann Emerg Med 1988;17:813-817.

35.  Hearne TR, Cummins RO.  Improved survival from cardiac arrest in the community.  PACE 1988 (Part II);11:1968-1973./

36.  Cummins RO, Schubach JA, Litwin PE, Hearne TR.  Training lay persons to use automatic external defibrillators:  success of initial training and one year retention of skills. Am J Emerg Med 1989;7:143-149.

37.  Eisenberg MS, Moore J, Cummins RO, Andresen E, Litwin PE, Hallstrom AP, Hearne T.  Use of the automatic external defibrillator in homes of survivors of out-of-hospital ventricular fibrillation.  Am J Cardiol 1989;63:443-446.

38.  Cummins RO, Schubach JA.  Frequency and types of medical emergencies among commercial air travelers.  JAMA 1989;261:1295-1299.

## 1990-1999

39.  Cummins RO, Haulman J, Quan L, Graves JR, Bilnowski W, Horan, S.  Near fatal yew berry overdose treated with transcutaneous pacing, and digoxin-specific antibodies.  Ann Emerg Med 1990;(Jan)19(1):38-43.

40.  Eisenberg MS, Horowitz R, Cummins RO, Hearne TR.  A tale of 29 cities:  cardiac arrest and resuscitation.  Ann Emerg Med 1990;(Feb)19(2):238-243.

41.  Cummins RO, Chesemore KD, White RD and the Defibrillator Working Group.   Defibrillator Failures:  causes of problems and recommendations for improvement.  JAMA 1990(Aug 22/29);264:1019-1025.

42.  Eisenberg MS, Cummins RO, Hearne TR, Damon SK, et al.  Survival rates from cardiac arrest: recommendations for uniform definitions and data to report.  Ann Emerg Med 1990;19(11)(Nov):1249-1259.

43.   Cummins RO, Thies W.   Automated external defibrillators and the Advanced Cardiac Life Support Program:  A new initiative from the American Heart Association (editorial).  Amer J Emerg Med 1991(Jan);9:91-93.

44.   Cummins RO, Ornato, JP, Thies, W, Pepe, PE, et al.  Improving survival from cardiac arrest:  the chain of survival concept.   Circulation 1991 May;83(5):1832-47.

45.   Cummins RO, Chamberlain DA, Eisenberg MS, Bossaert L, Holmberg S, et al.  The "Utstein Style": recommended guidelines for uniform reporting of data from out-of-hospital cardiac arrest. **Circulation** 1991 Aug;84(2):960-75.
   • (Note:  as the product of an international consensus conference this article was reprinted in **Annals of Emergency Medicine** 1991;20:861-874(August), **Resuscitation1991**;22:1-26(August).  An abridged version appeared in the **Br Heart J** 1992;67:325-33.  **Eur J Anaesthesiol** 1992;9(May):245-56
   • The article has been translated into German:  (Notfall. Empfehlungen zur einheitlichen Datenerfassung bei Herzstillstand-Teil I Der "Utstein-Style". (Translated by A. Schmidt and W. Dick).  **Notfallmedizin** 1991;17:510-518.  This German version was reprinted in **Intensivmedizin und Notfallmedizin**).
   • The article has been translated into French ("Recommendation pour une description uniforme des donnees concernant l'arret cardiaque extra-hospitalier:  le style d'Utstein" (Translated by Carli P, Riou B, Barriot P, Lambert Y).  **JEUR** 1991;4:202-223(European Journal of Emergencies)

46.   Cummins R, Chamberlain D. The Utstein Abbey and Survival from Cardiac Arrest:  what is the connection? Annals Emerg Med 1991;20(August):918-919.

47.   Eisenberg MS, Cummins RO, Larsen MP.  Numerators, denominators and survival rates:  reporting survival from out-of-hospital cardiac arrest.  Am J Emerg Med 1991 Nov,9(6):544-6.

48.   Quan L, Graves JR, Kinder DR, Horan S, **Cummins RO**.  Transcutaneous cardiac pacing in the treatment of out-of-hospital pediatric cardiac arrests.  Ann Emerg Med 1992;21:905-909.

49.   Brown CG, Martin DR, Pepe PE, Stueven H, Cummins RO, Gonzalez E and the Multicenter High-dose epinephrine study Groups.  A comparison of standard-dose and high-dose epinephrine in cardiac arrest outside the hospital.  New Engl J Med 1992;327:1051-5

50.   Cummins RO, Graves JR, Larsen MP et al.  The use of transcutaneous pacing for asystolic out-of-hospital cardiac arrest.  N Engl J Med 1993;328(May 17):1377-82

51.   Hoekstra, JW, Banks, JR, Martin DR, Cummins RO, Pepe PE, et al.  The Effect of First-responder automated defibrillation on time to therapeutic interventions during out-of-hospital cardiac arrest.  Annal Emerg Med 1993;22(Aug):1311-2

52.   Larsen MP, Eisenberg, MS, Cummins, RO.  Predicting Survival from out-of-hospital cardiac arrest:  a graphical model.  Ann Emerg Med 1993(Nov);22:1652-1658.

53.   Martin DR, Gavin T, Bianco J, Brown CG, Stueven H, Pepe PE, Cummins RO, Gonzalez E, Jastremski M.  Initial countershock in the treatment of asystole.  Resuscitation 1993;26:63-68.

53A.Cummins, RO.  La "cadena de sobrevida": un concepto que puede salvar vidas.  Enero 1993:1:45-47.

54. Martin DR, Soria DM, Brown CG, Pepe PE, Gonzalez E, Jastremski M, Stueven H, <u>Cummins RO.</u> Agreement between paramedic-estimated weights and subsequent hospital measurements in adults with out-of-hospital cardiac arrest.  Prehospital and Disaster Medicine 1994; 9:54-7

55. Martin DR, Mill J, Brown CG, Pepe PE, Gonzalez E, Jastremski M, Stueven H, Cummins RO. Outcome of insulin-treated diabetics receiving epinephrine during cardiac arrest.  Am J Emerg Med 1994 Mar 12(2). P. 147-50.

56. Dull S, Graves JR, Larsen MP, Horan S, <u>Cummins RO</u>.  Expected Death and unwanted resuscitation in the prehospital setting.   Ann Emerg Med 1994;23(5):997-1002.

57. Zaritsky AR, Nadkarny V, <u>Cummins RO</u>, Hazinski MF et al.  The Utstein style for reporting outcome data for Pediatric Resuscitation.  Circulation 1995;92(Oct 1):2006-2026, Pediatrics 1995;96(4):765-779, Annals of Emergency Medicine, Resuscitation (simultaneous publication)

58. Appleton GA, <u>Cummins RO</u>, Larsen MP, Graves JR.  CPR and the Single Rescuer:  Should they Call First? or Call Fast?  Annals of Emergency Medicine 1995;25(No 4; April):492-494

59. Biros MH, Lewis RJ, Olson CM, Runge JW, Cummins RO, Fost N.  Informed Consent in Emergency Research:  Consensus Statement from the Coalition Conference of Acute Resuscitation and Critical Care Researcher.  JAMA 1995;273:1283-1287 (April 26).

60. Idris A, Becker L, Ornato, JP, Hedges, JR, Bircher, NG Chandra, NC, Cummins, RO, Hazinski, MF et al Utstein-Style Guidelines for Uniform Reporting of Laborartory CPR Research: A Statement for Healtcare Professionals. Circulation 1996;94(Nov)2324-2336 (also jointly published in: Annals of Emergency Medicine, Resuscitation 1996;33:69-84 (Circulation 1996;94:2324-2336 (November 15, 1996)

61. Benson D, Klain M, Braslow A, Cummins R, Grenvik A, Herlich A, et al.  Future Directions for resuscitation research. I. Advanced airway control measures.  Resuscitation 1996;32:51-62.

62. Kerber RE, Becker LB, Bourland JD, Cummins RO, Hallstrom AP et al. Automatic external defibrillators for public acces defibrillation:  recommendations for specifying and reporting arrhythmia analysis algorithm performance, incorporatiing new waveforms, and enhancing safety. Circulation 1997;95:1677-1682.

63. <u>Cummins RO</u>, Chamberlin D, <u>Hazinski MF,</u> Nadkarni V, Kloeck W et al.  Recommended Guidelines for Reviewing, Reporting, and Conducting Research on In-hospital Resuscitation:  the In-Hospital "Utstein Style".  Circulation 1997;95:2213-2239.  (Joint publication in Annals of Emergency Medicine 1997;29:650-679).

64. <u>Cummins RO</u>, Sanders A, Mancini E, Hazinski MF. In-hospital resuscitation: executive summary. Ann Emerg Med. 1997 May;29(5):647-9.

65. <u>Cummins RO</u>. Human research on cardiopulmonary resuscitation: current constraints on implementation. New Horiz. 1997 May;5(2):120-7. Review.

66.. <u>Cummins RO</u>, Hazinski MF, Kerber RE, Kudenchuk P, Becker L, Nichol G, Malanga B, Aufderheide TP, Stapleton EM, Kern K, Ornato JP, Sanders A, Valenzuela T, Eisenberg M.  Low-energy biphasic waveform defibrillation: evidence-based review applied to emergency cardiovascular care guidelines: a statement for healthcare professionals from the American Heart Association Committee on

Emergency Cardiovascular Care and the Subcommittees on Basic Life Support, Advanced, Cardiac Life Support, and Pediatric Resuscitation.  Circulation. 1998 Apr 28;97(16):1654-67.

67.   Jerin JM, Ansell BA, Larsen MP, Cummins RO. Automated external defibrillators: skill maintenance using computer-assisted learning.  Acad Emerg Med. 1998 Jul;5(7):709-17.

68.   Cummins RO, Hazinski MF. The next chapter in the high-dose epinephrine story: unfavorable neurologic outcomes? Ann Intern Med. 1998 Sep 15;129(6):501-2.

69.   Cummins RO, Hazinski MF. Resuscitations from pulseless electrical activity and asystole: how big a piece of the survivors' pie?  Ann Emerg Med. 1998 Oct;32(4):490-2.

70.   Kloeck W, Cummins RO, Chamberlain D, Bossaert L, Callanan V, Carli P, Christenson J, Connolly B, Ornato JP, Sanders A, Steen P. [Special situations in resuscitation]. Arq Bras Cardiol. 1998 Dec;71 Suppl 1:29-42. Portugese.

71.   Kloeck W, Cummins RO, Chamberlain D, Bossaert L, Callanan V, Carli P,Christenson J, Connolly B, Ornato JP, Sanders A, Steen P. [Early defibrillation]. Arq Bras Cardiol. 1998 Dec;71 Suppl 1:17-8. Portugese.

72.   Cummins RO, Hazinski MF. Apples and oranges. Ann Emerg Med. 1999 May;33(5):602-3.

73.   Cummins RO.Why are researchers and emergency medical services managers not using the Utstein guidelines? Acad Emerg Med. 1999 Sep;6(9):871-5.

74.   Kudenchuk PJ, Cobb LA, Copass MK, Cummins RO, Doherty AM, Fahrenbruch CE, Hallstrom AP, Murray WA, Olsufka M, Walsh T.  Amiodarone for resuscitation after out-of-hospital cardiac arrest due to ventricular fibrillation.  N Engl J Med. 1999 Sep 16;341(12):871-8.

75.   Cummins RO, Hazinski MF. Cardiopulmonary resuscitation techniques and instruction: when does evidence justify revision? Ann Emerg Med. 1999 Dec;34(6):780-4.


## 2000-2009

76.   Cummins RO, Hazinski MF. Guidelines based on fear of type II (false-negative) errors : why we dropped the pulse check for lay rescuers. Circulation. 2000 Aug 22;102(8 Suppl):I377-9.

77.   Cummins RO, Hazinski MF. Guidelines based on fear of type II (false-negative) errors. Why we dropped the pulse check for lay rescuers. Resuscitation. 2000 Aug 23;46(1-3):439-42. Review.

78.   Cummins RO, Hazinski MF. The most important changes in the international ECC and CPR guidelines 2000. Circulation. 2000 Aug 22;102(8 Suppl):I371-6.

79.   Cummins RO, Hazinski MF. The most important changes in the international ECC and CPR guidelines 2000.  Resuscitation. 2000 Aug 23;46(1-3):431-7.

80.   Cummins RO, Hazinski MF.Guidelines based on the principle "first, do no harm" : new guidelines on tracheal tube confirmation and prevention of dislodgment. Circulation. 2000 Aug 22;102(8 Suppl):I380-4.

**81.** Cummins RO, Hazinski MF. Guidelines based on the principle 'First, do no harm'. New guidelines on tracheal tube confirmation and prevention of dislodgment. Resuscitation. 2000 Aug 23;46(1-3):443-7. Review.

82. Chamberlain DA, Hazinski MF and **Writing Group from the American Heart Association**, European Resuscitation Council, and the International Liaison Committee on Resuscitation. *Education in Resuscitation.* Resuscitation 2003;59:11-43.

83. Ornato JP, McBurnie MA, Nichol G et al. and the **Public Access Defibrillation Trial Investigators**. *The Public Access Defibrillation (PAD) Trial:  study design and rationale*. Resuscitation 2003;56:135-47.

84. Mosesso VN HJr. Brown LH, Greene HL, et al and the **Public Access Defibrillation Trial Investigators**.  *Conducting research using the emergency exception from informed consent: the Public Access Defibrillation Trial experience*. Resuscitation 2004;61:29-36.

85. Sayre MR, Travers AH, Daya M, Greene HL, Salive ME, et al and the **Public Access Defibrillation Trial Investigators**. *Measuring survival rates from sudden cardiac arrest:  the elusive definition*. Resuscitaion 2004;62:25-34.

86. The **Public Access Defibrillation Trial Investigators**.  Public-Access Defibrillation and Survival after Out-of-Hospital Cardiac Arrest. N Engl J Med 2004;351:637-46.

87. Cummins RO, Chamberlain D, Montgomery WH, Kloeck WGJ, Nadkarni V. International Collaboration in Resuscitation Medicine **Circulation** 2006;113:1260-1270).

88. Aufderheide T, Hazinski MF, Nichol G, Cummins, RO, et al.  Community Lay Rescuer Automated External Defibrillation Programs: Key State Legislative Components and Implementation Strategies A Summary of a Decade's Experience for Healthcare Providers, Policymakers,Legislators, Employers and Community Leaders. **Circulation** 2006;113:1260-1270


## BOOKS

1. Cummins,RO, Eisenberg MS (eds):  The Blue Book of Medical Diagnosis.  Philadelphia; WB Saunders, l985.

2. Cummins RO, Graves JR, Austin D, Jr:  RapidZap!  Automatic Defibrillation by Emergency Medical Technicians.  Brady Training Publications.  Englewood Cliffs, N.J.: 1989

3. Eisenberg MS, Cummins RO, Ho M (eds):  Code Blue:  CardiacResuscitation.  WB Saunders and Company.  Philadelphia; 1986.

4. Cummins RO, Editor; and the members of the National ACLS Subcommittee.  The 1994 Textbook of Advanced Cardiac Life Support.  American Heart Association, 1994; Dallas Texas.

4. Cummins RO, Editor; and the members of the National ACLS Subcommittee.  Handbook of Algorithms and Drugs for Advanced Cardiac Life Support.  American Heart Association, 1993; Dallas Texas.

5. Billi JA and Cummins RO, editors, Instructors Manual of Advanced Cardiac Life Support.  American Heart Associations; 1994; Dallas, Texas

6.   Cummins, RO and Graves JR.  ACLS Scenarios: core-concepts for case-based learning.  St Louis; Mosby Publishers; 1994.

7.   Cummins RO, Editor; and the members of the National ACLS Subcommittee.  The 1997-99 Textbook of Advanced Cardiac Life Support.  American Heart Association, 1994; Dallas Texas.

8.   Hazinski MF, Cummins RO.  The AHA 1995 (2nd edition)  Handbook of Emergency Cardiac Care: BLS, ACLS, PLS.  American Heart Association; 1995, Dallas, Texas.  Later editions:
     3rd Edition--1997;
     4th Edition--1999;
     5th Edition—2000

9.   Cummins RO, editor;  2001 Instructors Manual of Advanced Cardiac Life Support.  American Heart Associations; 2001; Dallas, Texas

10.  Cummins RO, Hazinski, MF.  The ACLS-2001 Provider Manual. American Heart Association; 2001; Dallas, Texas

11.  Cummins RO; Editor. The ACLS-for Experienced Providers' Instructor's Toolkit. 1999; American Heart Association; Dallas, Texas.

12.  Cummins RO, Editor; and the members of the National ACLS Subcommittee.  ACLS—the Reference Textbook: vol 1—ACLS Principles and Practice; vol-2—ACLS for Experienced Providers. Dallas, TX;  American Heart Association publisher; 2003 (ISBN numbers 0-87493-341-2 and 0-87493-424-9). AHA catalog number 70-2500 (1 of 2 and 2 of 2); 4/03.

***Above AHA publications can be ordered from the following distributors: Channing Bete Company (www.channing-bete.com); Laerdal Medical Corporation (www.laerdal.com); WorldPoint ECC, Inc. (www.worldpoint-ecc.com)***


**BOOK CHAPTERS**

1.   Graves JR, Cummins RO:  "Defibrillation by Emergency Medical Technicians:  A review".  In Hafen BQ, Karren KJ (eds) Prehospital Emergency Care and Crisis Intervention:  EMT-Review.  2nd ed. Englewood, Colorado; Morton Publishing  Company; 1983.  Denver, Colorado.

2.   Cummins RO. "Options to shorten time to definitive care" in: Sudden death in the    Community. Eisenberg, MS, et al (eds):  traeger Scientific Press, 1984.

3.   Cummins RO, Graves JR:  "Defibrillation by Emergency Medical Technicians".  In: Heckman JD, Rosenthal RE, et al (eds),  Emergency Care and Transportation of the Sick and Injured, 4th ed, Park Ridge, Illinois; American Academy of Orthopedic Surgeons; 1987:572-586.

4.   Cummins RO, Graves JR Clinical Results of Standard CPR:  Out-of-hospital and In-hospital.  In McKaye W, Bircher N, eds.  Advances in Cardiac Resuscitation.  pp. 87-102. New York, Churchill Livingstone, 1988.

5.   Cummins RO.  "Epidemiology of Sudden Death Outside the Hospital:  Implications for prehospital emergency medical systems".  In:  Progress in Clinical Pacing.  Eds Santini M, Pistolese M, Alliego A.  Current Clinical Practice Series 51.  Amsterdam; Excerpta Medica; 1988:329-342

6. Cummins RO. "Cardiac Arrest during Commercial Air Travel" in Chapman PJC, .Medical Emergencies during Commercial Air travel. Churchill, Livingstone; London, 1989.

7. Cummins RO, Graves JR. "Sudden Cardiac Arrest", in Rakel RE, ed. Conn's Current Therapy. WB Saunders; Philadelphia, 1990.

8. Cummins RO. "Traveling in Poor Health: cardiopulmonary health problems during commercial air travel" in Jong EC (eds) Health Advice for Travelers' Health Alert. American Health Consultants. 1990. Atlanta Georgia.

9. Cummins RO. "Automated External Defibrillation" in Textbook of Advanced Cardiac Life Support, 3rd edition; American Heart Association; Dallas, Texas,1990

10. Cummins RO. "Dementia", In: The Blue Book of Medical Diagnosis. Cummins RO,      Eisenberg MS (eds): Philadelphia; WB Saunders, l985.

11. Cummins RO. "Acid-Base Problems", In: IBID.

12. Cummins RO. "Mononucleosis", In: IBID.

13. Cummins RO. "Monoarticular Arthritis", In: IBID

14. Cummins RO. "Systemic Lupus Erythematosus", In: IBID.

15. Cummins RO. "Progressive Systemic Sclerosis", In: IBID.

16. Cummins RO. "Spondylarthropathies", In: IBID.

17. Cummins RO. "Anemia", In: IBID.

18. .Cummins RO: "Ankle Injuries". In: IBID.

19. Cummins RO: "Initial  assessment of trauma patients". in: IBID

20. Cummins RO. "Knee Injuries". In: Eisenberg MS, Copass M,  eds, Emergency Medical Therapy, 3rd edition. Philadelphia, WB Saunders, 1987.

21. Cummins RO: "Basic Cardiopulmonary resuscitation".  In: Eisenberg MS, Cummins RO, Ho M (eds): Code Blue: Cardiac Resuscitation. WB Saunders and Company. Philadelphia; 1987.

22. Cummins RO: "Transcutaneous cardiac pacing"  In: IBID.

23. Cummins RO: "Defibrilllation", In: IBID.

24. Cummins RO: "Airway management techniques", In: IBID

25. Cummins RO, Graves JR. Prehospital Cardiac Care: European and American perspectives. In Skinner D. Swain A, Peyton R, Robertson C. Cambridge textbook of Accident and Emergency Medicine. Cambridge; Cambridge University Press; 1997

26.     Cummins RO, Chamberlain D. Consensus Development in Resuscitation:  the growing movement toward international emergency cardiac care guidelines.  In Cardiac Arrest:  the Science and Practice of Resuscitation Medicine.  Ed by Paradis NA, Halperin HR, Nowak RM. Williams & Wilkins; Philadelphia; 1996; 935-951

27.     Cummins RO, Field J.  "Acute Coronary Syndromes" in Textbook of ACLS. Dallas; American Heart Association; 1997

28.     Cummins RO, Hazinski MF.  Public Access to Defibrillation:  Response to Emergencies at Athletic Events--Economic, Training, and Cost Implications. In Estes NAM, Salem DN, Wang PJ (eds). Sudden Cardiac Death in the Athlete. Armonk, NY: Futura Publishing Co., Inc.; 1998: 189-204


**OTHER PUBLICATIONS—PEER REVIEW JOURNALS**

1.     <u>Cummins</u> RO.  A Yank Reads for Pleasure.  Brit Med J l982;284:105-106.

2.     <u>Cummins RO</u>.  Review of Emergency Medicine:  <u>Concepts and Clinical Practice</u> by Peter Rosen et al, l983.  In JAMA l983;250:3233.

3.     <u>Cummins RO</u>.  Review of <u>Current Emergency Diagnosis and Treatment</u>, by John Mills, Donald Trunkey, Mary Ho, l983.  In JAMA l984;252:2408.

4.     <u>Cummins RO</u>.  Review of <u>Current Emergency Procedures</u>, by James R. Roberts and Jerris Hedges, 1984.  In JAMA 1985;254:2477.

5.     <u>Cummins RO</u>.  Review of Flint's <u>Emergency Treatment and Management</u>, edited by Harvey D. Cain, 1985.  In JAMA 1986;255:1943-1944.

6      <u>Cummins RO</u>.  Review of <u>Principles and Practice of Emergency Medicine</u>, edited by George R. Schwartz et al, 2nd ed, 1986.  In JAMA 1987;257:2096.

7.     <u>Cummins RO</u>.  Review of <u>Emergency Medicine:  Concepts and Clinical  Practice</u>    (2nd edition), by Peter Rosen et al, l987.  In JAMA l988;259:2321

8.     <u>Cummins RO</u>.  Cardiac Arrest: Lessons from the Fifth Purdue Conference on CPR and Defibrillation (editorial).  Am J of Emergency Medicine l985;3:171-173.

9.     <u>Cummins RO</u>. Cardiopulmonary resuscitation and sudden cardiac death.  An annotated bibliography of the 1984 literature. Am J of Emerg Med 1985;3:485-493.

10.    Eisenberg MS, <u>Cummins RO</u>.  Termination of CPR in the prehospital arena.  Ann Emerg Med 1985;14:1106-1107.

11.    <u>Cummins RO</u>.  Eisenberg MS.  Cardiopulmonary resuscitation--American Style. Br Med J 1985;291:1401-1403.

12.    Eisenberg MS, <u>Cummins RO</u>.  Automatic external  defibrillation: Bringing it home.  Am J Emerg Med 1985;3:568-569.

13.    Cummins RO.  Interhospital transfer of acutely ill cardiac patients  JAMA 1988;259:1707-1708.

14. Cummins RO, Crowell R, Shao X.  Emergency Medicine in China--1987.  Annals Emerg Med 1988;17:1069-1073.

15. Cummins RO.  High-altitude flights and risk of cardiac disease. JAMA 1988;260:3668-3669.  (Q and A section).

16. Cummins RO.  Infection control guidelines for CPR  Providers.  JAMA 1989;262(Nov 17):2732-2734.

17. Cummins RO.  From Concept to Standard-of-Care?  A review of the clinical experience with automated external defibrillators.  Ann Emerg Med 1989;(Dec)18:1269-1275.

18. Cummins RO.  Expanding the use of automatic external defibrillators to home and community.  West J of Med 1987;146:609.

19. Cummins RO.  Decision analysis, the Journal of General Internal Medicine, and the General Internist (editorial).  J Gen Int Med 1990;5:June-July :512-514

20. Cummins RO, Eisenberg MS.  From pain to reperfusion:  what role for the 12-lead ECG?  Annals Emerg Med 1990(Nov);19:1343-1345.

21. Cummins RO, Ornato J, Thies W et al.  Encouraging Early defibrillation:  the American Heart Association and automated external defibrillators.   Ann Emerg Med 1990(Nov);19:1245-1248.

22. Cummins RO.  Getting ready for the 1992 National Conference on ECC and CPR.  Am J Emerg Med 1991;9:295(May)

23. Cummins RO, Chamberlain DA.  The Utstein Abbey and survival from cardiac arrst:  what is the connection?  Ann Emerg Med 1991 Aug;20(8):918-9.

24. Cummins RO.  Matters of Life and Death:  conversations between doctors and terminally ill patients.  (Editorial).  J Gen Int Med 1992;7(Sep-Oct):475-480

25. Cummins RO.  CPR as a Medical intervention (Editorial).  J Am Board Fam Practice 1993;6(Mar-Apr):137-141

26. Cummins, RO.  Guidelines for cardiopulmonary resuscitation and emergency cardiac care, II:  Adult Advanced Cardiac Life Support.  JAMA 1992;268:2199-2241

27. Cummins, RO.  Emergency Medical Services and Sudden Cardiac Arrest:  The "Chain of Survival" Concept.  Annu Rev Publ Health 1993;14:313-333

28. Chamberlain D, Cummins RO.  International emergency cardiac care:  support, science, and universal guidelines.  Ann Emerg Med 1993;22(Feb Part 2):508-11

29. Cummins RO.  Moving towards uniform reporting and terminology. Proceedings of the Methodology in Cardiac Arrest Research Symposium.  Annals of Emerg Med 1993:22:33-36

30. Cummins RO.  The Utstein Style for uniform reporting of data from out-of-hospital cardiac arrest.  Proceedings of the Methodology in Cardiac Arrest Research Symposium.  Annals of Emerg Med 1993;22:37-40

31. Cummins RO.  "Code Magic" for A Piece of my Mind.  JAMA 1993;269:3076

32. Cummins RO.  Code Smoke.  Annals of Emerg Medicine 1994;24(2):298

33. Cummins RO.  Red Lips and Painted Toenails.  Journal of General Internal Medicine 1994; May Issue: pp.

34. Cummins RO.  "Witnessed Collapse and bystander CPR:  what is really going on?" (editorial).  Academic Emergency Medicine 1995;2(6):

35. Cummins RO.  "CPR and Ventricular Fibrillation:  Lasts Longer, Ends Better " (editorial) Annals of Emerg Med 1995; 25(June): 833-836.

36. Cummins RO, White RD, Pepe PE.  "VF, AEDs and the FDA:  Confrontation without comprehendsion" Annals Emerg Med 1995;26(Nov): 621-631

37. Thompson W, Bellamy R, Cummins, RO et al.  Funding Resuscitation Research.  Crit Care Med 1996;24(2(Suppl)):S90-S94

38. Cummins RO.  Human Research on CPR:  current constraints on implementaion.  New Horizons 1997;5(2):120-127

39. Cummins RO, Sanders A, Mancini E, Hazinski MF.  In-hospital Resuscitation:  Executive Summary.  Annals Emerg Med 1997;29:647-649 (also published in Circulation 1997;95:2172-2173 (April 15, 1997)

40. Cummins RO, Hazinski MF.  The next chapter in the high dose epinephrine debate:  Unfavorable Neurologic Outcomes? Annals Internal Medicine 1998;129 Sept 15 Issue

41. Cummins RO, Hazinski MF. Resuscitations from pulseless electrical activity and asystole:  how big a piece of the survivors' pie? Annals Emerg Med 1998;32:490-492(Oct)

42. Cummins RO. Review of An Introduction to Clinical Emergency Medicine: Guide for Practitioners in the Emergency Department, edited by Mahadevan SV, Garmel GM.  New York: Cambridge University Press; 2005.  In Annals of Int Med 2006;144(3):226-227

43. Cummins RO, Hazinski MF.  The Quest for a Terminator.  Annals Emerg Med 2006;47(3):227-229

---

## OTHER PUBLICATIONS:  NON-PEER REVIEW JOURNALS

1. Cummins RO, Eisenberg MS.  EMT-Defibrilllation:  A proven concept.. Emergency Cardiac Care:  National Faculty Newsletter.  American Heart Association.  l984;1(#4, Oct):1-3.

2. Eisenberg MS. Carter WB, Cummins RO, Bergner L:  Dispatcher CPR Instruction via telephone.  Emergency Cardiac Care:  National Faculty Newsletter.  American Heart Association. 1985;2(#5 March):1-2.

3. Pierce J, Wendt R, Andresen E, Hearne TR, Eisenberg MS, Cummins RO, Litwin PE, Hallstrom A.  Automatic External Defibrillation:  Lay person use in the home.  J Emer Med Services 1986;11:58-60.

4.     Cummins RO: Is EMT-D right for you?  Cummins RO.  Current status of EMT-D.  In:  Making EMT-D Work:  Proceedings from the University of Iowa Workshop.  Part I.  J Emerg Medical Services 1986;11:26-31.

5.     Cummins RO.  Medical Control.  Cummins RO, Graves JR, Stults KR:  The coming of automatic external defibrillation.  In Making EMT-D Work:  Proceedings from the University of Iowa Workshop.  Part 2.  J Emerg Medical Services 1986;11:50-56.

6.     Cummins RO,  Eisenberg MS, Graves JR, Austin D, Damon S. EMT-Defibrillation.  Part 3: Achieving Medical Control.  J Emerg Medical Services 1985;10:48-53.

7.     Eisenberg MS, Cummins RO.  Latest advances in defibrillation. Resident and Staff Physician. 1986;32(6):3pc-6pc

8.     Stults KR, Cummins RO.  Choosing between fully automatic or shock advisory external defibrillators.  J Emerg Med Services 1987;12:71-73.

9.     Cummins RO,  Austin DA, et al.  Training Curriculum for EMT-Defibrillation Programs using standard manual defibrillators.  Olympia, Washington State Emergency Medical Services Department, 1986.  (Copyright King County EMS Division, Department of Public Health).

10.    Cummins RO,  Austin DA, et al.  Training Curriculum for EMT-Defibrillation Programs using automatic external defibrillators.  Olympia, Washington State Emergency Medical Services Department, 1986.  (Copyright King County EMS Division, Department of Public Health).

11.    Cummins RO, Hazinski MF.  "Who Better to Implement Public Access Defibrillation than EMS Physicians and Directors?" Editorial. National Association of EMS Physicians Newsletter. July, 1998; page 13. Chicago; National Association of EMS Physicians

12     Cummins RO.  Editorial commentary on Swor RA, Krome RL.  Administrative support of emergency medical services medical directors:  a profile. Prehospital and Disaster Med 1990;5:30 (Jan-March).

13.    Cummins RO.  The "Chain of Survival Concept:  how it can save lives. Heart Disease and Stroke 1992;1(Jan/Feb):43-45

14.    Viderol, N.  "The Defender of Defib".  Emergency: the Journal of Emergency Services. 1993(Feb);25(2):20-23 (profile of Cummins with interview)

15.    Cummins RO.  The 1992 ACLS Guidelines:  what's new?  What's different?  Coronary Acute Care; Cahners Publishing Company; March, 1993

16.    Cummins RO.  Automated external defibrillators:  where we've been and where we're going. Resident and Staff Pnysician 1994;40(Jan):61-67.

---

## Published Abstracts of Scientific Research

These number more than 50.  Available upon need and request.  Most eventually appeared as publications in peer-reviewed journals and are accessible through the published article.



EXHIBIT 8

```
                  UNITED STATES DISTRICT COURT

                WESTERN DISTRICT OF WASHINGTON

                        AT TACOMA


WILLIAM OSTLING, individually and    )
as Personal Representative of the    )
Estate of DOUGLAS OSTLING,           )
deceased; JOYCE OSTLING; and         )
TAMARA OSTLING,                      )
                                     )
                  Plaintiffs,        )
                                     )
            vs.                      ) No. 3:11-cv-05219
                                     )
CITY OF BAINBRIDGE ISLAND, a         )
political subdivision of the State   )
of Washington; JON FEHLMAN; and      )
JEFF BENKERT,                        )
                                     )
                  Defendants.        )
```

DEPOSITION OF CHRIS JENSEN

January 17, 2012

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

```
One Union Square        2208 North 30th Street, Suite 202
600 University St.      Tacoma, WA 98403
Suite 2300              (253) 627-6401
Seattle, WA 98101       (253) 383-4884 Fax
(206) 340-1316          scheduling@byersanderson.com
(800) 649-2034          www.byersanderson.com
```

Serving Washington's Legal Community Since 1980

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 2

```
 1                          APPEARANCES

 2


 3          For the Plaintiffs:

 4                      Nathan P. Roberts
                        Julie A. Kays
 5                      Connelly Law Offices
                        2301 North 30th Street
 6                      Tacoma, WA  98043
                        253.593.5100
 7                      253.593.0380 Fax
                        nroberts@connelly-law.com
 8                      jkays@connelly-law.com

 9


10          For the Defendants:

11                      Jeremy W. Culumber
                        Keating, Bucklin & McCormack
12                      800 Fifth Avenue
                        Suite 4141
13                      Seattle, WA 98104-3175
                        206.623.8861
14                      206.223.9423 Fax
                        jculumber@kbmlawyers.com
15


16


17
                            EXAMINATION INDEX
18

19      EXAMINATION BY:                          PAGE NO.

20      MR. ROBERTS                                  3

21

22                          EXHIBIT INDEX

23
        EXHIBIT NO.      DESCRIPTION            PAGE NO.
24
              (No exhibits marked for identification.)
25
```

**Chris Jensen**
**January 17, 2012**

```
 1    Q   How does the role of a lieutenant differ from the role

 2        of a regular patrol officer?

 3    A   As lieutenant, I'm responsible for the day-to-day

 4        processing of paperwork, reports, reviewing officers'

 5        activities on the street, making sure that the actions

 6        they take on the street are consistent with policy and

 7        procedure.  They come to me for questions; I answer

 8        their questions.  I'm responsible for certain pieces

 9        of the budget, overtime, equipment purchases.  Those

10        kind of things.

11    Q   Have you received crisis intervention team training?

12    A   Yes, I have.

13    Q   Where did you receive that training?

14    A   I received that training at Poulsbo.

15    Q   The Poulsbo Department had it?

16    A   Yes.  They did it for -- they did it for the region.

17    Q   Do you know the names of any other officers from

18        Bainbridge Island that may have attended that training?

19    A   I couldn't do it accurately, so I'm not going to

20        guess.

21    Q   Do you know whether or not other officers besides

22        yourself attended?

23    A   Yes, I do.

24    Q   Can you tell me how many approximately?

25    A   I want to say four to six.
```

```
 1    Q    And what was the purpose of sending only four to six of

 2         the Bainbridge Island officers to that training?

 3    A    It wasn't that we only sent four.  It was that budget

 4         and scheduling only allowed four to be able to attend

 5         for the full cycle.  It was a training that you can't

 6         just attend part of.  You have to attend the entire

 7         cycle.

 8    Q    Is it your understanding that those four to six

 9         officers, including yourself, who received that CIT

10         training would then become resources for the other

11         officers that did not get it?

12    A    Correct.

13    Q    And what did the CIT training consist of?

14    A    It consisted of people in the mental health profession

15         talking with us about the concept of dealing with

16         people in personal crisis, mental illness as part of

17         our job.  It talked about how to involve them in the

18         process as early as possible.  It talked about how to

19         gain cooperation from those individuals.  It talked

20         about how to make the decision for ourselves whether

21         or not what we were dealing with was an emotionally

22         disturbed person.  That was -- that was the core of

23         what the training was all about.

24    Q    So it helps you identify people that have mental

25         illness, right, and then teaches you how to deploy the
```

```
 1           appropriate resources to respond to them; is that fair?
 2     A     Yes.
 3     Q     And it also teaches you to some extent how to deal with
 4           people with mental illness, right?
 5     A     I don't like the word "deal."
 6     Q     What word do you like, sir?
 7     A     I would say "understand."
 8     Q     And do you think it's important for police officers to
 9           understand that people that they're dealing with that
10           have mental illness -- you don't like that term so I'm
11           going to strike my question and phrase it more
12           appropriately.
13              Do you think it's important for police officers to
14           have an understanding of mental illness in general?
15     A     Yes.
16     Q     And that's because a fair number of the people you
17           interact with are going to be mentally ill, right?
18     A     Yes.
19     Q     And can you give me some examples of the way in which
20           your methods and tactics might differ when a person
21           you're dealing with or interacting with is mentally
22           ill?
23     A     It's so situational based that to just tell you this
24           is the process, I mean, that was the first thing that
25           they explained to us, is there's no one process to
```

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 11

```
 1          deal with people that are mentally ill.  You have to

 2          deal with the situation realizing that they're not

 3          seeing it through the eyes of a person who is thinking

 4          rationally or has the ability to conceive rationally

 5          what you're asking them to do.

 6              So there are -- there are so many variables that

 7          to sit here and answer your question with a definitive

 8          is impossible.

 9     Q    Are you trained that people who are suffering from

10          mental illness may not react in the same somewhat

11          predictable fashion that others without mental illness

12          might?

13     A    I can say yes to that.

14     Q    And are you trained that people with mental illness may

15          be potentially more violent than people without it?

16     A    No.

17     Q    You mentioned that the mental health professionals that

18          help put on the course wanted to teach the officers in

19          the CIT training how to get the professionals involved

20          as soon as possible in the process.

21              Do you understand if you want to consult with a

22          mental health professional while you're out on patrol,

23          for example, how to do that?

24     A    Uh-huh.  Yes.

25     Q    How?  How do you do that?
```

```
1        tactics that you're supposed to employ?
2    A   In fact, at the CIT training, the answer was no.  You
3        treat a threat as a threat.
4    Q   Do you think an officer should be particularly careful
5        not to agitate or exacerbate a situation involving a
6        mentally ill person?
7    A   Once the officer knows that's what he's dealing with,
8        yes.
9    Q   So once the officer realizes that the person is
10       potentially ill, they should take some extra care not
11       to aggravate the situation or agitate the person,
12       right?
13   A   Yes.
14   Q   What are the circumstances under which you would want
15       to confront a mentally ill person who is acting
16       aggressively or with hostility towards police?
17   A   How many scenarios do you want?
18   Q   Just the first one that comes to mind.  How about that.
19   A   Okay.  Ask the question again, please.
20   Q   What are the circumstances under which you would want
21       to confront a mentally ill person who is behaving with
22       hostility towards the police?
23   A   If it's me and that person -- and we're in an open
24       environment and it's just me and that person and he's
25       being openly hostile towards me, I'm going to want to
```

Page 18

```
 1              verbally engage immediately to try to de-escalate

 2       Q    You just mentioned de-escalation.  What is that?

 3       A    That's a process under which through conversation you

 4            reach a mutual point where you and the other person

 5            can at least talk rationally about something.

 6       Q    And de-escalation is obviously the opposite of

 7            escalation, right?

 8       A    Yes.

 9       Q    So the purpose of de-escalation is to lower the level

10            of anxiety, lower the level of potential for violence

11            or irrationality, right?

12       A    It's the intent.

13       Q    The goal, right?

14       A    Yes.

15       Q    And it's to avoid a physical confrontation if possible;

16            that's one of the goals too, right?

17       A    Yes.

18       Q    You would never want to engage in an unnecessary

19            physical confrontation with a mentally ill person,

20            right?

21       A    I have no idea what you mean by "unnecessary," because

22            I don't engage in unnecessary physical confrontation

23            with anybody.

24       Q    So we can agree to that, right?  A police officer

25            shouldn't engage in unnecessary physical
```

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

```
 1        confrontations?

 2   A    Correct.

 3   Q    Because doing so creates an unnecessary risk of harm

 4        for the officer and for the citizen?

 5   A    Yes.

 6   Q    And that's true without regard to whether the person

 7        has mental illness, or is it especially true when the

 8        person has mental illness?

 9   A    That particular piece I believe is important in all

10        our encounters.

11   Q    You think it's universal?

12   A    Yes.

13   Q    Do you expect the officers under your supervision to be

14        the familiar with the Bainbridge Island Police

15        Department general orders manual?

16   A    Yes.

17   Q    Does that contain the department's policies, or is

18        there a separate policy manual?

19   A    No, that's -- that's the general policies, the GOM,

20        that's what it is.

21   Q    So those tell the officers what the expectations are

22        for them in different roles and also guide their -- the

23        way that they interact with citizens in different

24        situations, right?

25   A    Expectations and guidance, yes.
```

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 23

```
 1    A   It's Berg and Portrey.  I don't remember -- I'm sorry
 2        it's Berg and Benkert.  I don't remember if Mr.
 3        Portrey was actually on my crew or somebody else's
 4        crew.
 5    Q   Now, as you're home sick this evening, are you
 6        monitoring the scanner or the frequency?
 7    A   No.
 8    Q   Everything is turned off.  How were you notified there
 9        had been an officer-involved shooting?
10    A   I received a phone call from dispatch.
11    Q   On your cell phone?
12    A   No.  On my home phone I believe.
13    Q   If there were an issue in the field with your crew or
14        with other officers, shy of an officer-involved
15        shooting, if someone wanted to ask you a question as
16        their supervisor, would they feel comfortable calling
17        you at home, to your understanding?
18    A   Yes.
19    Q   Have you been called at home for purposes of providing
20        advice on how to deal with a particular situation
21        before?
22    A   Yes.
23    Q   Can you give me an example of what types of things
24        might lead to a call at home?
25    A   "I'm at a three-car collision.  I've got a serious
```

```
1              injury accident.  I'm trying to decide about using

2              county or state patrol to help us with the collision

3              investigation."  That would be an example.

4         Q    And you don't mind getting those types of calls at

5              home?

6         A    No.

7         Q    It's part of the job?

8         A    Yes.

9         Q    As one of the officers with the CIT training, would you

10             expect to receive calls at home when people had

11             questions about how to deal with somebody with mental

12             illness?

13        A    No.

14        Q    Why not?

15        A    It's a routine we deal with -- as you said yourself

16             earlier, we deal with these folks on a regular basis,

17             so just because that's who they're dealing with, I

18             wouldn't expect to get a call, no.

19        Q    If someone had a question about how to deal with

20             somebody with mental illness and they did call you at

21             home, would that upset you?

22        A    No.

23        Q    Wouldn't be bothered by it?

24        A    No.

25        Q    Had anyone called you about the response to the Doug
```

1       Ostling residence prior to the call from dispatch about

2       the officer-involved shooting?

3    A  No.

4    Q  So you didn't become aware that officers were dealing

5       with Doug Ostling until after the shots had been fired?

6    A  Correct.

7    Q  And if I understand correctly, once you received the

8       call, you got on the radio and let people know that you

9       would be coming to the scene, correct?

10   A  Yes.

11   Q  And at some point did you assume control of the scene

12      as the lieutenant?

13   A  Yes.

14   Q  Did you assume control of the scene via the radio

15      before you arrived there physically?

16   A  Yes.

17   Q  So you're giving commands to the officers on scene as

18      the lieutenant before you got there, right?

19   A  Two commands.

20   Q  The two commands were what?

21   A  One, don't force the door.  The second one, check on

22      SWAT and wait for SWAT.

23   Q  So prior to arriving on scene or speaking to officers

24      on scene, you understood that -- well, what did you

25      understand at that time about what had occurred?



EXHIBIT 9

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA


| | |
|---|---|
| WILLIAM OSTLING, individually and<br>as Personal Representative of the<br>Estate of DOUGLAS OSTLING,<br>deceased; JOYCE OSTLING; and<br>TAMARA OSTLING, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>)<br>) |
| vs. | ) No. 3:11-cv-05219 |
| CITY OF BAINBRIDGE ISLAND, a<br>political subdivision of the State<br>of Washington; JON FEHLMAN; and<br>JEFF BENKERT, | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |


VIDEOTAPED DEPOSITION OF JON M. FEHLMAN

January 17, 2012

Seattle, Washington




Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square        2208 North 30th Street, Suite 202
600 University St.       Tacoma, WA 98403
Suite 2300              (253) 627-6401
Seattle, WA 98101       (253) 383-4884 Fax
(206) 340-1316          scheduling@byersanderson.com
(800) 649-2034          www.byersanderson.com


Serving Washington's Legal Community Since 1980

Page 2

```
 1                        APPEARANCES

 2

 3            For the Plaintiffs:

 4                        John R. Connelly, Jr.
                          Nathan P. Roberts
 5                        Julie A. Kays
                          Connelly Law Offices
 6                        2301 North 30th Street
                          Tacoma, WA  98043
 7                        253.593.5100
                          253.593.0380 Fax
 8                        jconnelly@connelly-law.com
                          nroberts@connelly-law.com
 9                        jkays@connelly-law.com

10

11            For the Defendants:

12                        Stewart A. Estes
                          Keating, Bucklin & McCormack
13                        800 Fifth Avenue
                          Suite 4141
14                        Seattle, WA 98104-3175
                          206.623.8861
15                        206.223.9423 Fax
                          sestes@kbmlawyers.com
16

17

            Also present: Cody Malone
18                        Videographer, Byers & Anderson, Inc.
                          Court Reporters & Video
19

20

21

22

23

24

25
```

```
 1          made that determination.
 2    Q     (By Mr. Connelly)  Well, what -- I mean, when
 3          you're -- you've trained police officers.  When should
 4          they make that determination?  What criterion should
 5          they use?
 6    A     When they're calling -- to call in a mental health
 7          professional, or we'll just say a professional.
 8    Q     (Nods head.)
 9    A     If you're in a situation where you're just negotiating
10          back and forth with somebody, not necessarily moving
11          one direction or another, if you're at a point where
12          it's safe enough and you have the opportunity, you can
13          at that point utilize a professional, call a
14          professional.
15              But even so, when I've utilized professional like
16          that, it's been as an advisor to the police officers.
17          It hasn't been in a direct negotiation with a mentally
18          ill person that we got a call on.
19    Q     Police officers should have training in dealing with
20          mentally ill people, correct?
21                          MR. ESTES:  Objection to form;
22          foundation, calls for a legal conclusion.
23    Q     (By Mr. Connelly)  Go ahead, sir.
24    A     Police officers do receive training on dealing with
25          the mentally ill.
```

Page 34

1    Q    The question was --

2    A    Should?

3    Q    -- should have, correct?

4    A    Yes.

5    Q    All right.  And as far as after 1999, you left the

6         Santa Rosa Police Department, correct?

7    A    No, sir.

8    Q    Did you stay there?

9    A    Yes, I was with Santa Ro- -- oh, I'm sorry.  Which

10       department did you say?

11    Q    Santa Rosa.

12    A    No.  I was with Santa Rosa until 2008.

13    Q    Okay.  Let me make sure I understand the history then.

14       It's -- the reason I had used 1999 is I think that's

15       when you said you had gone to Southern Illinois.  Did

16       you actually go back to Illinois?

17    A    No, sir.  I'm -- I'm sorry.

18    Q    That was --

19    A    Southern Illinois was an extension program.

20    Q    I got you.

21    A    I went to a local military base.  I got my degree

22       there.  I was with Santa Rose from 1996, September of

23       1996, until October -- I'm sorry -- October, yes,

24       of -- no, I'm sorry -- November of 2008.

25    Q    Okay.  And what position did you -- were you in when

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

Page 86

```
 1          they're expected to be familiar with and abide by,

 2          correct?

 3     A    Yes.

 4     Q    Now, there's a chapter in there, 13.135, about dealing

 5          with the mentally ill, correct?

 6     A    We're on Page 5?

 7     Q    Yes.

 8     A    Yes, sir.

 9     Q    And the -- that chapter is used in training, correct?

10     A    Yes.

11     Q    And how often does the training occur with regard to

12          dealing with the mentally ill?

13     A    Department wise, between officers, whenever an officer

14          will be sent to some specific type of training.  But

15          as far as regular training dealing with mentally ill,

16          it does not occur.

17     Q    All right.  So there's no training -- regular training

18          regarding dealing with the mentally ill, but this

19          manual is passed out and officers are supposed to read

20          it, correct?

21     A    Well, yes.  In dealing with the mentally ill, it's

22          when officers -- let's say, for instance, tactical

23          training.  They don't necessarily glean out the

24          mentally ill person.  But they would just deal -- they

25          would go over contacting and covering for any persons,
```

```
1    A    2009.

2    Q    2009?

3    A    Yes, sir.

4    Q    And then other than that, you prepared for it in

5         connection with this deposition; is that correct?

6    A    Reviewed it, yes, sir.

7    Q    Now, the -- since this incident with Douglas Ostling,

8         has there been additional training regarding dealing

9         with members of the citizenry who have a mental

10        illness?

11   A    Department-wide, no.  I believe individual officers --

12        I don't know who off the top of my head -- have been

13        to tactical training that that would have been part

14        of.

15   Q    So individual officers may have taken some training on

16        their own regarding this issue; is that what you're

17        saying?

18   A    I wouldn't necessarily on their own.  Usually we

19        assign their training.  But there might be something

20        they've gone to that would have had a piece of this.

21        And not a -- when I say a piece of this, I don't mean

22        our policy, but just something dealing with either the

23        mentally ill or emotionally disturbed people.

24   Q    My question to you is specifically has the Bainbridge

25        Island Police Department taken steps to ensure that
```

```
 1        its members are trained on mental illness since

 2        Douglas Ostling's incident?

 3    A   Specific training on dealing with the mentally ill,

 4        no, not that I know of.

 5    Q   Now, as far as going to the -- we've talked a little

 6        bit back when you were with the Santa Rosa Police

 7        Department about some of the steps that an officer

 8        takes in dealing with the mentally ill.  And I've got

 9        a few questions about the provisions in here.

10             First of all, what is excited delirium?

11    A   Excited delirium to the -- my understanding is a state

12        induced by could be acute mental illness, emotional --

13        being emotionally disturbed or possibly under the

14        influence of a controlled substance.

15    Q   And how should an officer react when he's advised that

16        a subject is in a state of excited delirium?

17                     MR. ESTES:  Objection; vague, calls

18        for speculation.

19    A   The officer should be, if I can say this broadly,

20        prepared for all things.  You don't know what you're

21        going to experience or what you're going to see when

22        you're dealing with somebody under these conditions.

23    Q   (By Mr. Connelly)  Within the Bainbridge Island Police

24        Department, how should an officer's conduct be

25        affected when its -- when that officer is informed
```

```
 1          training of the officers overall.

 2     Q    When was the last time you brought or -- brought

 3          somebody in to train regarding dealing with the

 4          mentally ill?

 5     A    I cannot recall bringing somebody in to a training

 6          session with the entire department.  I don't think

 7          we've had that in the three years I've been there.

 8          Officers have been to training, but again, I don't

 9          recall who or when they would have done it.

10     Q    And specifically with regard to Officer Portrey or

11          Benkert, you don't know what training they had for

12          dealing with the mentally ill?

13     A    No.

14     Q    All right.  I want to go -- let's go through your

15          manual.  It indicates, "Policy:  Dealing with

16          individuals in enforcement and related contexts who

17          are known or suspected to be mentally ill carries the

18          potential for violence, requires an Officer to make

19          difficult judgments about the mental state and intent

20          of the individual, and requires special police skills

21          and abilities to effectively and legally deal with the

22          person so as to avoid unnecessary violence...."

23               What special police skills and abilities are being

24          referred to in your manual?

25     A    (Witness reviews document.)  Hmm.  Don't know, and
```

1    Q    (By Mr. Connelly)  And you ratify their conduct and

2         state that's the way that a Bainbridge Island Police

3         Department police officer should deal with a mentally

4         ill subject?

5                          MR. ESTES:  Objection to form.

6              Go ahead.

7    A    I ratify that this incident, what they were confronted

8         with that night, and what they acted upon and what

9         they dealt with, that their actions, while tragic,

10        were appropriate.

11   Q    (By Mr. Connelly)  That's not my question.  My

12        question -- and I'll move to strike as nonresponsive.

13             This is the way that you expect -- as the police

14        chief of Bainbridge Island, this is the way that you

15        expect a Bainbridge Island Police Department officer

16        to deal with mentally ill subjects?

17                          MR. ESTES:  Objection to the form of

18        the question.

19   A    Yes.

20   Q    (By Mr. Connelly)  The -- you never required the two

21        officers to provide their statements within 24 hours,

22        correct?

23                          MR. ESTES:  Objection; asked and

24        answered.

25   A    Correct.

**Byers & Anderson Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

Page 129

1    A    And, I'm sorry, are we talking about first calling the

2         fire department or calling the fire department to the

3         house?

4    Q    How long -- how long was -- did it take until Doug

5         Ostling was assessed to determine whether or not

6         medical assistance was needed?

7    A    I believe the time that was stated from the officers

8         calling out the shots fired until medical treatment

9         was 70-some minutes, 7-0-some minutes.

10   Q    Did you have the SWAT team make entry into the

11        apartment to determine whether or not the subject had

12        been injured?

13   A    And I'm -- I'm sorry.  Did I?  No, I did not.

14   Q    Chief, did you ask anybody to use SWAT team members on

15        the scene to make entry into the apartment as soon as

16        possible?

17   A    Yes, I did.  It was a --

18   Q    Who did you ask?

19   A    I believe he was a patrol sergeant with the sheriff's

20        department, but his name escapes me right now.

21   Q    And why was it important to do it as soon as possible?

22   A    Officer Benkert had indicated to me on his public

23        safety statement that he had hit the subject inside

24        the room with one of the rounds he fired, at least one

25        of the rounds he fired.

1   Q   So you knew that he needed to be helped as soon as

2       possible?

3   A   I believed he was probably in need of aid, yes.

4   Q   And you understand that he bled to death while you

5       were standing outside?

6   A   Yes.

7   Q   Did the SWAT team make entrance?

8   A   Yes.

9   Q   And how soon did that occur?  70 minutes after the

10      fact?

11  A   I don't have the exact, but 70-some minutes after.

12  Q   Was there any need for the officers to go in at the

13      point that they did?

14              MR. ESTES:  Objection to form;

15      misstates the record.

16  A   And I'm sorry, "go in"?

17  Q   (By Mr. Connelly)  Was there any need for the officers

18      to go into Doug Ostling's apartment?

19              MR. ESTES:  Same objection.

20              THE VIDEOGRAPHER:  This is the

21      videographer.  We are off the record.  The time is

22      12:44.  One moment, please.

23                      (Brief recess.)

24                      (Exhibit No. 5 marked for

25                       identification.)

```
 1                         THE VIDEOGRAPHER:  We are back on

 2          the record.  The time is 12:55.  Please proceed.

 3    Q     (By Mr. Connelly)  All right, Chief.  I just only have

 4          a couple more questions.

 5                Before this shooting, and I had indicated earlier

 6          that there was five minutes between the time that they

 7          arrived at the house and the time that they shot Doug

 8          Ostling.  It actually was less than that.  It was 4

 9          minutes and 50 seconds.

10                Was there any reason that they had to hurry into

11          that room to see Douglas Ostling?

12                         MR. ESTES:  Objection to form.

13                Go ahead.

14    A     Hurry into the room, no, sir.

15    Q     (By Mr. Connelly)  Is there any reason they couldn't

16          have waited?

17                         MR. ESTES:  Objection to form.

18    A     In my opinion, no.  They needed to check the welfare

19          of Mr. Ostling.

20    Q     (By Mr. Connelly)  Was there any reason they couldn't

21          have taken more time and calmed the situation down?

22                         MR. ESTES:  Objection to form.

23    A     I'm sorry --

24    Q     (By Mr. Connelly)  What I'm looking for --

25    A     Say it again, please.
```

EXHIBIT 10

EXHIBIT 10

1/20/11 11:41 PM

Jeffrey Benkert



Search

Home   Profile   Account

## Jeffrey Benkert  [Add as Friend]

[Send Message]   [Poke]

Worked at Bainbridge Island Police Department (Field Training Officer)   Went to
Westlake High   Lives in Poulsbo, Washington   Married to Jennica Benkert   From
Woodland Hills, California   Born on June 8

Wall
Info
Photos (6)
Friends

**Married to**

 Jennica Benkert

**Friends (92)**

 William Gutierrez

 Grant Bell

 Ted Rought

 Amy Lowdermilk

 Robert Scott

 Rob Corn

 James M
Cherrette

 Candie Stinebring

 David Lester

 Ryan Lowdermilk

**Family**

 Kylie Benkert
Sister

Share Profile
Report/Block This Person

### Education and Work

| Employers | |
|---|---|
|  | **Bainbridge Island Police Department**<br>Field Training Officer |

| High School | |
|---|---|
|  | **Westlake High**<br>Class of 1998 |

### Sports

Favorite
Teams



Seattle
Seahawks

### Activities and Interests

Other        The Smell of Water Inside the Pirates of the Caribbean
             Ride, In Memory of "The LAPD SWAT Fallen", Crown Royal,
             In-N-Out Burger

### Basic Information

About Jeffrey   The person who has nothing for which he is willing to fight, nothing
                which is more important that his own personal safety, is a miserable
                creature and has no chance of being free unless made and kept so by the
                exertions of better men than himself.

Sex             Male

Relationship    Married to Jennica Benkert
Status

Anniversary     August 3, 2002

**You and Jeffrey**

Cornerstone Church is a mutual friend.

**Sponsored**        Create an Ad

**Planning your Reunion?**
reunionswithclass.com



Let us do the work and
we'll make it easy for
you. All the fun,
without the hassle. Call
Reunions With Class,
425-644-1044.

**$Paid Research Study !**



We're looking for
people who are
intending to buy a
Windows Laptop,
Tablet PC, or Apple
iPad in the next
month. Earn $125 if
qualified

**Introducing CityVille**



Little town or giant
metropolis, build your
dream city from the
ground up. Play
CityVille, Zynga's
newest game!

Joy Kuijnenbelt played this.

**Goddard Community Games**
www-goddardschool-com.netsolads.com



On February 5,
experience the power
of play for learning at
The Goddard School®!
Join us for a day of
excitement and
discovery!

Facebook © 2011 · English (US)

About · Advertising · Developers · Careers · Privacy · Terms · Help

Chat (2)



**Jeffrey Benkert**
for those who know what I'm talking about...the rose parade just isn't the same without Bob and Steph...I stayed awake for nothing.
January 1 at 2:17pm

Ryan Judd likes this.


**Cristy Booher** Agreed
January 1 at 3:08pm


**Ryan Judd** She had a bad cold this year and sounded like a man, it was awkward!!!
January 1 at 8:18pm


**David Evans**
Men like you are rare. I just found out what happened. Read my message to you.

You did the right thing. It is tragic. But you did your job. Very few men would I ever trust to be a cop. You have always shown good judgement and a cool head. God bless you and your partner. California lost a good man when you moved.
December 23, 2010 at 2:34am via iPhone

RECENT ACTIVITY

Jeffrey likes In-N-Out Burger and Seattle Seahawks.

Jeffrey is now friends with Ryan Hughes and Sonny Gonzalez.

Jeffrey and Michel Quiroz are now friends. · Add Michel as Friend

RECENT ACTIVITY

Jeffrey and Billy Montgomery are now friends. · Add Billy as Friend


**Francois Reese**
Hey man how you doing? Heard you did some combat qual???!!!
November 4, 2010 at 11:00pm via iPhone


**Jeffrey Benkert** no sweat here...bad guy should have listened a little better
November 5, 2010 at 1:14pm


**Francois Reese** Cool. Glad to hear it
November 5, 2010 at 3:13pm

RECENT ACTIVITY

Jeffrey and Ted Rought are now friends. · Add Ted as Friend


**Cody Matheny**
your sooooooo cute lolz
November 2, 2010 at 12:25am


**Kylie Benkert**
I just want you to know that I'm so proud of you! Oh, and that I love you!
October 29, 2010 at 11:23am

RECENT ACTIVITY

Jeffrey is now friends with Jamie Dilbeck Montoya and Tim Wayne.


**Zack Goldstein**
Glad to hear you are safe
October 27, 2010 at 11:30pm via iPhone


**Robert Scott**


Robert asks: Will you join me in committing to vote?
Join the Commit to Vote Challenge and inspire your friends to vote

EXHIBIT 11

EXHIBIT 11

# BAINBRIDGE ISLAND POLICE
# GENERAL ORDERS MANUAL

7.      Only opened containers that contain an alcoholic beverage will be emptied or destroyed at the scene by the investigating Officer.

8.      The Washington State Liquor Control Board will be notified of any business establishment that is found to be serving or selling alcoholic beverages to persons under twenty-one years of age.

**NOTE:**  In all alcohol related offenses involving minors, Officers should remain as objective as possible, enforcing these laws in a consistent manner.  The guidelines stated will provide direction to the Officer; however, situations may arise where those guidelines will not be practical, causing the Officer to depend on his own knowledge and judgement to take the appropriate action.  If an Officer chooses not to take formal action, the reason(s) will be articulated in the incident report.

## 13.135  DEALING WITH THE MENTALLY ILL

**Purpose:**  It is the purpose of this policy to provide guidance to officers when dealing with suspected mentally ill persons.

**Policy:**  Dealing with individuals in enforcement and related contexts who are known or suspected to be mentally ill carries the potential for violence, requires an Officer to make difficult judgments about the mental state and intent of the individual, and requires special police skills and abilities to effectively and legally deal with the person so as to avoid unnecessary violence and potential civil litigation.  Given the unpredictable and sometimes violent nature of the mentally ill, officers should never compromise or jeopardize their safety or the safety of others when dealing with individuals displaying symptoms of mental illness.  In the context of enforcement and related activities, officers shall be guided by Washington state laws regarding the detention of the mentally ill.  Officers shall use this policy to assist them in defining whether a person's behavior is indicative of mental illness and dealing with the mentally ill in a constructive and humane manner.

A.      **DEFINITIONS**

  *Mental Illness:*  A subject may suffer from mental illness if he or she displays an inability to think rationally, exercise adequate control over behavior or impulses (e.g. aggressive, suicidal, homicidal, sexual), and/or take responsible care of his or her welfare with regard to basic provisions for clothing, food, shelter, or safety.

B.      **PROCEDURES**

  1.      **Recognizing Abnormal Behavior**
          Mental illness is often difficult for even the trained professional to define in a given individual.  Officers are not expected to make judgments of mental or emotional disturbance but rather to recognize behavior that is potentially destructive and/or dangerous to self or others.  The following are generalized signs and symptoms of behavior that may suggest mental illness although officers should not rule out other potential causes such as reactions to narcotics or alcohol or temporary emotional disturbances that are situationally motivated.  Officers should evaluate the following and related symptomatic behavior in the total context of the situation when making judgments about an individual's mental state and need for intervention absent he commission of a crime.
          a.      DEGREE OF REACTIONS:  Mentally ill persons may show signs of strong and unrelenting fear of persons, places, or things.  The fear of people or crowds, for example, may make the individual extremely reclusive or aggressive without apparent provocation.
          b.      APPROPRIATENESS OF BEHAVIOR:  An individual who demonstrates extremely inappropriate behavior for a given context may be emotionally ill.

BAIN 07293

# BAINBRIDGE ISLAND POLICE
# GENERAL ORDERS MANUAL

For example, a motorist who vents his frustration in a traffic jam by physically attacking another motorist may be emotionally unstable.

c.    EXTREME RIGIDITY OR INFLEXIBILITY:  Emotionally ill persons may be easily frustrated in new or unforeseen circumstances and may demonstrate inappropriate or aggressive behavior in dealing with the situation.

d.    In addition to the above, a mentally ill person may exhibit one or more of the following characteristics:

1.  Abnormal memory loss related to such common facts as name, home address (although these may be signs of other physical ailments such as injury or Alzheimer's disease);

2.  Delusions, the belief in thoughts or ideas that are false, such as delusions of grandeur ("I am Christ"), or paranoid delusions ("Everyone is out to get me");

3.  Hallucinations of any of the five senses (e.g. hearing voices commanding the person to act, feeling one's skin crawl, smelling strange odors);

4.  The belief that one suffers from extraordinary physical maladies that are not possible, such as  persons who are convinced that their heart has stopped beating for an extended period of time; and/or

5.  Extreme fright or depression.

2.    **Determining Danger:**  Not all mentally ill persons are dangerous while some may represent danger only under certain circumstances or conditions.  Officers may use several indicators to determine whether an apparently mentally ill person represents an immediate or potential danger to himself, the Officer, or others.  These include the following:

a.    The availability of any weapons to the suspect.

b.    Statements by the person that suggest to the Officer that the individual is prepared to commit a violent or dangerous act.  Such comments may range from subtle innuendos to direct threats that, when taken in conjunction with other information, paint a more complete picture of the potential for violence.

c.    A personal history that reflects prior violence under similar or related circumstances.  The person's history may be known to the Officer, or family, friends, or neighbors may be able to provide such information.

d.    Failure to act prior to arrival of the Officer does not guarantee that there is no danger, but it does in itself tend to diminish the potential for danger.

e.    The amount of control that the person demonstrates is significant, particularly the amount of physical control over emotions of rage, anger, fright, or agitation. Signs of a lack of control include extreme agitation, inability to sit still or communicate effectively, wide eyes, and rambling thoughts and speech. Clutching one's self or other objects to maintain control, begging to be left alone, or offering frantic assurances that one is all right may also suggest that the individual is close to losing control.

f.    The volatility of the environment is a particularly relevant factor that officers must evaluate.  Agitators that my affect the person or a particularly combustible environment that my incite violence should be taken in to account.

3.    **Dealing with the Mentally Ill:**  Should the Officer determine that an individual may be mentally ill and a potential threat to himself, the Officer, or others, or may otherwise require law enforcement intervention for humanitarian reasons as prescribed by statute, the following responses may be taken:

a.    Request a backup Officer and always do so in cases where the individual will be taken in to custody.

b.    Take steps to calm the situation.  Where possible, eliminate emergency lights and sirens, disperse crowds, and assume a quiet non-threatening manner when approaching or conversing with the individual.  Where violence or destructive

BAIN 07294

# BAINBRIDGE ISLAND POLICE
# GENERAL ORDERS MANUAL

acts have not occurred, avoid physical contact, and take time to assess the situation.

c. Move slowly and do not excite the disturbed person.  Provide reassurance that the police are there to help and that he will be provided with appropriate care.

d. Communicate with the individual in an attempt to determine what is bothering him.  Relate your concern for his feelings and allow him to ventilate his feelings.  Where possible, gather information on the subject from acquaintances or family members and/or request professional assistance if available and appropriate to assist in communicating with and calming the person.

e. Do not threaten the individual with arrest or in any other manner as this will create additional fright, stress, and potential aggression.

f. Avoid topics that may agitate the person and guide the conversation toward subjects that help bring the individual back to reality.

g. Always attempt to be truthful with a mentally ill individual.  If the subject becomes aware of a deception, he may withdraw from the contact in distrust and may become hypersensitive or retaliate in anger.

4. **Taking Custody or Making Referrals:**  Based on the overall circumstances and the Officer's judgment of the potential for violence, the Officer may provide the individual and family members with referrals on available community mental health resources or take custody of the individual in order to seek an involuntary emergency evaluation.

a. Make mental health referrals when, in the best judgment of the Officer, the circumstances do not indicate that the individual must be taken into custody for his own protection or the protection of others or for other reasons as specified by State law.

b. Summon an immediate supervisor or the Officer in charge prior to taking into custody a potentially dangerous individual who may be mentally ill or an individual who meets other legal requirements for involuntary admission for mental examination.  When possible, summon crisis intervention specialists to assist in the custody and admission procedures.

c. Once a decision has been made to take an individual into custody, do it as soon as possible to avoid prolonging a potentially volatile situation.  Remove any dangerous weapons from the immediate area, and restrain the individual if necessary.  Using restraints on mentally ill persons can aggravate their aggression.  Officers should be aware of this fact, but should take those measures necessary to protect their safety.

d. Report the incident whether or not the individual is taken into custody.  Ensure that the report is as explicit as possible concerning the circumstances of the incident and the type of behavior that was observed.  Terms such as "out of control" or "psychologically disturbed" should be replaced with descriptions of the specific behaviors involved.  The reasons why the subject was taken into custody or referred to other agencies should be reported in detail.

**13.140  UNSECURED BUILDINGS**

It is the policy of this Department to provide building security as time allows, through aggressive patrol by the Officers.

When an establishment is found to be open and unattended or unsecured, the discovering Officer will notify dispatch of the incident and give the location.  Absent exigent circumstance, no Officer will enter a building alone prior to the arrival of assistance.  A second Officer will be assigned to assist the initial Officer at the scene and more may be assigned as needed.

Whenever an Officer enters an unsecured building to clear it or check building status, an attempt will be made to contact either the owner, manager, or an employee.  Communications dispatchers are the primary

BAIN 07295

EXHIBIT 12

EXHIBIT 12

# OFFICER BENKERT



## OFFICER PORTREY

