1

2

3

4

5

6                                                          The Honorable Ronald B. Leighton

7                              UNITED STATES DISTRICT COURT
                              WESTERN DISTRICT OF WASHINGTON
                                          AT TACOMA

8

9    WILLIAM OSTLING, individually and as
     Personal Representative of the Estate of        NO.  3:11-cv-05219-RBL
     DOUGLAS OSTLING, deceased; JOYCE
10   OSTLING; and TAMARA OSTLING;                    **DECLARTION OF VAN BLARICOM**

11                          Plaintiffs,

12              v.

13   CITY OF BAINBRIDGE ISLAND, a political
     subdivision of the State of Washington; JON
     FEHLMAN; and JEFF BENKERT;
14

15                          Defendants.

16   D. P. Van Blaricom declares and states as follows:

17          1.      I am an expert in the field of police practices and procedures, and have testified

18   in this capacity on countless occasions.  My expertise is based upon twenty-nine years as a

19   police officer, including eleven years as chief of police for the Bellevue Police Department.

20   My credentials and qualifications are set forth in greater detail in my curriculum vitae, a true

21   and correct copy of which is attached hereto as Exhibit 1.

22          2.      I was retained by the plaintiffs in this matter to review the actions of Officers

23   Benkert and Portrey, as well as the policies, procedures, and training of the Bainbridge Island

**CONNELLY LAW OFFICES**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

1    Police Department.  My opinions are based upon by knowledge, skill, experience, training,

2    and education, as well as my review of the facts of this case as set forth in the police reports,

3    expert reports, records, ballistics analysis, scene photographs, deposition transcripts, and as

4    evidenced during my visit to the crime scene.  A true and correct copy of my written report is

5    attached hereto as Exhibit 2.

6    **Summary of Opinions**

7        3.      After reviewing the facts of this case, it is clear that Officers Benkert and

8    Portrey were not trained on, and failed to follow, BIPD's own internal policies and

9    procedures.  In their handling of this incident, and following the incident in their depositions,

10   both officers displayed a total lack of training and understanding of BIPD's own General

11   Orders Manual ("Manual") on dealing with the mentally ill, and on providing aid following

12   the use of deadly force.

13       4.      The evidence shows that the use of deadly force itself was objectively

14   excessive, unreasonable, and totally unnecessary under the circumstances.  In addition, it

15   should be noted that the entire confrontation was the byproduct of the officers' warrantless

16   and wholly impermissible entry (or attempted entry) into Doug Ostling's apartment.

17       5.      Review of the backgrounds of these two officers reveals that neither of them

18   were qualified to be police officers, and neither of them should have been on patrol that night,

19   carrying badges and loaded firearms issued by the City of Bainbridge Island.

20       6.      In addition, and perhaps most disturbingly, Chief Fehlman, on behalf of the

21   City of Bainbridge Island Police Department, has ratified and approved the conduct of these

22   officers on the evening of October 26, 2010, and the unnecessary loss of life that resulted

23   therefrom.

**CONNELLY LAW OFFICES**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

**Benkert & Portrey Were Not Properly Trained, and They Ignored BIPD's Own Manual**

7.     It is my considered professional opinion that shooter and his partner's approach to contacting Doug was fundamentally flawed and precipitated the unnecessary use of deadly force. It is my opinion that Officers Benkert and Portrey failed to follow proper police practices when they made contact with Doug Ostling that night.

8.     Section 13.135 of the Manual is titled "Dealing With the Mentally Ill." The section begins by acknowledging that dealing with the mentally ill "requires special police skills and abilities to effectively and legally deal with the person so as to avoid unnecessary violence and potential civil litigation." The manual states that officers "<u>shall</u> use this policy to assist them in … dealing with the mentally ill in a constructive and humane manner" (emphasis supplied). The manual suggests use of the following techniques when dealing with the mentally ill:

- Where possible, gather information on the subject from acquaintances or family members and/or request professional assistance if available and appropriate to assist in communicating with and calming the person.

- Where violence or destructive acts have not occurred, avoid physical contact, and take time to assess the situation.

- Take steps to calm the situation.

- Move slowly and do not excite the disturbed person.

- Do not threaten the individual with arrest or in any other manner as this will create additional fright, stress, and potential aggression.

- Provide reassurance that the police are there to help and that he will be provided with appropriate care.

VAN BLARICOM DECLARATION - 3 of 10
(No. 3:11-cv-05219-RBL)

- Communicate with the individual in an attempt to determine what is bothering him. Relate your concern for his feelings and allow him to ventilate his feelings.

9. In summary, the Manual states that special police skills are required when dealing with the mentally ill, so as to avoid unnecessary violence. Officers are wisely directed to move slowly, take time to assess the situation, avoid physical confrontation, and gather as much information as possible about how to communicate with and calm the mentally ill person.

10. But on October 26, 2010, Officers Benkert and Portrey completely ignored this fundamental advice. Instead, they insisted on making warrantless and unauthorized entry into Doug Ostling's apartment for the apparent purpose of physically confronting him. Doing so exposed everyone involved to unnecessary danger, and the violent confrontation that followed was the predictable and avoidable (per the Manual) consequence of the officers' dysfunctional attitude.

11. The officers' failure to follow the Manual's guidance on dealing with the mentally ill may be due to the officers' lack of training and nearly complete unfamiliarity with these directives. In deposition, Officer Portrey admitted that he was "not familiar" with the portion of the manual dealing with mentally ill, nor is he familiar with the "basic principles and concepts" regarding how to deal with mentally ill people.[1] As for Officer Benkert, he believes that dealing with the mentally ill requires simply maintaining officer safety and that officers are supposed to "remain calm, reinforce your logic, do not enter into any of their

---

[1] Portrey Dep., p. 85:4-15.

VAN BLARICOM DECLARATION - 4 of 10
(No. 3:11-cv-05219-RBL)

CONNELLY LAW OFFICES
2301 North 30th Street
Tacoma, WA 98403
(253) 593-5100 Phone - (253) 593-0380 Fax

1    possible delusions."[2]  When asked whether he agreed with the statement, taken directly from

2    BIPD's own general orders manual, that dealing with the mentally ill requires special police

3    skills and abilities, Officer Benkert answered incorrectly that it does not.[3]  Officer Benkert's

4    subsequent Facebook post regarding the shooting, stating "no sweat here…the bad guy should

5    have listened a little better" displays profound obliviousness and indifference towards Doug

6    Ostling and others who suffer from mental illness.

7            12.    Both officers failed to ask critical questions of Doug's family prior to going

8    upstairs. Such questions would include: when did you last see Doug, describe Doug's mental

9    illness, and taking time to assess the situation.

10           13.    Had they done this Officers would have learned about Doug's mental illness,

11   how the family manages that illness, that Doug is sometimes prone to outbursts, that Doug is

12   best left alone after such an outburst. It is my opinion that had the officers followed proper

13   police procedures, talked with family, assessed the situation, that they could have asked the

14   father to conduct the welfare check of Doug, or conducted it by speaking to Doug through the

15   door to his room.

16           14.    The term "barricaded subject" generally describes a person inside a structure,

17   refusing police commands to exit. Once a subject is "barricaded" police have to assess

18   whether or not the police will reasonably try to extricate the subject.  In this particular case,

19   while at the doorway to Doug's residence, the officers repeatedly asked to speak with Doug,

20   and demanded to have a face to face conversation with him.  Doug repeatedly told officers to

21   "go away" and to leave his property.  It is my opinion, that while Doug's refusal to come out

22

23   _____

     [2] Benkert Dep, pp. 26:17-23.
     [3] Id., p. 27:6-10.

VAN BLARICOM DECLARATION - 5 of 10
(No. 3:11-cv-05219-RBL)

CONNELLY LAW OFFICES
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

1    of his residence created a "barricaded subject" scenario, Officers Portrey and Benkert failed to

2    properly assess whether Doug should have been extricated, if at all.

3        15.    It is my opinion that Officers Portrey and Benkert should have left the

4    stairway, gave Doug plenty of room, contacted a supervisor for assistance, attempted to

5    develop a contact to negotiate his exit, contacted a mental health professional for assistance,

6    and included Doug's father in this process to determine whether it was necessary to

7    "extricate" Doug from his own residence.  There was absolutely no public safety reason to

8    rush into Doug's apartment within four minutes and fifty seconds of officers Benkert and

9    Portrey responding to Doug's call.

10       16.    It is further my opinion, that had Benkert and Portrey followed this basic

11   police practice, that they would have come to the responsible conclusion either to leave the

12   residence and have family conduct the welfare check, or taken a safer, more responsible

13   approach to negotiate Doug's exit in a peaceful manner.

14       17.    It is also noteworthy that BIPD employs a number of officers who are Crisis

15   Intervention Team (CIT) certified, and better equipped to deal with the mentally ill.

16   However, Officers Benkert and Portrey are not among them.  One or more CIT officers *were*

17   available for consultation that evening, but Officers Benkert and Portrey inexplicably failed to

18   contact them or employ them as a resource.

19   **The Ballistic Evidence Confirms Benkert's Use of Force Was Objectively Unreasonable**

20       18.    Based upon my visit to the crime scene and the ballistic evidence, it is my

21   considered professional opinion that decedent was inside of his apartment and behind a closed

22   or nearly closed door at the time the two ultimately fatal shots were fired into him, and he was

23

VAN BLARICOM DECLARATION - 6 of 10
(No. 3:11-cv-05219-RBL)

**CONNELLY LAW OFFICES**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

1    then left to bleed to death from those wounds.

2        19.    The physical evidence confirms that Doug Ostling was not attacking the

3    officers at the time he was shot, but that he was in the process of closing the door between

4    himself and the officers.   A person with an axe does not pose a serious threat through a

5    closed, solid wood door, and Officer Benkert's decision to shoot Doug Ostling as he was

6    closing his door was objectively unreasonable.   At that time Doug did not pose a legitimate

7    threat to the officers (or to anyone else for that matter).   The critical question for Officer

8    Benkert is as follows: "*If* decedent was ***advancing*** on Officer Portrey with an axe ready to

9    strike, ***how*** did he manage to be back inside and ***behind*** his door ***when*** (emphases supplied)

10   you shot him?"

11       20.    The contrary statements of Officers Portrey and Benkert are inconsistent with

12   the physical evidence.   Officer Portrey's initial statement, given a short time after the

13   shooting, states that Doug held the axe over his head while inside the doorway. Based upon

14   the physical constraints of the crime scene, if Doug held the axe above his head in the manner

15   described by Officer Portrey, while at the threshold of the doorway, he would have struck the

16   interior wall and ceiling of the apartment.   Therefore, Officer Portrey's description of events

17   is not possible, as there is insufficient space for the axe to be held in the manner described by

18   Portrey. Portrey's description is also directly contradicted by Officer Benkert, who states that

19   Ostling never raised the axe above his head

20   **Human Delays in Reaction Time Cannot Account for Shots Through the Door**

21       21.    I was a police firearms instructor for over ten years and trained officers, who

22   thereafter successfully survived gunfights.  Delays in human reaction time cannot and do not

23   account for the fact that Doug was shot through the door to his room.   It is known and

VAN BLARICOM DECLARATION - 7 of 10
(No. 3:11-cv-05219-RBL)

**CONNELLY LAW OFFICES**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

1    understood from the only relevant research that it takes only 1/3 of one second from the

2    decision to fire until a round leaves the barrel of the firearm.  This would not be enough time

3    for Doug Ostling to change courses from "attacking" the officers with an axe, to closing his

4    door.

5    **After Shooting Him, BIPD Unreasonably Denied Doug Ostling Access to Aid**

6           22.    Section 11.030 of the BIPD Manual states that officers must render aid

7    following use of deadly force: "After the use of any restraint technique or weapon, officers

8    must determine any need for medical treatment and shall render or summon any aid needed."

9           23.    Based upon my training, experience and a careful evaluation of the totality of

10   circumstances in this matter, it is my considered professional opinion that Officers Benkert

11   and Portrey (as well as others from BIPD) ignored their own policies and unreasonably

12   prevented Doug Ostling from being rescued and that they further denied him timely and

13   critical medical care.

14          24.    Doug's father asked to go to his aid and was denied; Doug's mother asked to

15   go to his aid and was denied; Doug's father testified in his deposition, "We were starting to

16   plead with the older officer to check on our son, we asked that we check on him, we asked to

17   go up and check on him, we both did it individually pleading with the officer" (page 160 lines

18   15-23).

19          25.    Officer Benkert testified in his deposition he thought it was "likely" he had

20   shot decedent because of the "short distance" (page 78 lines 23-24) he knew he "should

21   determine the need for medical assistance" and "as soon as possible" (page 38 lines 24-25 and

22   page 39 lines 1-10), yet he prohibited decedent's mother from going to his aid (page 78 lines

23   7-9).

VAN BLARICOM DECLARATION - 8 of 10
(No. 3:11-cv-05219-RBL)

**CONNELLY LAW OFFICES**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

26.     Officer Portrey testified in his deposition that he knew that the BIPD deadly force policy requires, "As soon as possible, check for injuries and render aid" (page 79 lines 3-8).

27.     There were two skylights into Doug's apartment that provided a readily available means to observe his level of danger and/or medical distress and his father had provided officers with a ladder to access those skylights.  That means of observation was known to shooter, his partner, and presumably other officers but was ignored. There was never any reason to believe that decedent was armed with anything other than an axe, which requires close physical contact to cause injury, or that he posed a risk or injury to someone on the roof looking down through a skylight.

28.     Nevertheless, Doug was left unobserved and unattended to bleed-out over a period of 1 hour and 20 minutes after he was shot.  Had officers looked through the skylight (or allowed Doug's parents to do so), they would have discovered that he was not holding an axe, that he had been shot in the leg and was bleeding, and that he did not pose any danger to the officers or paramedics.  Aid could then have been safely provided.

**Neither Officer Should Have Been at the Ostling Residence that Evening**

29.     Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that Officers Benkert and Portrey were unqualified to serve as police officers and should not have been hired, assigned and/or retained in the first place.

30.     Officer Portrey admits that he was intellectually disqualified from being a police officer with BIPD, or any of the other three departments to which he applied.  In repeatedly hiring Portrey as a reserve and then provisional officer, the City effectively skirted

VAN BLARICOM DECLARATION - 9 of 10
(No. 3:11-cv-05219-RBL)

**CONNELLY LAW OFFICES**
2301 North 30th Street
Tacoma, WA  98403
(253) 593-5100 Phone - (253) 593-0380 Fax

1   its own minimum standards for hiring police officers.  As this case demonstrates, those

2   standards are there for a reason.

3       31.   As for Officer Benkert, the same demonstrable propensity for untruthfulness

4   that branded him as a "*Brady* cop" and rendered him unfit for continued service with LAPD

5   also should have ruled him out as a potential hire at Bainbridge Island.

6   **CBI's Failures Caused Doug's Death**

7       32.   It is my further opinion that Douglas Ostling would still be alive today had the

8   City of Bainbridge Island dispatched *qualified* and *properly trained* officers to the Ostling

9   home on the evening of October 26, 2010, or had the officers who *were* dispatched simply

10  followed their own Manual, avoided an unnecessary physical confrontation in a closed space

11  with a man who was known to have mental illness, avoided an application of deadly force that

12  was objectively unreasonable under the circumstances, or had they followed the provisions of

13  their own Manual with and rendered aid within a reasonable time after shooting Doug Ostling

14  through the door to his apartment.

15      I declare under penalty of perjury of the laws of the State of Washington that the

16  foregoing is true and correct to the best of my knowledge and belief.

17      Signed this 28th day of February 2012, at Bellevue, Washington.

18

19

20

21

22

23

VAN BLARICOM DECLARATION - 10 of 10
(No. 3:11-cv-05219-RBL)

**CONNELLY LAW OFFICES**
2301 North 30th Street
Tacoma, WA 98403
(253) 593-5100 Phone - (253) 593-0380 Fax



EXHIBIT 1

# EXHIBIT "A"

## D. P. VAN BLARICOM, INC.

**MPA, FBI-NA, CHIEF OF POLICE (RET.)**
*POLICE PRACTICES EXPERT*
835 - 91ST LANE N.E.
BELLEVUE, WASHINGTON 98004-4811
(425) 453-0082   FAX (425) 453-3263   E-Mail dvbinc@aol.com

## *SUMMARY of QUALIFICATIONS*

A. Retained as a police practices expert by both plaintiffs and defendants in over **1,500** lawsuits alleging police liability throughout the United States: AK, AL, AZ, CA, CO, DC, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, SD, TX, UT, VA, WA, WI and WY.

B. Testified in several hundred depositions, federal court trials, state court trials and arbitrations.

C. Prevailing parties' police practices expert in appellate decisions from the United States 1st, 6th, 7th, 8th, 9th and 10th Circuits; State Supreme Courts of AK, AZ, CO, ID, MT, MS, OR and WA; Appeals Courts of AZ, CA, CO, FL, GA and WA.

D. Recognized as an expert on the following issues and all of the cited appellate court decisions were decided in favor of my client:

   1. **POLICE USE of FORCE – Including 300+ Officer-Involved Shootings** (9th Cir. Davis v. City of Ellensburg 1989, 9th Cir. Davis v. Mason County 1991, a consultant to federal prosecution task force in United States v. Koon, et al. 1993, Rodney King v. City of Los Angeles 1994, 1st Cir. Roy v. City of Lewiston 1994, WA App. Lee v. City of Spokane 2000, 9th Cir./US S.Ct. Haugen v. City of Puyallup 2003/2004, 9th Cir. Wilkins v. City of Oakland 2003, 9th Cir. Marsall v. City of Portland 2004, 8th Cir. Craighead v. City of St. Paul 2005, 9th Cir. Davis v. City of Las Vegas 2007, 9th Cir./US S.Ct./9th Cir. Lehman v. City of Reno 2007/2009, 9th Cir. Kiles v. City of North Las Vegas 2008, 9th Cir. Tubar v. City of Kent 2008, AZ App. Celaya v. City of Phoenix 2008, 10th Cir. Rhoads v. Big Horn County 2009, Bryan v. City of Las Vegas 2009, 6th Cir. Jefferson v. City of Flint 2010, AK S.Ct. Russell v. City of Kotzebue 2011 and 9th Cir. Glenn v. Washington County 2011);
   2. **LESS-LETHAL ALTERNATIVES to DEADLY FORCE in BOTH EQUIPMENT and TACTICS** (9th Cir. Reed v. Hoy 1989 and ID S.Ct. Kessler v. Payette County and State of ID 1997);
   3. **POLICE K-9s as USE of FORCE** (quoted in Deadly Force: What We Know 1992, FL App. Pacot v. Wheeler 2000);
   4. **CONTROL of POLICE VEHICULAR PURSUIT and EMERGENCY DRIVING – Including 200+ Accidents** (my policy was recommended by the Public Risk and Insurance Management Association of Washington, D.C. as being among the 4 best in the United States 1984, quoted by 2 CA App. Payne v. City of Perris 1993 and Berman v. City of Daly City 1993, OR S.Ct. Lowrimore v. Marion County 1990, MS S.Ct. Mosby v. Jeffries 1998, CO

2

      S.Ct. Tidwell v. City & County of Denver 2003, WA App. Brooks v. City of Washougal 2007, CO App. Meyer v. City of Evans 2008 and GA App. McCobb v. Clayton County 2011);

5. **POLICE ADMINISTRATION and POLICY** (7th Cir. Montano v. City of Chicago 2008);

6. **POLICE PRACTICES, PROCEDURES and STANDARDS of CARE** (9th Cir. Gulliford v. Pierce County 1998, 6th Cir. Carter v. City of Detroit 2005, 9th Cir. Hall v. Hughes 2007, 9th Cir. Tensley v. City of Spokane 2008, 9th Cir. Howell v. Yavapai County Attorney 2008, 9th Cir. DeLew v. Adamson 2008, 9th Cir. Tennison v. City & County of San Francisco 2009 and 9th Cir. Rosenbaum v. Washoe County 2011);

7. **SPECIAL DUTIES to PROTECT and 911 RESPONSES** (WA S.Ct. Bailey v. Town of Forks 1987, 9th Cir. Wood v. Ostrander 1988, WA S.Ct. Roy v. City of Everett 1992, AZ S.Ct. Hutcherson v. City of Phoenix 1998, MT S.Ct. Nelson v. Driscoll 1999, 9th Cir. Kennedy v. City of Ridgefield 2005 and 9th Cir. Tamas v. WA DSHS 2010);

8. **DOMESTIC VIOLENCE** (quoted by the National Law Enforcement Policy Center in their model policy 1991, 9th Cir. Beier v. City of Lewiston 2004 and WA App. Osborne v. Seymour 2011);

9. **POLICE RESPONSE to the MENTALLY ILL** (listed in the FBI Academy's Subject Bibliography, 9th Cir. Gibson v. Washoe County 2002, US MD PA Schorr v. Borough of Lemoyne 2003 and 9th Cir. Herrera v. City of Las Vegas 2004);

10. **CIVIL RIGHTS VIOLATIONS** (under 42 U.S.C. § 1983);

11. **EXCITED DELIRIUM and RESTRAINT ASPHYXIA – Including 50+ Deaths** (10th Cir. Cruz v. City of Laramie 2001, AZ App. Oscielowski v. City of Benson 2003, 9th Cir. Arce v. City of North Las Vegas 2008 and 10th Cir. Weigle v. State of WY 2008);

12. **POLICE INTERNAL INVESTIGATION and DISCIPLINE;**

13. **DISCRIMINATORY ENFORCEMENT or EMPLOYMENT PRACTICES;**

14. **AMERICANS with DISABILITIES ACT** (10th Cir. Davoll v. City of Denver 1996, 9th Cir. Cripe v. City of San Jose 2001 and US PA Schorr v. Borough of Lemoyne 2003);

15. **POLICE COLLECTIVE BARGAINING;**

16. **FIREARMS** (USMC trained small arms repair MOS 2111 and police firearms instructor); and

17. **PRIVATE SECURITY PRACTICES** (US WD WA Groom v. Safeway).

D. Served 29 years in municipal policing with the last 11 as Chief of Police (until retirement and election to the City Council) in Bellevue, Washington - the State's then fourth largest and fastest growing city.

E. Directed development of a progressive police department and created several model programs, including: control of vehicular pursuits, alternatives to deadly force, fully integrated emergency response team operations, domestic violence reduction, affirmative action employment of minorities and women, comprehensive crime prevention, lateral recruitment of experienced officers, police canine operations, multi-city narcotics unit and others. Additionally, co-authored the Washington State Standards on Internal Discipline of Law Enforcement agencies.

F. Served on many professional commissions and committees, including: Washington Criminal Justice Education & Training Center Steering Committee, Bellevue Community College Local Advisory Council and Chairman Law Enforcement Program Advisory Board, Washington Attorney General's Committee on Security and Privacy, consultant to U.S. Department of Justice Community Relations Service, consultant to the National Consultation on Safety and Force, intern with 94th Congress, Governor's appointee to Community Task Force for Corrections

3

Development, Washington State Council on Crime & Delinquency's Adult Criminal Policy Committee and Ad Hoc Committee on Board of Prison Terms/Paroles, Youth Eastside Services Board of Trustees, Eastside Community Mental Health Center Advisory Board, King County Executive's appointee to E911 Task Force, U.S. Attorney's Law Enforcement Coordinating Committee, Governor's appointee to Select Committee for Police/Fire Pension Review, IACP's Education & Training Committee, IACP's Organized Crime Committee, Assessor Team Leader for 1 of 5 Pilot Projects of the Commission on Accreditation for Law Enforcement Agencies, Governor's appointee to the Emergency Commission on Prison Overcrowding, IACP book reviewer, Suburban Cities Association's Jail Advisory Committee, Governor's Advisory Group on Personal Harassment, Portland, Oregon Chief's Committee on Police Use of Force.  Assisted the appointing authorities at various times in selecting Chiefs of Police for Cities of Longview, Everett, Bellingham, Richland, Bremerton, Kirkland, Redmond, Clyde Hill, Kent (1991), Bellevue (1996) a Sheriff of King County and the Security Administrator of Seattle City Light (all in the State of Washington), King County Regional Justice Center Citizens Site Advisory Committee, Solutions To Tragedies of Police Pursuits Advisory Board, Superintendent of Public Instruction's Washington State Safe Schools Advisory Committee, King County Civil Rights Commission, Voices Insisting on Pursuit Safety.

G.  Hold a security clearance from the U. S. Government.

H.  Maintain an extensive and current library of standards, policies, procedures, references, depositions and information on other experts with subscription services to update professional and legal developments in my areas of expertise.

## *EDUCATION and CERTIFICATION*

University of Washington - Bachelor of Arts degree with magna cum laude honors l973
Seattle University - Master of Public Administration degree 1976
Graduate of the FBI's National Academy and Law Enforcement Executive Development programs
**University of Washington – Certificate in Forensics 2000**
**Americans for Effective Law Enforcement – Certified Police Litigation Specialist**
**2003/2008/2011**

## *CONTINUING TRAINING*

Police Civil Liability AELE 1987, Deadly Force and the Police Officer NWU 1987, Police Liability for Policies and Practices AELE 1988, PR-24 Side Handle Baton BPD 1988, Police Civil Liability AELE 1989, Sexual Harassment and the Consequences FS 1989, Wrongful Discharge RIMS 1989, Police Practices and Use of Expert Witnesses AELE 1989, Expert Witnesses, Litigation Consultants and Attorneys NFS 1989, Police Discipline and Labor Problems AELE 1990, Assessment Center Selection Process HRA 1991, Rodney King Incident and Policing SWLEI 1992, Role of Expert Witnesses in the 1990's SEAK 1992, Critical Liability Issues AELE 1992, Pursuit Driving and Managing Use of Force ILM 1992, AFIS Live ID HP 1993, Police/Medical Investigation of Death IACP 1993, Medical Records Review for the Legal Professional PES 1994, Developing Policies, Procedures and Rules NLEPC 1994, Civil Rights Trial Advocacy ATLA 1994, Family Violence and Police Policy SLEI 1995, Investigation of Excessive Force Incidents IACP 1995, Police Civil Liability

and Defense of Misconduct Complaints AELE 1996, Use of Force and Pursuit Driving Policies SLEI 1996, Critical Incident Dispatching NWU 1996, Police Officer Survival Tactics NWU 1997, Police Civil Liability AELE 1998, Criminal Justice WSBA 1999, Critical Incident Trauma and Legal Survival CP 1999, Traffic Stops and Racial Profiling PI 2001, Racial Profiling NWU 2001, Police Liability LES 2002, Cap-Stun ZARC 2002, Masters in Trial ABOTA 2002, Discipline and Internal Investigations AELE 2003, Critical Incident Response Management and Liability AELE 2003, Police Civil Liability AELE 2003, Police-Involved Shooting Reconstruction NWU 2004, Police Liability AELE 2005, Shooting Reconstruction AAFS 2005, Police Misconduct Litigation SULS 2005, Use of Force TASER 2006, Lethal and Less-Lethal Force AELE 2006, TASER AAFS 2006, Excited Delirium SPD 2007, Winning Extreme Encounters from Street to Court FSRC 2007, Sudden Death, Excited Delirium & In-Custody Death IPICD 2007, Discipline & Internal Investigation AELE 2008, Police Liability LES 2009, Legal, Psychological and Biomechanical Aspects of Officer-Involved Lethal and Less-Lethal Force AELE 2009, Use of Force / Domestic Violence / Community Policing / Emotional Intelligence IACP-PCN 2009, Gunshot Residue / Gunshot Wounds AAFS 2010, Active Shooter / Bloodborne Pathogens / Applied Ethics / Ethnic and Sexual Harassment IACP-PCN 2010, Arrest-Related Excited Delirium Sudden Death IPICD 2010, Discipline and Internal Investigations AELE 2010, ECD Forensic Analyst IPICD 2010, Police Liability LES 2011, Police Pursuit Policy Instructor IADLEST/ALERT 2011.

### *TEACHING and TRAINING EXPERIENCE*

Washington State Vocational Education Certificate for teaching Police Supervision, taught law enforcement courses at the Bellevue Police Academy, Washington Criminal Justice Education and Training Center, Bellevue Community College, Seattle University, Northwestern University's Traffic Institute and International City Management Association's Training Institute.  Lectured on police-related issues before the University of Washington School of Law and Graduate School of Public Affairs, Simon Fraser University, American Civil Liberties Union, Washington State Bar, Seattle-King County Bar, Washington State Court Administrators, Washington Association of Legal Secretaries, American G. I. Forum, United States Justice Department Community Relations Service, National Institute of Law Enforcement and Criminal Justice, U. S. Attorney General's Task Force on Family Violence, Montana Department of Social and Rehabilitation Services, Washington Advisory Committee to the U.S. Commission on Civil Rights, American Society of Criminology, debated California Highway Patrol Commissioner on police pursuit before National Association of Police Planners and International Association of Police Planning and Research Officers in 1990, Labor Relations Information System, City of Bellevue's Management Certificate Training Program, lectured for Association of Trial Lawyers of America's Civil Rights Section and the National College of Advocacy on excessive force from the expert's perspective in 1994 and domestic violence litigation liability arising from failure of prevention and response in 1995, lectured on loss prevention civil liability to Nordstrom Washington/Alaska Region in 1997, demonstrated expert witness testimony to the American Board of Trial Advocates in 2002.  Additionally, served on the Law Enforcement Education Advisory Committee to the Washington State Board for Community College Education in developing their statewide curriculum, achieved the first college accreditation of a Basic Law Enforcement Academy in the State of Washington, testified before the California State Senate on police vehicular pursuit in 2005, testified before the City of Oakland Citizens' Police Review Board on police vehicular pursuit policy in 2007, serve of the Bellevue College Criminal Justice Program

5

Advisory Board, lectured at the Henry C. Lee Institute of Forensic Science on Investigation of Officer-Involved Shootings in 2010.

## PUBLICATIONS

"Recruitment and Retention of Minority Race Persons as Police Officers" in September 1976 issue of The Police Chief magazine, "An Overview of Police Service Today" in the April 18th and May 2nd, 1978 issues of Law Enforcement News, "Kids Meet Cops Through Basketball Trading Card Program" in the July 9th, 1979 issue of Law Enforcement News, "A Police Chief's View of Deadly Force" in the National Institute of Law Enforcement & Criminal Justice January 1979 booklet on Police Use of Deadly Force, "Career Development: The Next Step to Police Professionalism" in the November 1979 issue of The Police Chief magazine, "Crime Prevention Cuts Insurance Cost" in the August 1980 issue of Center City Report, "A Sensible Alternative to Those High-Speed Chases" in the November 25, 1980 issue of The Seattle Times, "Chiefs Should Chase Sane Pursuit Driving Guidelines" in the December 22, 1980 issue of Law Enforcement News, "Commercial Crime Prevention Can Earn Discounts" in the February 1981 issue of the FBI Law Enforcement Bulletin, "Enforcing Malicious Harassment Laws" in the January 1983 edition of Washington Council on Crime and Delinquency News, "Reducing Crime, Traffic Accidents - Bellevue Shows It Can Be Done" in the May 10, 1983 issue of The Seattle Times and the June 27, 1983 issue of Law Enforcement News, "Carrying A Gun - It Depends On You" in the February 3, 1985 issue of the Journal-American, "When To Use Deadly Force" in the Winter 1985 issue of the Washington Law Enforcement Executive Journal, "Domestic Violence - A New Approach to an Old Problem" in the June 1985 issue of The Police Chief magazine, "It's Time for Police To Re-Examine Their Role In Society" in the October 1, 1989 issue of The Seattle Times, "Shaking The Pillars of Police Tradition" in the October 31, 1989 issue of Law Enforcement News, "Training-The First Hundred Years" in Law Enforcement In Washington State: The First Hundred Years 1889-1989, "K-9 Use of Force:  A Biting Example of Questionable Policy" in the July/August 1992 issue of Law Enforcement News, "Police Pursuit: Uncontrolled Deadly Force" in the February 28, 1993 issue of Law Enforcement News, Bulletin Alert on a "Hair-raising Comb" in the June 1994 issue of the FBI Law Enforcement Bulletin, "Excessive Force - The Expert's Perspective" in the Association of Trial Lawyers of America July 1994 Annual Convention Reference Materials Volume I, "Domestic Violence Litigation: Liability Arising from Failure of Prevention and Response" in the Association of Trial Lawyers of America July 1995 Annual Convention Reference Materials Volume I, "Shades of Blue: What White Police Officers Can - and Must - Learn from Minority Officers" in the January/February 1996 of the Police Executive Research Forum's Subject to Debate, "Doing Something About Excessive Force" in the January 15, 1998 issue of Law Enforcement News (republished by San Diego State University 2003), "The Consistent Law Enforcement Expert" in the November/December 1998 issue of The Forensic Examiner, "To Pursue or Not to Pursue: THAT is the Question" in the November 1998 issue of Police, "Handling the Mentally Ill" in the March 2000 issue of Police, "Building a Bridge" in the September 30, 2000 (25th Anniversary) issue of Law Enforcement News, "The Media: Enemies of Allies?" in the April 2001 issue of The Police Chief, "Control of Police Vehicular Pursuit" in the 2004 (1) issue of the Law Enforcement Executive Forum, "Preventing Officer-Involved Deaths of the Mentally Ill" in the Third Quarter 2004 issue of The Law Enforcement Trainer, "Suicide-by-Cop" in the September-October 2006 issue of American Cop, "Police Response to Excited Delirium" in the January 2008 issue of the IADLEST Newsletter (republished by Americans for Effective Law Enforcement 2008), "Policing in the 1950's" in the January-February 2009 issue of National Academy Associate, "Investigation of

Officer-Involved Shootings" in the 19th Annual Markle Symposium program guide September 27-28, 2010 program, **Co-Author (with Dr. Cyril Wecht, Dr. Henry Lee and Chief Mel Tucker) of** *INVESTIGATION and PREVENTION of OFFICER-INVOLVED DEATHS* © **2011 CRC Press.**

### NATIONAL TELEVISION and RADIO APPEARANCES

Currently retained as KIRO-TV News' (CBS) police practices consultant.
NBC Nightly News special report on the dangers of police vehicular pursuit.
NBC Today Show:
    1.  Personal protection against criminal attack;
    2.  Misuse of pepper spray to punish;
    3.  Police use of force (opposite Rev. Al Sharpton).
NBC *"You Be The Judge"* on the dangers of police vehicular pursuit.
NPR *"Cops and the Mentally Ill"*.
CKNW World Today:
    1.  TASER;
    2.  Restraint asphyxia.

### QUOTED in MAJOR NEWSPAPERS

USA Today, Wall Street Journal, The New York Times, The Baltimore Sun, Los Angeles Times, San Francisco Chronicle, The Seattle Times, The Oregonian, Toronto Sun, The Virgin Island Daily News ("Deadly Force" won ABA's 2004 Silver Gavel Award), The Tennessean, Christian Science Monitor, Milwaukee Journal Sentinel, Vancouver (B.C.) Sun, Ottawa Citizen.

### PROFESSIONAL MEMBERSHIPS

**American Academy of Forensic Sciences (AAFS)**, International Association of Chiefs of Police (IACP) - Life Member, Americans for Effective Law Enforcement (AELE), Association of Certified Litigation Specialists (ACLS), FBI National Academy Associates, Washington Association of Sheriffs & Police Chiefs (WASPC) - Life Member, International Association of Directors of Law Enforcement Standards and Training (IADLEST), Association of Professional Law Enforcement Emergency Vehicle Response Trainers International (ALERT).

### AWARDS

USMC Expert Rifleman 1953-1956, FBI "Possible Club" 1970 (of the 19,130 police officers who attended the FBI National Academy during the 50 years from when it started to the year of my retirement in 1985, I was 1 of only 165/.0086% who fired a perfect score on the PPC or TRC), Appreciation from the Drug Enforcement Administration 1977, Outstanding Community Service from Bellevue Jaycees 1979, Human Rights (Implementing Law and Order with Justice) from Baha'i Communities of Bellevue and Eastside 1980, Youth Service from the Chief Seattle Council of the Boy Scouts of America 1983, Program Innovation from the King County Domestic Violence Coalition 1983, Support and Service from Bellevue Cadet Squadron Auxiliary USAF 1984, Law Enforcement Appreciation from the Puget Sound Chapter of the American Society for Industrial Security (presented by the Governor of the State of Washington) 1984, Outstanding Volunteer Service from

7

the Salvation Army 1984, Outstanding Service as a Public Official Citizenship Award from the Bellevue Kiwanis Club 1985, Appreciation from the United States Secret Service 1986, **Award for Public Service from The U.S. Department of Justice 1986**, Recognition for 30 Years of Public Service from the City of Bellevue 1986, Recognition and Commendation Resolution by the Municipality of Metropolitan Seattle 1988, Appreciation for Service from the Woodland Park Zoo Bond Oversight Committee 1990, Appreciation for Service from the King County Executive 1992, Appreciation for Personal Contribution to Developing Bellevue Convention Center from the City of Bellevue 1993, Outstanding Support of the Arts (jointly with wife) from the City of Bellevue Arts Commission 1993, Commendation for Outstanding Service from the City of Bellevue 1997.



EXHIBIT 2

**D.P. VAN BLARICOM, Inc.**
MPA, FBI-NA, CHIEF of POLICE (Ret)
*POLICE PRACTICES EXPERT*
835 – 91ST lane N.E.
Bellevue, Washington 98004-4811
(425) 453-0082 FAX 453-3263 E-Mail dvbinc@aol.com

**Federal Rule 26 (a) (2) (B)**
**REPORT OF PLAINTIFF'S POLICE PRACTICES EXPERT**
**October 29, 2011 – Amended December 6, 2011 and January 19, 2012**

     1.   My name is D.P. Van Blaricom and I make this report on behalf of plaintiff in the matter of ***Ostling v. City of Bainbridge Island, et al***. under my file 11-1627.

     2.   My law enforcement career has spanned over fifty-four years of active employment to date:
     a.   Twenty-nine years of continuous police service, during which I was the Chief of Police of Bellevue, Washington for the last eleven of those years;
     b.   Thereafter, I have been engaged as a police practices consultant for an additional twenty-five years.

     3.   A detailed statement of my qualifications, experience, training and a list of all of my publications are attached hereto as Exhibit "A".  Both my fee schedule for services and a list of my deposition and trial testimony for the preceding four years are attached hereto as Exhibits "B" and "C" respectively.  My areas of expertise in the police arts and sciences include but are not limited to: police administration, policies, practices, procedures and standards of care; use of force; less-lethal alternatives to deadly force in both equipment and tactics; police response to the mentally ill; Americans with Disabilities Act (ADA); internal investigation and discipline.  As a police practices expert, I have testified in state and federal courts for both plaintiffs and defendants throughout the United States.

     4.   Nathan P. Roberts retained my services on January 29, 2011 to review the facts and circumstances of the officer-involved fatal shooting of William Ostling (decedent) by City of Bainbridge Island Police Department (BIPD) Officer Jeffrey Benkert (shooter), while accompanied by Officer David Portrey (partner) on October 26, 2010 (Tuesday) at approximately 2059 hours (8:29PM).  I have discussed the matter with plaintiff's counsel and this report was prepared in reliance upon my review of the following documents:
     a.   BIPD report 110-001601 (partial);
     b.   Kitsap County Sheriff's Office (KCSO) reports K10011941 (partial);
     c.   Kitsap County Coroner's Office (KCCO) reports 1586-10H;
     d.   KCSO news release;
     e.   CDs (6):
        1)  Call to 911,
        2)  Dispatch communications,

3)  Photographs (4).

5.  I have reviewed the following additional documents, since preparing my preliminary report on October 29, 2011:

a.  Plaintiff's Initial Disclosures;

b.  Defendants' Initial Disclosures;

c.  Plaintiff's First Interrogatories and Requests for Production with Answers and Responses;

d.  Notes (handwritten) of shooter's interview on January 17, 2001;

e.  Report of Dr. Richard Cummins;

f.  Complete BIPD reports110-001601;

g.  Complete KCSO reports 1586-10H;

h.  BIPD Administrative Review;

i.  Kitsap County Prosecuting Attorney's Office (KCPAO):

    1)  Declines to Prosecute Notice,

    2)  Response to complaint by decedent's sister;

j.  BIPD General Orders Manual (GOM) Chapter 11 - Use of Force,

k.  Records of BIPD prior contacts with decedent;

l.  BIPD Mental Reports October 1, 2006 through October 5, 2011;

m.  BIPD training records:

    1)  Shooter,

    2)  Officer Portrey;

n.  Defense expert reports:

    1)  Robert Bragg,

    2)  Joseph Fountain,

    3)  Ellis Amdur;

o.  BIPD General Orders Manual:

    1)  Chapter 2 Code of Ethics,

    2)  Chapter 11 Use of Force,

    3)  Chapter 12 Lethal and less-lethal Weapons,

    4)  Chapter 13 Patrol,

    5)  Chapter 14 Communications,

    6)  Chapter 19 Special Operating Procedures;

p.  Shooter's pre-employment background investigation;

q.  Depositions:

    1)  Shooter,

    2)  Officer Portrey,

    3)  Chief Jon Fehlman,

    4)  Decedent's father;

r.  National Law Enforcement Policy Center Model Policies:

    1)  001 - Use of Force,

    2)  020 - Post-Shooting Incident Procedures,

    3)  064 - Electronic Control Weapons,

    4)  070 - Dealing with the Mentally Ill,

    5)  076 - Investigation of Officer-Involved Shootings,

    6)  109 - Barricaded Subjects,

    7)  112 - *Brady* Disclosure Requirements,

8)  122 - Special Weapons and Tactics.

6.  Additionally, I visited and inspected the scene of this OIS with plaintiff's counsel on November 28, 2011.

7.  I have requested but defendants have yet failed to produce any of the requisite *"internal investigative interviews"* of:

1)  Shooter,
2)  Officer Portrey.

8.  It is my customary practice to evaluate the objective reasonableness of police conduct on a case-by-case basis from the perspective of a former Chief of Police, career law enforcement officer and nationally recognized police practices expert (see Exhibit "A").  In conducting that evaluation I apply:

a.  My training and experience as a police officer, who was required to respond to *"unknown trouble"* calls in the performance of my law enforcement duties;

b.  My training and experience as a police supervisor, who was assigned to conduct internal investigations;

c.  My training and experience as a police supervisor and commander, who was assigned to train police officers on patrol procedures, use of force, police response to the mentally ill and firearms;

d.  My training and experience as a police supervisor and commander, who had to evaluate the performance of my subordinate police officers;

e.  My training and experience as a chief of police, who had to hire, train, assign, administer and, as may be necessary, discipline and/or terminate police officers;

f.  My training and experience as a chief of police, who had to develop and administer policies and procedures for directing police officers under my command;

g.  My training and experience as a chief of police, who had to review internal investigations and make the final administrative decision on whether to sustain or not sustain allegations of misconduct;

h.  My service as an elected city council member, after my retirement as chief of police;

i.  My continuing training, as is supplemented by an ongoing review of professional publications, that addresses contemporary developments in my areas of expertise (see Exhibit "A" Continuing Training);

j.  Although police practice expertise is not generally susceptible to and/or likely to be affected by a *Daubert* analysis, I compare the facts of each matter that I review to recognized professional standards of care:

1)  State and federal appellate court decisions, such as *Graham v. Connor* and similar citations,
2)  National Law Enforcement Policy Center model policies and similar publications,

k.  Additionally, I have served as a police practices expert in 1,500+ matters of police-related litigation (see Exhibit "A"), wherein I have testified at deposition or trial in hundreds of cases (see Exhibit "C") on

whether or not a particular fact pattern was objectively reasonable under the totality of circumstances.

9.  My use of certain terms (i.e. – *"negligent"*, *"reasonable suspicion"*, *"probable cause"*, *"objectively reasonable"*, *"deliberately indifferent"*, *"ratified"*, *"unconstitutional"*, etc.) merely reflects my training and experience, in applying reasonable standards of care to police officers' conduct, and does not presume or imply a statement of any legal opinion.

10.  Similarly, my use of certain terms (i.e. – *"cyanosis"*, *"petechiae"*, *"apnic"*, *"excited delirium"*, *"carotid"*, *"hyoid"*, *"asphyxia", "mucosal"*, etc.) merely reflects my training and experience in reviewing triage and/or autopsy reports and does not presume or imply a statement of any medical opinion.

11.  My specific training to review officer-involved shootings, includes the following:

   a.  U.S. Marine Corps small arms repairman (MOS 2111);

   b.  U.S. Marine Corps *"expert rifleman"*;

   c.  Death investigation by the King County, WA Coroner;

   d.  Police and medical investigation of death by the Dade County, FL Medical Examiner;

   e.  International Association of Chiefs of Police (IACP):

      1)  Management Controls on Police Use of Deadly Force,

      2)  Investigation of Excessive Force Incidents,

      3)  Active Shooter;

   f.  Deadly Force and the Police Officer by Northwestern University;

   g.  Lethal and Less-Lethal Force by the Americans for Effective Law Enforcement;

   h.  Shooting reconstruction by Northwestern University's Center for Public Safety;

   i.  American Academy of Forensic Sciences:

      1)  Shooting Reconstruction,

      2)  Recognition, Detection and Significance of Gunshot Residue,

      3)  Gunshot Wounds Theory and Practice;

   j.  Forensics Certificate from the University of Washington;

12.  Additional experience, as a career police officer, in the prevention and investigation of shootings, included:

   a.  Police firearms instructor for over ten years;

   b.  Fired a rare *"possible"* score on the FBI practical pistol course (PPC);

   c.  Detective commander in shooting investigations, including a freeway sniper who shot two victims in motor vehicles;

   d.  Incident commander in the deployment of SWAT units during critical incidents;

   e.  Designed prototype of Detonics MkVII .45 ACP semi-auto pistol.

13.  As a police practices expert retained in over 1,500 matters, for both plaintiffs and defense, I have:

   a.  Reviewed 358 OIS to date;

   b.  Served as the prevailing party's expert in the following OIS appellate decisions:

    1) 9th Cir. *Reed v. Douglas County, OR* 1989,
    2) 1st Cir. *Roy v. City of Lewiston, ME* 1994,
    3) ID S. Ct. *Kessler v. Payette County, ID* 1997,
    4) WA App. *Lee v. City of Spokane, WA* 2000,
    5) 9th Cir. *Haugen v. City of Puyallup, WA* 2003,
    6) 9th Cir. *Wilkins v. City of Oakland, CA* 2003,
    7) 9th Cir. *Herrera v. City of Las Vegas, NV* 2004,
    8) 8th Cir. *Craighead v. City of St. Paul, MN* 2005,
    9) 9th Cir. & US S. Ct. *Lehman v. Robinson*, 2007/2009,
    10) 9th Cir. *Kiles v. City of North Las Vegas, NV* 2008,
    11) 9th Cir. *Tubar v. City of Kent, WA* 2008,
    12) AZ App. *Celaya v. City of Phoenix, AZ* 2008,
    13) 9th Cir. *Bryan v. City of Las Vegas, NV* 2009,
    14) 6th Cir. *Jefferson v. City of Flint, MI* 2010;
    15) 9th Cir. *Glenn v. Washington County, OR* 2011;

c. Lectured on Investigation of Officer-Involved Shootings at the Henry C. Lee Institute of Forensic Science;

d. Co-authored *INVESTIGATION and PREVENTION of OFFICER-INVOLVED DEATHS* © 2011 CRC Press and includes chapters on:
    1) Reducing and Preventing Deaths by Training and Policy Guidance;
    2) Officer-Involved Shootings,
    3) *"Suicide-by-Cop"*;
    4) Emotionally Disturbed Persons (EDP);

e. Testified in state and federal courts throughout the United States in OIS-related litigation;

f. Served to reconstruct OIS for my recommendation on whether or not the shooting officer should be criminally charged:
    1) Rapides Parish, LA District Attorney, wherein I recommended a criminal charge and shooter was charged and convicted,
    2) City and County of San Francisco District Attorney, wherein I recommended no criminal charge and shooter was not charged.

14.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the following facts appear to be undisputed in the record:

a. The shooting scene is at the top of a steep and very narrow staircase to the door of a loft apartment (see photographs and diagram):
    1) The door is hinged on the left (from outside) and opens inward,
    2) There is a small landing below the door,
    3) There is a second landing a step below the first;

b. Decedent was:
    1) 43 years of age,
    2) 6 feet tall,
    3) 193 pounds,
    4) Had a post mortem blood alcohol (BA) of .10;

    c.  BIPD Officers Jeffrey Benkert (shooter) and Officer Portrey were dispatched to decedent's residence on a 911 *"unknown problem"* call and arrived at 2054 hours;

        1)  The *"male* (caller) *was yelling and screaming"*,

        2)  The *"dispatcher mentioned that it sounded similar to an excited delirium situation"*,

        3)  The dispatcher hung-up on decedent, rather than keep the line open;

        4)  There had been *"a history at the residence with a male subject being 'unstable' and uncooperative";*

    d.  The officers contacted decedent's father at the residence at 2054 hours:

        1)  He advised them that his son *"was mentally ill"* and had probably called 911,

        2)  He offered to make contact with his son in the loft apartment above the garage but, when he knocked on the apartment door, there was no answer,

        3)  When the father left to obtain a key, Officer Portrey knocked on the door and announced his presence, whereupon decedent replied, *"I order you off my property",*

        4)  Additionally, decedent's father testified in his deposition that decedent also said, *"911 is bugged"* and *"I'm okay, just go away"* (page 120 lines 6-7 and page 122 lines 1-2),

        5)  Decedent's father returned with a key, which Officer Portrey used to unlock the door and, when he heard/felt the door knob move, he retreated to the second (lower) landing,

        6)  At that point, the dynamic of this encounter had changed to that of a **"BARRICADED SUBJECT"** (emphasis supplied) and an immediate change of tactics was required,

        7)  Shooter testified in his deposition, *"Typically that's a SWAT or entry team call out"* (page 20 line 16);

    e.  The door *"opened quickly"* and opened was a *"foot inside the room holding a long handled double headed axe above his head and to his right"*:

        1)  According to the notes of shooter's interview, which was finally taken on January 17, 2011 but was not recorded for transcription:

            a)  Both officers drew their sidearms,

            b)  Shooter ordered, *"Drop it!"*

            c)  Decedent was *"possibly startled"* and *"moved back 3-6 feet"*,

        2)  The *"situation goes **STATIC**"* (emphasis supplied),

        3)  Officer Portrey reholstered his weapon and fired his TASER into decedent's chest,

    4) Decedent *"took two steps backward"* and appeared to be unsuccessfully attempting to remove the probes, as Officer Portrey advanced up the stairs toward him,

    5) Decedent did not go down and *"started to move toward"* Officer Portrey, *"with the axe again over his head"*,

    6) Officer Portrey *"fell backwards"* from the top landing onto the second landing;

f.  Shooter fired 3 x .40 caliber rounds from his Glock semi-automatic service pistol at decedent at 20:59 hours;

    1) 1 shot, which was more probably than not the first shot fired, went through the right side opening of the closing door, missed decedent and exited to the outside through an apartment wall,

    2) The next 2 shots perforated the intervening door and struck decedent, who had to have been standing behind that door, in his left leg:

        a) 1 bullet penetrated his left upper front thigh and was recovered at autopsy,

        b) 1 bullet perforated his left knee and was recovered from the apartment floor;

g.  Decedent was left unattended behind the closed apartment door until 2219 hours or 1 hour and 20 minutes after he was shot;

h.  The autopsy concluded that plaintiff *"died of massive external bleeding"* or literally bled out;

i.  Both officers refused to give statements:

    1) The foregoing description of events is based on Officer Portrey's report made 2 days later,

    2) That report is at odds with the initial investigative report and press release of how events transpired, both of which were prepared without the cooperation of either shooter or Officer Portrey, who were the only surviving witnesses to this OIS;

j.  The BIPD General Orders Manual both provides and fails to provide direction for such circumstances as are described herein:

    1) *"Use of Deadly Force"*:

        a) *"When an Officer uses deadly force on a person"*, he/she *"**MUST** (mandatory and emphasis supplied) determine if anyone is injured"* and *"if necessary, summon medical assistance"* – this mandate is of sufficient importance, incidentally, that it is cited twice!

        b) *"Once legal counsel has been secured, the officer **MUST** (mandatory and emphasis supplied) submit to an investigative interview within 24 hours"*.

    2) *"Dealing with the Mentally Ill"*:

        a) *"A personal history that reflects prior violence under similar or related circumstances may be known to family"* and *"where possible, gather information on the subject from family"*,

    b) *"Take steps to calm the situation"* and, *"where violence or destructive acts have not occurred, avoid physical contact, and **TAKE TIME*** (emphasis supplied) *to assess the situation",*

    c) *"Move **SLOWLY*** (emphasis supplied) *and do not excite the disturbed person",*

3) Shooter testified in his deposition that when confronting a mentally ill person:

    a) *"Speak slowly and calmly"* but he also and incorrectly believed that an officer should *"reinforce your position of authority"* (page 23 lines 18-21),

    b) *"If you can"*, gather information on a mentally ill person from family and, although decedent's father told them his son was mentally ill, they did not ask him any further questions (page 32 lines 6-11 and page 49 lines 7-11),

    c) Although he incorrectly believes, *"no special skills"* are required for successfully dealing with the mentally ill, he did have access to the resource of a *"county mental health professional"* (page 27 lines 6-10 and page 123 lines 4-11),

4) Officer Portrey testified in his deposition:

    a) Even though he was dispatched on this call *"as sounding similar to an excited delirium situation",* he has absolutely no idea of what *"excited delirium"* is and did not ask (page 32 lines 2-11 and page 33 lines 9-16),

    b) He is *"actually not familiar with that section"* of the BIPD General Orders Manual on *"Dealing With the Mentally Ill"* (page 85 lines 4-15),

5) Chief Fehlman testified in his deposition:

    a) Decedent's family *"could be one resource"* for learning his history of mental illness (page 24 lines 4-7),

    b) In his *"vernacular"* officers making contact with the mentally ill should go *"low and slow, low tone of voice, slow type of movements so as not to excite"* and *"all the while evaluate, meaning not just the person, but surroundings also"* (page 28 lines 10-15),

    c) Decedent had not committed *"any crime"* (page 111 lines 7-17),

    d) There was no need to *"hurry into the room"* and they could have waited longer (page 131 lines 10-18),

    e) In summary, shooter and his partner *"should have assumed a quiet non-threatening manner, taken time to assess, should have moved slowly and provided assurances"* of their intentions to help decedent (page 118 lines 13-25 and page 119 lines 1-9),

6) Decedent's father testified in his deposition that he was experienced and practiced in quieting his son, when he became *"upset"* but who *"would be fine shortly thereafter"* (page 40 lines 3-5 and page 41 lines 3-7),

7) No policy or procedural direction was provided for responding to either nuisance or *"hang-up"* 911 calls,

8) No policy or procedural direction was provided for responding to *"barricaded subjects"*,

k. As will be seen throughout this incident, failure to follow and/or adopt the foregoing standards of care would prove critical to both the conduct of the officers and the subsequent evaluation thereof.

15.   Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that decedent was inside of his apartment and behind a closed or nearly closed door at the time the 2 ultimately fatal shots were fired into him and then he was left to bleed to death from those wounds.  In reaching that conclusion I was especially mindful of the following information from the record:

a. All of the information previously described herein;

b. The physical evidence conclusively and indisputably establishes that the door was between shooter and decedent when the 2 shots that struck him were fired;

c. Accordingly, decedent could not have been *"start(ing) to move forward"* toward Officer Portrey *"with the axe over his head"* at the time shooter fired the 2 shots that struck him, and, in compliance with accepted police practice, justification for such a police shooting requires:

1) Probable cause to believe the decedent posed a significant and imminent threat of death or serious physical injury to shooter or others,

2) That the use of such force was objectively reasonable under the totality of the then existing circumstances;

d. Shooter testified in his deposition:

1) Decedent was advancing:

a) In full view, when he fired his first shot and at least partly visible for the second and third shots,

b) Decedent was *"behind my sights when I fired all three shots"* (page 71 lines 12-13),

c) However and as previously explained herein, the indisputable physical evidence proves the foregoing statements to not be factual (page 68 lines 16-20, page 69 line 23, page 72 lines 1-25 and page 73 lines 1-5)

2) Admittedly, *"it's possible"* that decedent was not attacking and was merely coming over to close the door (page 74 lines 8-11)

3) Decedent was holding the axe *"across his chest"* when he *"began firing"* and not *"over his head"*, as previously reported (page 74 lines 12-18 and page 122 lines 14-18);

l.  Applicable fundamental rules of forensic analysis, especially for shooting reconstruction, are:
1)  *"Believe the physical evidence"*,
2)  *"Adopt the least extraordinary hypothesis"*,

m.  Additionally, noted shooting reconstructionist Lucien ("*Luke"*) Haag concludes his definitive and authoritative text, <u>Shooting Incident Reconstruction</u> © 2006, with the following quotes therefrom:
1)  *"Evaluate the physical evidence with the purpose of determining what did and did not occur"*,
2)  *"Eyewitness accounts are notoriously untrustworthy"*,
3)  *"Participants in a shooting incident may have strong motives to misrepresent the facts"*;

n.  Additionally, the National Law Enforcement Policy Center's model policy on Investigation of Officer-Involved Shooting contains a similar admonishment:
1)  *"Only by asking the 'tough questions' can all of the facts and circumstances surrounding the event be compiled"*,
2)  *"Claims by an officer that he/she believed the suspect was armed, was in the process of drawing a firearm, was holding a firearm or was otherwise posing a threat of death or serious bodily harm cannot always be taken at face value"*,
3)  *"Careful collection and examination of the physical evidence in conjunction with witness statements will generally prove sufficient to support or refute these claims and thereby focus the investigation"*.

o.  The *"tough* (and critical) *question"* that was **NOT** asked of shooter, who was not required to submit to an *"internal investigative interview"* until 3 months after the fact, was, ***"IF decedent was ADVANCING on Officer Portrey with an axe ready to strike, HOW did he manage to be back inside and BEHIND his door WHEN*** (emphases supplied) ***you shot him?"***

16.   Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that shooter and his partner's approach to contacting decedent was fundamentally flawed and precipitated the unnecessary use of deadly force.  In reaching that conclusion, I was specifically mindful of the following information from the record:

a.  All of the information previously described herein;

b.  Shooter and his partner knew or should have known decedent was mentally ill:
1)  The BIPD had prior contacts with decedent that were recorded and had demonstrated his mental illness:
a)  November 28, 2001 - Decedent's mother had reported him as being *"delusional"* and she had *"talked to an MHP"* (Mental Health Professional),

Case 3:11-cv-05219-RBL   Document 69   Filed 03/05/12   Page 30 of 40
Case 3:11-cv-05219-RBL   Document 69   Filed 03/05/12   Page 30 of 40

11

    b) December 13, 2006 - Decedent was contacted as a *"suspicious person",* after which his mother told responding officer, who noted, *"I would recommend caution when dealing with him"*, that he *"is mentally ill"*,

    c) October 12, 2007 - Decedent called 911 to report someone was *"trying to smash open"* his front door but the responding officer reported he *"is on disability, has heard people inside the house before"* and *"no problem here"*,

    d) May 19, 2009 - Decedent reported *"rogue LE* (law enforcement) *pointing* (a) *gun at* (his) *residence"* but, when responding officer asked him to *"step out to talk"*, he *"will not come to the door"*,

    e) May 19, 2009 - Decedent was contacted at home as having acted suspiciously in his neighborhood, after which he told responding officers to *"get the hell out of here and leave"* and threatened them with *"a bat or some other type of club",* so they *"decided we would just leave for now, as Ostling was not a suspect in any crime",*

    f) February 18, 2010 – Decedent reported *"energy beams and aliens telleporting* (sic) *and being harrassed* (sic) *about people wanting him to take psych meds"*, which caused the responding officer to conclude *"mental health related",*

2) The dispatcher had originally cautioned the responding officers that *"it sounded like an excited delirium situation"*,

3) Upon the responding officers' arrival at this call, decedent's parents told them he *"was mentally ill"*,

4) In fact, decedent had been diagnosed as *"schizophrenic"* and *"bi-polar"*,

5) Decedent's behavior demonstrated that he was currently decompensating and *"was almost surely in a psychotic state";*

c. Upon making voice contact with decedent outside his door:

    1) He immediately became hostile and demanded to be left alone,

    2) He had locked his door and refused to come out;

d. As previously explained, this situation had thereupon changed to one of a *"barricaded subject"*, who is additionally mentally ill, and an immediate change of tactics was required:

    1) A *"barricaded subject is defined"* as:

        a) *"A focus of a legitimate police intervention effort – most often involving threats of suicide or 'mental illness' – who has taken a position in a physical location, most*

> *often s structure, that does not allow immediate police access – whether fortified or not – and who is refusing to exit"*,

    b) *"A barricaded subject may be known to be armed, thought to be armed, have access to weapons in the location, or be in an unknown weapons status"*,

  2) Primary *"resolution techniques"* include *"police action geared toward resolving a barricaded subject situation involving the use of minimally intrusive techniques such as negotiations and time"*;

e. Although use of the term *"barricaded subject"* occurs throughout the investigation of this OIS:

  1) BIPD training records of both shooter and his partner reflect absolutely no training whatsoever on the concept or proper police response to such a situation,

  2) Furthermore and as previously explained herein, the BIPD General Orders Manual provides no policy or procedural direction;

f. Additional considerations for this particular *"barricaded subject"* included a physical environment that precluded any reasonable attempt to forcibly take decedent into custody:

  1) The point of contact was at the top of very steep and narrow staircase at an inward opening door of only 6 ½ feet by 2 feet,

  2) Those too close quarters prevent using overwhelming numbers of officers to physically overcome decedent, as there was insufficient space for any more that a one-on-one encounter,

  3) Use of oleoresin capsicum (OC – pepper) aerosol spray would cross contaminate the officers,

  4) There is insufficient distance for adequate probe spread to attempt an effective TASER application, although that tactic was *"unreasonably"* attempted,

g. In other words, this is **NOT** (emphasis supplied) a place to confront a hostile person, who was mentally ill and probably in a state of *"excited delirium"*, wherein the subject typically will:

  1) Not feel pain,

  2) Exhibit *"super human"* strength,

  3) Engage in wildly combative behavior;

h. Accordingly, the correct and only acceptable tactics to employ, under the totality of these circumstances, are:

  1) Contain the scene, as could have easily been accomplished with a single access entry point,

  2) Call for a supervisor and additional assistance,

  3) Evaluate whether or not to proceed with police intervention (note the previously described BIPD decision to simply leave the premises, under the very similar May 19, 2009 incident),

4) Begin and maintain a dialogue to establish rapport and negotiate his compliance, while always remembering that **TIME IS ON THE SIDE OF THE POLICE** (emphasis supplied):

i. As the 9th Circuit quoted from my report in their recent (November 4, 2011) Opinion on *Glenn v. Washington County, Oregon*:

1) The officers *"escalated a static situation into an unnecessary and avoidable shooting"*,

2) The *"fundamental rules for approaching"* such a situation are:

a) *"Slow it down"*,

b) *"Do not increase the subject's level of anxiety or excitement"*,

c) *"Attempt to develop rapport"*,

d) *"Time is on the side of the police"*,

3) In the expert's (my) opinion *"the rapidity of the time sequence is particularly illustrative of the too hasty and escalating approach to a person in crisis"*;

j. In the OIS of this decedent, the following times are also illustrative:

1) Both shooter and his partner had arrived at 20:54:25 (8:54 PM) and they broadcast *"Shots fired"* at 20:59:15 (8:59 PM),

2) Accordingly, they had taken only 4 minutes and 50 seconds to talk with decedent's parents, demand his immediate compliance and shoot him.

17.   Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that decedent was prevented from being rescued and was further denied both timely and critical medical care.  In reaching that conclusion, I was specifically mindful of the following information from the record:

a. All of the information previously described herein;

b. Decedent's father asked to go to his aid and was denied;

c. Decedent's mother asked to go to his aid and was denied;

d. Decedent's father testified in his deposition, *"We were starting to plead with the older officer to check on our son, we asked that we check on him, we asked to go up and check on him, we both did it individually pleading with the officer"* (page 160 lines 15-23)

e. Shooter testified in his deposition:

1) He thought it was *"likely"* he had shot decedent because of the *"short distance"* (page 78 lines 23-24),

2) He knew he *"should determine the need for medical assistance"* and *"as soon as possible"* (page 38 lines 24-25 and page 39 lines 1-10)

3) He prohibited decedent's mother from going to his aid (page 78 lines 7-9);

f. Officer Portrey testified in his deposition:

1) He knew that the BIPD deadly force policy requires, *"As soon as possible, check for injuries and render aid"* (page 79 lines 3-8),

        2) They prohibited decedent's parents from trying to make voice contact with their son and thereby learn of his injuries, after he had been shot (page 80 lines 20-22);

    g. Chief Fehlman testified in his deposition shooter told him at the scene, *"He had hit the subject inside the room with one of the rounds he fired, at least one of the rounds he fired"* (page 129 lines 22-25);

    h. Dr. Cummins has reviewed the timing of this incident from the record and has concluded:

        1) After decedent was shot, he was unattended for an *"interval of approximately 1 hour and 15 minutes"*,

        2) Decedent's wounds were relatively slow bleeding and *"were not fatal"* and *"should 'never'* (emphasis in original) *be fatal"*,

        3) All that was *"needed to prevent death was simply good first aid"*,

        4) If appropriate first aid had been administered, *"the probability of effective hemorrhage control and successful resuscitation remained greater than 50% for at least 30 minutes, and may have been as long as 45 minutes"*;

    i. There were 2 skylights into decedent's apartment that provided a readily available means to observe his level of danger and/or medical distress and his father had provided officers with a ladder to access those skylights:

        1) That means of observation was known to shooter, his partner and presumably other officers but was ignored,

        2) Such access could have been additionally used for the tactical insertion of irritating chemical agents (i.e. – CN, CS or OC) to flush decedent out of his apartment with a consequently severely compromised ability to physically resist being taken into custody

    j. There was never any reason to believe that decedent was armed with anything other than an axe, which requires close physical contact to cause injury

    k. Nevertheless and as previously explained herein, decedent was left unobserved and unattended to bleed-out over a period of 1 hour and 20 minutes after he was shot;

    l. While nothing had changed during that interval to reduce any supposed and/or continuing threat by decedent:

        1) Officer Scott Dickson finally *"climbed up onto the roof"* and *"over the roof line"*,

        2) Where, *"looking through the second skylight,* (he) *observed the subject* (decedent) *in the supine position partially upright"*,

    m. By that extended time, however, decedent had expired.

    18.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that this OIS violated BIPD GOM Chapter 11 Use of Force and the investigation thereof was not conducted to a reasonable standard of care.  In reaching that conclusion, I was specifically mindful of the following information from the record.

a. All of the information previously described herein;
b. 11.030 Rendering Aid After Use of Force: *"After the use of any restraint technique or weapon, officers* **MUST** (mandatory and emphasis supplied) *determine any need for medical treatment and* **SHALL** (mandatory and emphasis supplied) *render or summon any aid needed"*,
c. 11.070 Deadly Force Incidents: *"When an officer uses deadly force on a person, the following* **MUST** (mandatory and emphasis supplied) *be done"*:
   1) *"Determine if anyone is injured"*,
   2) *"If necessary, summon emergency medical assistance"*,
   3) *"Once legal counsel has been secured, the officer* **MUST** (mandatory and emphasis supplied) *submit to an investigative interview within 24 hours"*;
d. It is undisputed that, in spite of those duly adopted BIPD mandates:
   1) It was neither *"determined"* if decedent *"needed medical treatment"* nor was *"aid rendered"*,
   2) Shooter was not required to *"submit to an investigative interview"* **UNTIL 3 MONTHS AFTER THE FACT** (emphasis supplied);
e. Shooter testified in his deposition:
   1) He was provided with legal counsel the evening of the shooting (page 94 line 5 and page 95 lines 14-15),
   2) He was not asked or ordered to *"submit to an investigative interview within 24 hours"*, as required, and told them *"nothing"* (page 96 lines 14-19 and page 101 lines 13-19)
   3) He told his chief, however, that he *"would comply with any and all investigations"* but was still never asked or ordered to *"submit to an investigative interview"* (page 102 lines 2-8),
   4) When he finally made a statement to the *"Force Review Board"* some 3 months later:
      a) He objected to being *"recorded"* and no transcription of his *"investigative interview"* apparently exists (page 100 lines 8-25),
      b) He had inappropriately reviewed Officer Portrey's written statement before he gave his own (page 104 lines 3-5);
f. Officer Portrey testified in his deposition that, although he was only a percipient witness and not a shooter, he too refused to give a statement, as he was required to do before the end of his shift (page 93 lines 13-15);
g. Chief Fehlman testified in his deposition:
   1) He knew that neither shooter nor his partner submitted to the requisite *"investigative interview within 24 hours"* (page 72 lines 14-25),

    2) Accordingly, both *"failed to comply"* with the requirement and he did not enforce compliance (page 73 lines 9-14 and page 124 lines 20-25),

    3) When shooter was finally questioned, neither the questions nor answers were *"recorded"* (page 138 lines 1-2 and 21-22);

h. Accordingly, this OIS investigation was not conducted to a reasonable standard of care.

19.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the BIPD failed to comply with the requirements of the Americans with Disabilities Act (ADA).  In reaching that conclusion I was specifically mindful of the following information for the record:

a. All of the information previously described herein;

b. Chief Fehlman testified in his deposition that, *"as far as regular training dealing with the mentally ill, it does not occur"* in the BIPD and, since this OIS, no *"specific training on dealing with the mentally ill"* has even as yet been provided (page 86 lines 15-16, page 88 lines 24-25 and page 89 lines 1-4),

c. The BIPD's so-called Mental Reports for the 5 year period of October 1, 2006 through October 5, 2011 have established that BIPD police officers had to interact with at least one mentally ill person per week;

d. Consistent with that local police experience, the Criminal Justice/Mental Health Consensus Project has established:

    1) *"People with mental illness are significantly over represented among the segment of the population in contact with the criminal justice system"*,

    2) *"Approximately five percent of the U.S. population has a serious mental illness"*;

e. Accordingly, it was entirely foreseeable that law enforcement officers will frequently be called upon to respond to the mentally ill;

f. The ADA applies to *"mental impairment"* and specifically includes *"mental illness"*;

g. The law enforcement community's early attempts to be excluded from ADA compliance were categorically rejected;

h. Accordingly, the BIPD was required to provide the mentally ill with *"reasonable access"* to law enforcement services and programs;

i. State and local governments were required to conduct a *"self-evaluation"* for ADA compliance by January 26, 1993 and to bring their policies and procedures into compliance with ADA mandates;

j. A *"self-evaluation"* entails a survey of a law enforcement agency's clientele for special needs, an examination of how those special needs are or are not being reasonably accommodated and changes in policies, procedures and training to fulfill those accommodations within the mandates of the ADA;

k. There is no evidence that the BIPD has ever conducted the requisite *"self-evaluation"*;

    l.  Consequently, the BIPD has made no effort to be compliant with ADA requirements, by providing *"reasonable access"* for the mentally ill, and the conduct of the BIPD officers herein was reflective of that failure;

    m.  BIPD training records for both shooter and his partner document absolutely no in-service training whatsoever on how to effectively interact with the mentally ill.

20.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the chief policy maker has knowingly ratified the previously described conduct of shooter and his partner, as being within the custom, policy and practice of the BIPD.  In reaching that conclusion I was specifically mindful of the following information from the record:

    a.  All of the information previously described herein;

    b.  Jon Fehlman is indisputably the chief policy maker of the BIPD;

    c.  The BIPD conducted an *"Administrative Review"* of this OIS;

    d.  Thereafter, Chief Fehlman declared that *"there were no violations of policy or procedures that would have altered the outcome of this incident"*;

    e.  Shooter testified in his deposition that he has personally spoken with Chief Fehlman, who told him that *"it* (OIS) *was within policy"* (page 118 lines 14-20;

    f.  Chief Fehlman testified in his deposition:

        1)  Shooter and his partner handled this incident in accordance with the General Orders Manual (page 123 lines19-25),

        2)  And as to leave no doubt, he further unequivocally testified, *"I **RATIFY*** (emphasis supplied) *this incident"* because that is the way he expects BIPOD officers to deal with mentally ill subjects (page 124 lines 7-10),

    g.  Accordingly, Chief Fehlman has ratified shooter's and his partner's conduct in the killing of decedent, as being within the custom, policy and practice of the BIPD;

    h.  Furthermore, if the fact finder confirms that shooter's and/or his partner's conduct was unconstitutional, Chief Fehlman's ratification thereof will have been judicially determined.

21.  Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that shooter and Officer Portrey were unqualified to serve as police officers and should not have been hired, assigned and/or retained in the first place.  In reaching that conclusion I was specifically mindful of the following information from the record:

    a.  Shooter testified in his deposition and his pre-employment background investigation documents:

        1)  He was previously employed as a police officer by the City of Los Angeles Police Department (page 7 line 23):

            a)  An allegation of *"Knowingly making false and misleading statements to a supervisor conducting an*

*official investigation"* was sustained against him, for which the penalty is typically termination (page 12 lines 13-19),

    b) Accordingly, he resigned in lieu of being terminated (page 11 lines 8-10),

2) The BIPD was aware of all of the foregoing facts but inexplicably hired him anyway (page 13 lines 7-11 and page 110 lines 22-25),

3) Under the *Brady* standard, shooter was unemployable as a police officer, because his demonstrated propensity for untruthfulness had been officially established;

b. Officer Portrey testified in his deposition:

1) He has never been able to pass the written entry test for employment as a BIPD police officer and specifically failed such testing at least twice (page 16 line 24-25, page 17 lines 1-25, page 18 lines 1-11 and page 20 lines 22-23),

2) Additionally, he has successively failed the written entry tests for at least three other police agencies in the State of Washington (page22 lines 7-11):

    a) Poulsbo Police Department (page 22 lines 14-20),

    b) Bremerton Police Department (page 24 lines 4-12)

    c) Washington State Patrol (page 23 lines 8-13),

3) Officer Portrey has repeatedly demonstrated that he is intellectually unqualified to serve as a police officer;

c. Chief Fehlman testified in his deposition, however:

1) As regards shooter:

    a) He was not aware shooter had resigned in lieu of termination from LAPD for lying (page 71 lines 20-25, page 72 lines 1-10 and page 75 lines 13-14),

    b) Although he maintains a *"Brady list"* of BIPD officers, who have proven to be dishonest, shooter was not listed thereon either before or after this OIS (page 76 lines 22-25 and page 77 lines 1-8),

    c) Additionally, if shooter lied on his application about his reason for leaving LAPD, "*That would be reason to be disqualified"* (page 81 lines 19-25 and page 82 lines 1-12),

2) As regards Officer Portrey:

    a) If the an applicant fails *"any part"* of the entry test, including a *"passing 70%"* on the written test, *"they don't meet the minimum qualifications to be a police officer"* (page 69 lines 6-18),

    b) Although Officer Portrey has testified that he has never been able to pass a written police entry test anywhere, including twice at BIPD, the chief mistakenly believes he had passed the tests and employs him as a *"full-time*

*provisional officer"* (page 68 line 16 and page 70 lines 7-15);

    d.  In accordance with the foregoing admitted disqualifications, it was below a reasonable standard of care for the BIPD to employ, assign and retain shooter and Officer Portrey as armed police officers acting in unsupervised contact with the general public.

  22.  I have reviewed the reports of defendants' 3 experts and offer the following rebuttal thereto:

    a.  Robert Bragg:

        1)  Mr. Bragg has never been a police officer and his sole police-related experience is teaching physical defensive tactics in a gymnasium environment,

        2)  Accordingly:

            a)  He has never answered a call for police service or conducted a welfare check,

            b)  He has never dealt with the mentally ill, from a police practice perspective,

            c)  He has no expertise in the police use of firearms and/or deadly force,

        3)  Additionally, he misunderstands the fact pattern of this incident:

            c)  He reports, *"Officers were responding to a welfare check surrounding a 911 hang-up call",*

            d)  In actuality, dispatch *"hung-up"* on decedent and not the converse, as he mistakenly presumes;

    b.  Joseph Fountain:

        1)  Mr. Fountain concludes, from his experience as a City of Seattle Police Department (SPD) sergeant, that all of the officers literally did everything right but, for the reasons previously detailed herein, I obviously disagree,

        2)  In evaluating Mr. Fountain's credentials as a use of force expert, the fact finder may wish to also consider the following facts,

        3)  Mr. Fountain is a sergeant on the Seattle Police Department (SPD) and claims (in another expert report) they *"regularly consult me* (him) *on questions of use of force",*

        4)  However, the United States Department of Justice and U.S. Attorney recently conducted a civil rights investigation on use of force by Mr. Fountain's SPD employer and reported their following findings on December 16, 2011:

            a)  *"We find that SPD engages in a pattern or practice of using unnecessary or excessive force",*

            b)  *"The pattern is the result of inadequate policies, supervision, discipline and training",*

            c)  *"Supervisors* (i.e. – sergeants) *often fail to meet their responsibility to provide oversight of the use of force",*

            d)  *"When SPD officers use force, they do so in an unconstitutional manner 20% of the time",*

    e) *"Multiple SPD officers at a time use unnecessary or excessive force together"*,

    f) *"SPD fails to properly monitor or investigate the use of force"* and *"to properly train its officers on the use of force"*,

    g) *"SPD has tacitly allowed a pattern or practice of excessive use of force"*,

    h) *"Supervisors* (i.e. – sergeants) *frequently neglect their duty to investigate the use of force"*,

    i) *"We are aware of no case in which a first-line supervisor* (i.e. – sergeant) *was held accountable"*;

5) If the SPD *"regularly consults"* with Mr. Fountain *"on questions of use of force"*, as he claims, he must have been providing poor advice that is also reflected by his defense report in this matter;

6) Although Mr. Fountain has no training and/or experience in shooting reconstruction and/or pathology, he has nevertheless attempted to determine the sequence of shots and which shots struck decedent:

    a) Although he correctly assumes that the first shot entered through the right side opening of the closing door, he postulates that shot to have struck decedent first but there is no evidence of that mistaken presumption and that was, in fact, the shot that missed him and exited the apartment wall,

    b) There is no evidence to indicate the sequence of the two shots that struck decedent or which of them caused which gunshot wound (GSW),

7) To give Mr. Fountain his due, however, I agree with 2 of his conclusions:

    a) Officer Portrey's use of a TASER, under the circumstances, was *"unreasonable"*,

    b) He concedes, *"If the officers had a complete picture of Douglas Ostling's history of violence, the severity of his symptoms and recent decompensation, they would* (should) *have used different tactics"*,

8) That information **WAS** (emphasis supplied) available from BIPD records, as previously described herein, or decedent's parents on the scene:

    a) However, neither shooter nor his partner bothered to inquire further, even after decedent's father admittedly told them that his son was *"mentally ill"*;

    b) Incredibly, Mr. Fountain faults decedent's father for not volunteering more information during that brief period of 4 minutes and 50 seconds, between their surprise arrival at his door and the shooting immediately thereafter,

     9) In summary, my review of Mr. Fountain's defense report has provided no information that would cause me to change or modify my earlier opinions.

e.  Ellis Amdur:

     1) He is neither a psychologist nor a psychiatrist, but gives psychological opinions and he has no police experience beyond *"ride-alongs"* in 1992,

     2) He does report, however, and I agree:

        a) Decedent was *"almost surely in a psychotic state"*,

        b) Decedent was a *"barricaded individual"* and *"his verbalizations were those typical of a mentally ill individual"*,

     3) Thereafter, he digresses into police duties and practices, for which he has no training or experience.

23.  I am prepared to testify to these opinions at deposition or trial, if called upon to do so.

24.  If I am provided with further documentation for my review, I may have additional opinions.

/s/ *D.P. VAN BLARICOM*