HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WILLIAM OSTLING, individually and as personal representative of the ESTATE OF DOUGLAS OSTLING, deceased; JOYCE OSTLING; and TAMARA OSTLING,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BAINBRIDGE ISLAND, a political subdivision of the State of Washington; JON FEHLMAN; and JEFF BENKERT,<br><br>Defendants. | No. 11-cv- 5219 RBL<br><br>ORDER |

On October 26, 2010, Bainbridge Island police officers responded to a rambling, quixotic 911-call placed by Douglas Ostling, a mentally-ill man living in an apartment attached to his parents' home. Within minutes of the officers' arrival, the interaction went tragically awry. The officers argue that Douglas menaced them with an axe; Plaintiffs argue that Douglas simply sought to close his apartment door. In either case, Officer Benkert shot Douglas in the leg, and Douglas bled to death on the floor of his apartment. Plaintiffs argue that the shooting violated Douglas Ostling's Fourth-Amendment protection against the use of excessive force and violated their Fourteenth-Amendment substantive due process interest in their relationship with their child and sibling.

Order - 1

# I. BACKGROUND

## A. Douglas Ostling Calls 9-1-1.

At 8:40 p.m., on October 26, 2010, Douglas Ostling called 911. (Defs.' Mot. for Summ. J. at 2, Dkt. # 51; Pls.' Resp. at 3, Dkt. #66.) The call log reveals that Douglas, who suffered from either schizophrenia or Asperger's syndrome (Decl. of Steward Estes at 15, Dkt. #52 (quoting Dep. of William Ostling at 183)), repeatedly shouted confused questions: "What are you!" "What is that!" (Decl. of Nathan Roberts, Ex. 1, Dkt. # 67.) Apparently recognizing the source, the dispatcher asked "if it was Douglas." *Id.*

Officers Portrey and Benkert arrived at the Ostling home within 15 minutes. *Id.* Douglas' father, William Ostling met them at the door, unaware that Douglas had called 911. (Pls.' Resp. at 3.) William advised the officers that his son Douglas was mentally ill and was likely the source of the call. (Decl. of William Ostling ¶ 5, Dkt. #68.) He then led the officers through the house, into the garage, and up a staircase that led to Douglas's apartment. (Pls.' Resp. at 4; Defs.' Mot. at 3.)

## B. Officers Benkert and Portrey Confront Douglas

Douglas did not respond to his father knocking or speaking, which caused some alarm to William who feared that Douglas might have hurt himself. (Decl. of William Ostling ¶ 9.) Similarly, the officers worried that Douglas and his father might have had some sort of altercation. (Decl. of Jeffrey Benkert ¶ 9.) Officer Portrey then knocked repeatedly and announced that the police were present. *Id.* at 7–8. The parties' accounts now begin to diverge.

### 1. Account of William Ostling

William states that he then fetched a key to the room, which one of the officers "grabbed" from his hand and used to try and open the locked door. (Decl. of William Ostling ¶ 9.) Douglas then informed them that he did not need help, that "9-1-1 [was] bugged," and instructed the officers to leave. *Id.* ¶ 10. William states that, judging from the sound of his son's voice, it was apparent that Douglas was just behind the door. *Id.* Officer Benkert tried to turn the doorknob and met resistance, presumably from Douglas holding it. *Id.* ¶ 11. After "a few seconds," Benkert "succeeded in opening the door . . . and he began peering into Doug's room, moving his

head from side-to-side, as though he were trying to see around the partially-opened door trying to locate Doug." *Id.* Benkert then said "double-bladed axe . . . taser." *Id.* ¶ 12. Officer Portrey then holstered his gun, removed his taser, and fired it at Douglas. *Id.* Firing the taser apparently caused Officer Portrey to take "a step back," and he "stumbled slightly, catching himself on the wall"; but neither of the officers fell or was otherwise "lying in a vulnerable position." *Id.* ¶¶ 12–14. Officer Benkert then said, "stop or I'll shoot," and without hesitation, fired three shots. *Id.* ¶ 13. According to William, at the instant Benkert fired, he was separated from Douglas by the door, the landing, and a banister. *Id.*

### 2. Account of Officer Benkert

In contrast, Officer Benkert states that after Douglas did not respond to his father, he "said words to the effect of 'Doug, this is the police department' . . . 'we came to check on you.'" (Benkert Decl. ¶ 9.) Douglas responded that "we were part of the system that he was calling to check on to see if it was intelligent," and then instructed the officers to leave. *Id.* At that point, one of the officers asked William for a key to the room, which he then retrieved for the officers. *Id.* ¶ 10. Then, while Officer Portrey was attempting to find the correct key, *Id.* ¶ 10, "the door opened very quickly, and [Officer Benkert] observed Douglas with a double bitted axe in his hands holding it in front of him in a striking position, a short distance from Officer Portrey (perhaps two feet)." *Id.* ¶ 11. The officers drew their weapons, and Douglas moved back "3-6 feet." *Id.* Benkert states that he "loudly yelled commands": "Drop the ax, drop the ax . . . Do not advance towards us with that ax or you will be shot." *Id.* Douglas did not respond. *Id.* Portrey then requested "emergency traffic" from dispatch. *Id.* ¶ 12.

Officer Benkert states that he advised Portrey "[i]n a low voice" that he "might be able to use the TASER . . . ." *Id.* ¶ 13. Officer Portrey then tased Douglas and entered the apartment "to secure Douglas before the 5 second cycle . . . ended." *Id.* But the barbs failed to make proper contact, and Douglas kept ahold of the axe. *Id.* As Portrey entered the apartment, Officer Benkert states that he "could not provide proper cover to him and . . . told [Portrey] so." *Id.* Portrey then backed out of the apartment and out of Officer Benkert's field of vision. *Id.* ¶ 14. In doing so, he stumbled, and Officer Benkert believed he might have fallen. *Id.*

Officer Benkert states that Douglas then came "rapidly" forward with the axe, and he fired three shots in quick succession. *Id.* ¶¶ 14–15. In between the first and second shots, Douglas closed the door. *Id.* It is undisputed that the second and third shots, including the shot that struck Douglas in the left leg, passed through the door itself.

**C. Bainbridge Island Police Cordon Douglas' Apartment**

On a key factual issue, the parties disagree. Defendants argue that "Benkert did not observe any of his shots strike Douglas, nor did he hear him yell in pain." (Defs.' Mot. for Summ. J. at 5.) Indeed, Benkert radioed after the shooting that is was "unk[nown] if anyone has been hit . . . ." (Estes Decl., Ex. C at 3.)

Plaintiffs, on the other hand, argue that Officer Benkert was more certain that Douglas had been shot. Bainbridge Island Police Chief, Jon Fehlman stated that "Officer Benkert had indicated to me on his public safety statement that he had hit the subject inside the room with one of the rounds he fired, at least one of the rounds he fired." (Fehlman Dep., 129:22–130:6.) Indeed, Chief Fehlman "believed that [Douglas] was probably in need of aid" immediately after the shooting. *Id.*

In any event, while paramedics arrived within nine minutes of the shooting, no one rendered aid until approximately 10:20 p.m.—one hour and twenty minutes after the shooting. (Roberts Decl., Ex. 6 (Bainbridge Island Fire Dept. record)). Douglas had been struck in the femoral artery and had bled to death by that time. In that hour an twenty minutes, police cordoned off the room, called in SWAT officers, and prevented William from using a ladder to check on Douglas through a skylight. (*See* Defs.' Br. at 8–9.)

Plaintiffs have presented expert testimony from Dr. Richard O. Cummins, a University of Washington professor of emergency medicine, stating that medics would have been able to save Douglas if given access within 25 minutes of the injury—i.e., within 16 minutes of their arrival. (Roberts Decl., Ex. 6 (Dep. of Dr. Richard Cummins at 80:5–10.)

There are thus essentially two events giving rise to Plaintiffs' claims: first, the shooting; and second, the rendering of aid.

**D. Plaintiffs' Claims**

Plaintiffs are Douglas's estate (represented by his father), William Ostling (father), Joyce Ostling (mother), and Tamara Ostling (sister). They have brought claims under 42 U.S.C. § 1983 against Officer Benkert for use of excessive force in violation of the Fourth Amendment and for violation of substantive due process under the Fourteenth Amendment. (Am. Compl. at 7, Dkt. #6.) Additionally, Plaintiffs assert that the City and Chief Fehlman are liable for failing to train officers to deal with the mentally ill and because they ratified Officer Benkert's actions. *Id.*

**E. Defenses**

Defendants argue that Plaintiffs lack standing, that qualified immunity bars certain claims, that Plaintiffs' substantive-due-process claims fail as a matter of law, and that neither the City nor Chief Fehlman ratified any unconstitutional conduct.

## II.    DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

**A. Standing to Pursue Fourth Amendment Claims**

Defendants argue that "the Ostling-family Plaintiffs may not assert this cause of action" because "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." Defs.' Mot. for Summ. J. at 9 (quoting *Alderman v. U.S.*, 394 U.S. 165, 174 (1969)).

A § 1983 claim "that accrued before death survives the decedent when state law authorizes a survival action as a 'suitable remed[y] . . . not inconsistent with the Constitution and laws of the United States . . . .'" *Smith v. City of Fontana*, 818 F.2d 1411, 1416 (9th Cir. 1987), overruled on other grounds, *Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999) (citing 42 U.S.C. § 1988)). Thus, Washington law determines standing to assert. Fourth-Amendment claims.

There are five relevant statutes on this point: two survival statutes (Wash. Rev. Code §§ 4.20.046, .060) and three wrongful death statutes (Wash. Rev. Code §§ 4.20.010, .020; 4.24.010). The primary differences lie in the causes of action and the beneficiaries. *See Harms v. Lockheed Martin Corp.*, No. 06-cv-572, 2007 WL 2875024, *2 (W.D. Wash. Sept. 27, 2007) (Robart, J.) (citations omitted). The survival statutes "do not create new causes of action but instead *preserve* causes of action for a decedent's personal representative that the decedent could have maintained had he or she not died." *Id.* In contrast, the wrongful death statutes "create new causes of action for statutory beneficiaries of the deceased to recover their own damages." *Id.*

Under Washington's general survival statute, "all causes of action . . . shall survive to the personal representative[]" of the estate. Wash. Rev. Code § 4.20.046. The personal representative, however, "shall only be entitled to recover damages for pain and suffering, anxiety, emotional distress, or humiliation . . . on behalf of" parents and siblings "who may be dependent upon the deceased person for support." *Id.* §§ 4.20.046, 4.20.20. The general survival statute thus provides William, in his representative capacity, standing to pursue the Fourth-Amendment claims—but excludes non-economic damages because his family was not financially dependent. *See Harms*, 2007 WL 2875024, at *5 (noting that estate "is not entitled to recover *non-economic damages* (pain and suffering, etc.) on behalf of the decedent") (emphasis in original). Washington's special survival statute, R.C.W. § 4.20.60, which directs any recovery

of damages to the statutory beneficiaries rather than the estate, supplies no standing as it is also restricted to dependent parents and siblings. *See Otani ex rel. Shigaki v. Broudy*, 151 Wash. 2d 750, 756 (2004) ("recovery under the general survival statute is for the benefit of, and passes through, the decedent's estate, whereas recovery under the special survival statute is for the benefit of, and is distributed directly to, the statutory beneficiaries").

Similarly, the wrongful death statutes fail to provide Plaintiffs standing in their individual capacity. Under § 4.20.010, the personal representative may maintain "an action for damages against the person causing the death." Wash. Rev. Code. § 4.20.010. The purpose of the statute is to "compensate [beneficiaries] for the loss of economic and perhaps other benefits they would have received from the decedent." David K. DeWolf & Keller W. Allen, *Washington Practice: Tort Law & Practice* § 6.5 (2012); *see also Parrish v. Jones*, 44 Wash. App. 449, 453 (1986) ("the measure of damages is the actual pecuniary loss suffered by the surviving beneficiaries from the death of a relative"). But the statutory beneficiaries of the wrongful-death statute are again restricted by the same statute cited above: if the decedent leaves no spouse or children, only *financially dependent* parents and siblings may recover. Wash. Rev. Code § 4.20.20.

Lastly, Washington law provides a direct action by parents "for the injury or death of a minor child, or a child on whom either, or both, are dependent for support . . . ." Wash. Rev. Code § 4.24.010. Because Plaintiffs were not financially dependent on Douglas, they fall outside the plain language of the direct-action statute.

In sum, Washington law provides an avenue, via the general survival statute (Wash. Rev. Code § 4.20.046), for William to pursue the Fourth-Amendment claim as representative of Douglas's estate. But, as Plaintiffs note, the statutory limitation on damages creates a wrinkle. It appears that Douglas had little or no income, and thus, if non-economic damages (i.e., pain and suffering, anxiety, emotional distress, or humiliation) are unavailable, any award might be insufficient to compensate Plaintiffs and deter Defendants, in the event the latter are found liable. In short, the tie between § 1983 and the state survival and wrongful-death statutes has a prism-like effect, breaking the single federal statute into 50 variations. Courts have, however,

attempted to restore some uniformity by deviating from state-law where it is inconsistent with the purposes of § 1983.

### B. Availability of Non-Economic Damages

The Supreme Court has stressed that state-law survival remedies apply "unless those remedies are inconsistent with the Constitution and laws of the United States." *Jefferson v. City of Tarrant, Ala.*, 522 U.S. 75, 79 (1997) (citing *Robertson v. Wegmann*, 436 U.S. 584, 588–90 (1978)) (quoting 42 U.S.C. § 1988(a)). To determine consistency, "courts must look not only at particular federal statutes and constitutional provisions, but also at the policies expressed in [them]." *Robertson*, 436 U.S. at 590 (internal quotations and brackets omitted). Section 1983 "has its origins in § 1 of the Civil Rights Act of 1871, which was enacted as part of the congressional response to the states' failure to prevent widespread racial violence committed by the Klu Klux Klan." *Id.* at *7 (citing *Ngiraingas v. Sanchez,* 495 U.S. 182, 187–88 (1990)). The Act "was intended not only to 'override' discriminatory or otherwise unconstitutional state laws, and to provide a remedy for violations of civil rights 'where state law was inadequate,' but also to provide a federal remedy 'where the state remedy, though adequate in theory, was not available in practice.'" *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 124 (1990) (additional citations omitted)). Additionally, the Supreme Court has emphasized that § 1983 is "remedial" in nature, and courts should "broadly construe" the statute to provide a remedy "against all forms of official violation of federally protected rights." *Dennis v. Higgins*, 498 U.S. 439, 444 (1991) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "The policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Robertson*, 436 U.S. at 590–91; *see also Hardin v. Straub*, 490 U.S. 536, 539 (1989) (noting § 1983's "chief goals of compensation and deterrence" and its "subsidiary goals of uniformity and federalism").

These policies compel the Court to hold that the restriction of non-economic damages in Washington's survival statute undermines the purpose of § 1983 and must therefore be disregarded. Particularly in cases such as this—where the decedent had little or no income—economic damages alone would provide no compensation and no deterrent effect. Indeed, courts

Order - 8

appear to largely be following this trend. *Rentz v. Spokane Cnty.*, 438 F. Supp. 2d 1252 (E.D. Wash. 2006); *Loomis v. City of Puyallup Police Dep't*, No. 02-cv-5417, 2005 WL 1036445 (W.D. Wash. May 3, 2005); *Davis v. City of Ellensburg*, 651 F. Supp. 1248 (E.D. Wash. 1987); *Guyton v. Phillips*, 532 F. Supp. 1154 (N.D. Cal. 1981); Williams *v. County of Oakland*, 915 F. Supp. 1074 (N.D. Cal. 1996); *Guerrero v. County of San Benito*, No. 08-cv-0307, 2009 WL 4251435, at *5 (N.D. Cal. Nov. 23, 2009); *Hirschfield v. San Diego Unified Port Dist.*, No. 08-cv-02103, 2009 WL 3248101, at *4 (S.D. Cal. Oct. 8, 2009); *T.D.W. v. Riverside Cnty.*, No. 08-cv-232, 2009 WL 2252072, at *5–6 (S.D. Cal. July 27, 2009); *Garcia v. Whitehead*, 961 F. Supp. 230, 232–33 (C.D.Cal.1997); *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1190 (7th Cir. 1985); *Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984); *McClurg v. Maricopa Cnty.*, No. 09-cv-1684, 2011 WL 4434029, at *4 (D. Ariz. Sept. 23, 2011); *Gilbaugh v. Balzer*, No. 99-cv-1576, 2001 WL 34041889, at *5–7 (D. Or. June 7, 2001); *Banks v. Yokemick*, 177 F. Supp. 2d 239, 251–52 (S.D.N.Y. 2001).

Judge Saundra Armstrong recently issued a thoughtful decision in *Cotton ex rel. McClure v. City of Eureka, Calif.*, No. 08-cv-4386, 2012 WL 909669 (N.D. Cal. Mar. 16, 2012), addressing this question. In allowing the recovery of non-economic damages in a § 1983 action where California's survival statute excluded them, Judge Armstrong concluded:

> At bottom, the Court finds that application of California's prohibition on the recovery of damages for pain and suffering in survival actions is inconsistent with § 1983. Had the Decedent survived, he indisputably would be entitled to compensation for the pain and suffering he endured as a result of Defendants' use of excessive force and deliberate indifference to his serious medical needs. Precluding such damages would plainly undermine § 1983's twin goals of compensation and deterrence. Similarly, eliminating pain and suffering damages in an action where the victim dies would also undermine the statute's subsidiary goals of uniformity and federalism, particularly since a potential damage award could vary significantly depending on the forum in which the action was filed.

*Id.* at *10.

In sum, Defendant's motion for summary is granted as to fourth-amendment claims brought by Joyce, Tamara, and William as individuals, but denied as to William in his capacity as personal representative of the Estate. Further, following the reasoning above, the Court finds

that Washington's limitation of non-economic damages is inconsistent with the policies of § 1983 and cannot therefore apply.

### C. William, Joyce, and Tamara's Substantive Due Process Claim

Defendants move to dismiss Plaintiffs' substantive due process claims because Officer Benkert did not "act[] with the purpose (or intent) to cause harm to Douglas Ostling." (Defs.' Mot. to Dismiss at 14.) As Defendants acknowledge, though, the "intent to harm" standard is not the law of this circuit. *Id.* at 20 ("Defendants acknowledge that older Ninth Circuit panels have indicated to the contrary."). Rather, Ninth Circuit precedent holds that "a parent who claims loss of the companionship and society of his or her child, or vice versa . . . has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child . . . ." *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (citing *Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986); *Kelson v. City of Springfield*, 767 F.2d 651, 653–55 (9th Cir. 1985)); *see also Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 371 (9th Cir. 1998) (noting that plaintiffs "may assert a Fourteenth Amendment claim based on the related deprivation of their liberty interest arising out of their relationship with [their deceased son]"). This is true even where the deprivation is incidental to the state's acts. *See Moreland*, 159 F.3d at 371 (making no mention of purpose-requirement). No such interest has been recognized for siblings. *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992) (affirming dismissal of siblings' substantive due process claim). Thus, William and Joyce, as parents, may maintain a claim for violation of their substantive due process interest in the companionship of their son; however, Tamara's claim must be dismissed.

### D. Qualified Immunity

Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The Supreme Court has endorsed a two-part test to resolve claims of qualified immunity: a court must decide (1) whether the facts that a plaintiff has alleged "make out a violation of a constitutional right," and (2) whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*

*v. Callahan*, 553 U.S. 223, 232 (2009).[1]  Qualified immunity protects officers not just from liability, but from suit: "it is effectively lost if a case is erroneously permitted to go to trial," and thus, the claim should be resolved "at the earliest possible stage in litigation."  *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987).  The purpose of qualified immunity is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties."  *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).  Because "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause [to arrest] is present," qualified immunity protects officials "who act in ways they reasonably believe to be lawful."  *Garcia v. County of Merced*, 639 F.3d 1206, 1208 (9th Cir. 2011) (quoting *Anderson*, 483 U.S. at 631).

### 1. Excessive Force

Plaintiffs argue that Officer Benkert violated Douglas's fourth-amendment rights by using excessive force to seize Douglas, a situation precipitated by the officers' unconstitutional entry into Douglas's apartment without a warrant or exigent circumstances.  (Pls.' Resp. at 21–26.)

"Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement."  *Wilkinson v. Torres*, 610 F.3d 546, 550 (2010) (citing *Graham v. Conner*, 490 U.S. 386, 395 (1989)).  The reasonableness of force is determined by "carefully balancing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (citing *Graham*, 490 U.S. at 396).  Courts assess the "quantum of force used to arrest" by considering "the type and amount of force inflicted."  *Id.* at 1279–80.  A court assesses the governmental interests by considering a range of factors, including "the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, whether he was actively resisting arrest or attempting to evade arrest by flight," or any other "exigent circumstances."  *Id.*  Where an officer has "probable cause to

---

[1] In *Pearson*, the Supreme Court reversed its previous mandate from *Saucier* requiring district courts to decide each question in order.

believe that the suspect poses a threat of serious physical harm, either to the officer or to others," the officer may constitutionally use deadly force. *Wilkinson*, 610 F.3d at 550 (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

Importantly, a court must judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Courts are cautioned to make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* And, although the question is "highly fact-specific," the inquiry is objective: a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007); *Graham*, 490 U.S. at 397).

Viewing the evidence in the favor of the non-moving party, the Court must conclude that Plaintiffs make out a violation of the Fourth Amendment. Plaintiffs have presented testimony indicating that the officers forced their way into Douglas's room without a warrant, an indication of a crime, or any other emergency circumstance. Perhaps more importantly, Plaintiffs submit that Douglas was far enough into the room that Officer Benkert had to peer into the room to find him and then calmly request that Portrey use a taser. The Court cannot determine as a matter of law that it was reasonable to tase a mentally-ill man who had committed no crime when the officers might simply have backed away from the encounter. But qualified immunity provides a higher standard: the right must be "clearly established" at the time of the incident.

The right to be free from the use of excessive force is, of course, clearly established. The Court must conclude if the situation was as calm as William presents it—if Douglas had taken a defensive posture deep inside his apartment, if the officers had no pressing reason to escalate the situation, and if Douglas was shot *through* a door closing in the faces of the officers—the use of deadly force would be clearly unreasonable. Thus, it cannot be said as a matter of law that the officers are entitled to qualified immunity. Defendants' Motion for Summary on this point is **DENIED.**

## 2. Failure to Take Reasonable Steps to Secure Medical Care

Defendants next argue that Officer Benkert "had no legal duty to provide medical aid, beyond summoning it as he did within 120 seconds of the shots," (Defs.' Mot. for Summ. J. at 25), and that Chief Fehlman properly restrained medics at the scene.

Claims that officers have failed to provide medical care were previously analyzed under the due-process clause of the Fourteenth Amendment. *See City of Revere v. Mass. Gen. Hosp.*, 463 US 239, 244 (1983). In *Graham v. Connor*, 490 U.S. 386 (1989), however, the court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Id.* at 395. Thus, courts now sensibly analyze both claims of excessive force and failure to render post-arrest medical aid under the same reasonableness standard of the Fourth Amendment. *See Tatum v. City and County of San Francisco*, 441 F. 3d 1090, 1099 (9th Cir. 2006) (holding that "a police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment"); *see also Mejia v. City of San Bernadino*, No. 11-cv-452, 2012 WL 1079341, at *5 n.12 (C.D. Cal. Mar. 30, 2012) (noting that *Tatum* mandates analysis of post-arrest medical care under the Fourth Amendment in the wake of *Graham*).

The Court must reject Defendants' argument that Officer Benkert and Chief Fehlman's conduct in restricting medical access to Douglas was reasonable as a matter of law. Plaintiffs have presented evidence that Officer Benkert knew he had struck Douglas with at least one shot and had told Chief Fehlman so, (Roberts Decl., Ex. 9, (Dep. of Jon Fehlman, 129:22–130:6)), and that officers could have checked on Douglas by using a ladder to look through a skylight. (*See* Pls.' Resp. at 9.) Indeed, Plaintiffs argue that William was restrained from using a ladder to look into the apartment immediately following the shooting , but officers used *exactly* that option—the ladder—over an hour later. Defendants fail to explain what changed in that time to render the use of a ladder too dangerous in the first half-hour but safe an hour-and-a-half later. While the Court takes no position on the evidence, Plaintiffs paint a picture whereby a

reasonable factfinder could conclude that Officer Benkert and Chief Fehlman's restriction of medical aid was unreasonable and led to Douglas's death.

Defendants rely on *Alford v. Humboldt County*, 785 F. Supp. 2d 867 (N.D. Cal. 2011) in arguing that "delaying aid because of safety concerns—even those created by the officer–does not violate the Constitution." (Defs.' Mot. for Summ. J. at 27.) But the factual differences between *Alford* and the case at hand compel a different result. In *Alford*, a mentally-ill man, Mr. Stewart, broke into an acquaintance's home and displayed bizarre behavior suggesting he was on methamphetamines. *Id.* at 870. He informed the inhabitants that he had "slit a person's throat and he felt evil." *Id.* When police arrived, Stewart "pull[ed] out what appeared to be two butter knives, and scream[ed], 'Welcome to the Dragon, m-----------s!'" *Id.* at 871. He then went into the house and retrieved a rifle, which he "dry-fired" at the officers. *Id.* The owner of the house informed officers that he had many weapons in the house, including assault rifles. *Id.* During the standoff, Stewart twice fired at officers. *Id.* Eventually, officers used tear gas, which tragically started a fire. *Id.* at 873–74. Neither officers nor firefighters were permitted to enter the home because of the concern that Stewart was armed and because of concern that "ammunition was 'cooking off,'" i.e., unpredictably exploding. *Id.*

In contrast, there is no argument that Douglas was armed with a firearm, and Plaintiffs have argued that there was little or no risk involved in investigating Douglas's status through the skylight. Given these facts, summary judgment is unwarranted. And for similar reasons, the Court must deny qualified immunity. The right to medical aid in these circumstances is "clearly established," see *City of Revere v. Massachusetts General Hospital*, 463 US 239, 244 (1983), and qualified immunity is inappropriate where the disputed evidence suggests that officers knew Douglas was wounded, had no firearm, and had a safe avenue to investigate his medical needs.

**E. Failure-to-Train Claims Against Chief Jon Fehlman and the City of Bainbridge Island**

Plaintiffs argue that the City and Chief Fehlman failed to train officers to deal with mentally-ill citizens and failed to train officers in "de-escalation techniques, non-lethal tactics,

and the decision-making process that should accompany use of lethal force," and those failures amount to deliberate indifference. (Am. Compl. ¶¶ 43–45.)

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). To succeed on a failure-to-train theory, a plaintiff must show that a municipality's failure "amount[s] to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Further, a plaintiff must show that "inadequate training actually caused deprivation of constitutional rights." *Merritt v. Cnty. of Los Angeles*, 875 F.2d 765, 770 (1989).

Here, Plaintiffs have presented evidence that fewer than all officers receive training in dealing with mentally-ill persons, despite the likelihood of regularly confronting them. (*See* Roberts Decl., Ex. 8 (Jensen Dep., 24:15–18)); *see also Bd. of Cnty. Commr's of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 398 (1997) (noting that deliberate-indifference element need not be established by "recurring situations," but may be established where single violation is "a highly predictable consequence of the failure to train"). Further, they have argued that proper training, as presented in the Bainbridge Island Police Department's manual, would have led an officer to de-escalate the situation, which may have avoided Douglas's death. (*See* Pls.' Resp. at 28.) Plaintiffs also present testimony by D.P. Van Blaricom, a retired Bellevue police captain, suggesting that proper training would have led the officers to avoid physical contact with Douglas and request a mental health professional attend to the situation. *Id.* at 29.

While the Court considers Plaintiffs' claim indeed tenuous, they have presented evidence as to each element of a failure-to-train claim, and the Court cannot therefore decide the claim on summary judgment. *See Herrera v. Las Vegas Metro. Police Dep't*, 298 F. Supp. 2d 1043, 1053 (D. Nev. 2004) (denying summary judgment on failure-to-train claim on analogous facts).

**F. Ratification**

Plaintiffs argue that the City ratified the alleged constitutional violations and thus have incurred liability for them. (Pls.' Resp. at 31.) A plaintiff may establish municipal liability by showing that "an official with final policy-making authority ratified a subordinate's

unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992). As Defendants correctly argue, however, the failure to discipline an employee is not a ratification. (Defs.' Mot. for Summ. J. at 34.) Here, the facts are highly disputed, and Plaintiffs have shown no evidence that the City ratified unconstitutional conduct.

### III. CONCLUSION

For the reasons stated above, the Court **GRANTS** summary judgment on fourth-amendment claims by William, Joyce, and Tamara, individually, and as to fourteenth-amendment claims by Tamara. The Court **DENIES** summary judgment on William's fourth-amendment excessive-force claim in his capacity as personal representative and as to William and Joyce's fourteenth-amendment substantive-due-process claims. (*See* Defs.' Mot. for Summ. J., Dkt. #51.)

Dated this 7th day of May 2012.

Ronald B. Leighton
United States District Judge