<pre>
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF WASHINGTON
 2                            AT TACOMA

 3
     WILLIAM OSTLING,            )    Docket No. CV11-5219RBL
 4   Individually and as Personal )
     Representative of the Estate )
 5   of DOUGLAS OSTLING, deceased;)
     JOYCE OSTLING; and TAMARA    )
 6   OSTLING;                     )
                                  )
 7           Plaintiffs,          )    Tacoma, Washington
                                  )
 8   vs.                          )    May 21, 2012
                                  )
 9   CITY OF BAINBRIDGE ISLAND,   )
     a political subdivision of   )
10   the State of Washington; JON )
     FEHLMAN; and JEFF BENKERT;   )
11                                )
             Defendants.          )
12   _____)

13
                     TESTIMONY OF D.P. VANBLARICOM
14             BEFORE THE HONORABLE RONALD B. LEIGHTON
           UNITED STATES DISTRICT COURT JUDGE, and a jury
15
     APPEARANCES:
16   For the Plaintiffs:       NATHAN P. ROBERTS
                               JULIE L. KAYS
17                             Connelly Law Offices
                               2301 North 30th Street
18                             Tacoma, Washington 98403

19   For the Defendants:       STEWART A. ESTES
                               RICHARD B. JOLLEY
20                             BRIAN C. AUGENTHALER
                               Keating Bucklin & McCormack
21                             800 Fifth Avenue, Suite 4141
                               Seattle, Washington 98104-3175
22
     Court Reporter:           Teri Hendrix
23                             Union Station Courthouse, Rm 3130
                               1717 Pacific Avenue
24                             Tacoma, Washington  98402
                               (253) 882-3831
25   Proceedings recorded by mechanical stenography, transcript
     produced by Reporter on computer.
</pre>

1              T A B L E   O F   C O N T E N T S

2

3                         May 21, 2012

TESTIMONY                                          PAGE

4

5   DONALD "D.P." VANBLARICOM

        Direct Examination By Ms. Kays................. 5

6       Cross-Examination By Mr. Jolley............... 34
        Redirect Examination By Ms. Kays............. 86

7

8   EXHIBITS

9  Exhibit Nos. 48 and 49 .......................... 3

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                MONDAY, MAY 21, 2012 - 1:30 P.M.

2                              * * *

3        (Luncheon recess; Jury not present.)

4            THE COURT:  Please be seated.  Good afternoon.

5    Anything before the jury comes back?

6            MS. KAYS:  Yes.  Mr. Jolley, we understand, will be

7    cross-examining Mr. VanBlaricom.  We would seek the admission

8    of Exhibit 48 which is a general orders manual on annual

9    training and Exhibit 49, which is another general orders

10   manual provision which relates to arrest, search and seizure.

11           THE COURT:  Okay.  Mr. Jolley?

12           MR. JOLLEY:  No objection.

13           THE COURT:  So 48 and 49 will be admitted.

14               (Exhibit Nos. 48 and 49 admitted.)

15           MR. JOLLEY:  Your Honor, just so we don't have any

16   issues here, it's our understanding that Mr. VanBlaricom is

17   just being called to testify about training --

18           THE COURT:  Training.

19           MR. JOLLEY:  -- that I know he has opinions such as

20   Officer Portrey and Officer Benkert's, the fact that they were

21   hired, it would seem that's well beyond the scope as well as

22   anything dealing with the force or rendering aid.

23           THE COURT:  Yes.

24           MS. KAYS:  Your Honor, with respect to the motions in

25   limine, I have had conversations and refreshed Mr. VanBlaricom

1    about the status of Officer Benkert and Officer Portrey.  We

2    are in clear agreement on that.

3        With respect to the latter two portions, I thought I heard

4    Your Honor say this morning that Mr. VanBlaricom could discuss

5    training as it relates to training on the subject of use of

6    force and rendering aid, and if I am mistaken --

7            THE COURT:  The training, force continuum -- force

8    continuum is training, right?

9            MR. JOLLEY:  We would concur, although our

10   understanding is the claim about training is related to the

11   lack of training on dealing with mental illness; that's how it

12   was pled, so....

13           MR. ROBERTS:  It's pled much more generally than

14   that.  It's lack of training as it pertains to the whole

15   incident.  So I don't know why that would be read any

16   differently.  Training is training.

17           MR. JOLLEY:  Your Honor, the summary judgment motion

18   ruling, and responses from plaintiffs, seem to make it clear

19   that just like how it's pled, the training issue is related to

20   the failure to train on mental illness, not the failure to

21   train on reasonable force or failure to train on rendering

22   aid.

23           THE COURT:  What was all the cross-examination of Sue

24   Peters on?  That was force continuum.

25           MR. JOLLEY:  And she's the witness; I think that's

1  what she was being called to testify about:  patrol

2  procedures.

3           THE COURT:  I don't think so.  You wanted -- they

4  wanted to object, I said you could go there because it's their

5  witness and you can pick your nuggets where you find them.

6      So we can deal with the issues of training that deal with

7  the aspects of the case.

8           MS. KAYS:  That's correct that's my intent.

9           THE COURT:  Anything further?

10          MS. KAYS:  No, Your Honor.

11     (Jury present.  )

12          THE COURT:  Welcome back.  Please be seated.  All

13  right, the plaintiffs may call their next witness.

14          MS. KAYS:  We call Mr. D.P. VanBlaricom, Your Honor.

15          THE COURT:  Officer VanBlaricom, if you'd go to the

16  lectern and raise your right hand and be sworn.

17   DONALD "D.P." VANBLARICOM, called as a witness, duly sworn.

18          THE COURT:  Please be seated at the witness stand

19  immediately to my left.  Please keep the volume of your voice

20  up so the people in the courtroom can hear you.  Speak slowly

21  enough so the court reporter can keep up with you.

22                         DIRECT EXAMINATION

23  BY MS. KAYS:

24  Q.  Good afternoon.

25  A.  Good afternoon.

1  Q.  Mr. VanBlaricom, will you please state your first name and

2  last name and spell all of them for the record, please?

3  A.  Donald VanBlaricom, D-o-n-a-l-d  V-a-n-B-l-a-r-i-c-o-m.

4  Q.  Mr. VanBlaricom, what do you do for a living currently?

5  A.  I am incorporated as a litigation consultant in cases

6  alleging police misconduct or malpractice throughout the

7  United States.

8  Q.  Can you tell us what did you do in your prior life, before

9  you became incorporated, so to speak?

10 A.  I was a police officer from age 21 through 50.  I was

11 hired by the city of Bellevue as a 21-year-old fresh out of

12 the Marine Corps.  I stayed there for the next 29, 30 years.

13 I served in every rank and position and capacity.  I retired

14 as Police Chief of Bellevue for 11 years, from 1975 through

15 1985.

16 Q.  And what were the total years you spent with the Bellevue

17 Police Department?

18 A.  Started in 1956 and retired at the end of 1985.

19 Q.  In your years from 56 to '85, I am going to ask you

20 obvious questions, the city of Bellevue grew quite a bit

21 during that time period, did it not?

22 A.  Yes, ma'am, it sure did.

23 Q.  What was the city of Bellevue at its smallest level, or

24 number, I should say?

25 A.  When I came there, there was 11 of us.  I used to put

1    horses back in corral where Nordstrom is today.  So you can

2    have some idea of what the changes are.

3    Q.  I am glad there's been a change.

4        So tell us about your role as a Chief.  What does that

5    just generally encompass and specifically, Mr. VanBlaricom, as

6    it relates to training your men and women on the force?

7    A.  The Chief, either the Sheriff and the Sheriff's Office or

8    the Chief of Police in a police department, is the chief

9    policy maker for that department.  You create the policies

10   under which the officers are going to fulfill their duties.

11       You are responsible for training them in those policies.

12   You are responsible for their conduct on the street.  You are

13   responsible for investigating any complaints that may arise.

14   You try to improve the service as it goes on.  I was the first

15   chief in the state to hire women police officers back in 1975,

16   when that was literally unheard of.

17       We tried to stay ahead on all the issues.  Another was

18   domestic violence, because if you are the chief policy maker

19   you have the responsibility to serve your community and you

20   have to deal with the issues that are arising as time goes on

21   and make sure your officers are prepared to deal with those

22   issues.

23   Q.  Mr. VanBlaricom, what have you done to keep current in

24   your training, and current in the conventional schools of

25   thought with respect to training law enforcement officers,

1  since you left the Bellevue Police Department?  Tell us about

2  that.

3  A.  I engage in at least two professional training courses a

4  year.  I will be going down to Glynco, Georgia, to the federal

5  law enforcement training center, actually next month, for a

6  week of training for them.

7      I have to continue to be updated on what's occurring in

8  the business, because it changes.  The laws change, court

9  decisions change, how services are delivered changes.  And if

10 you are going to be kept -- keep up with how it's being done,

11 you have to continue with your training.

12 Q.  Have you testified as an expert such as you are being

13 called in this case, in courts before?

14 A.  Yes, ma'am.

15 Q.  And how many different courts, including federal courts,

16 if you wouldn't mind tell telling us?

17 A.  I have testified at almost every state in the United

18 States.  I was in federal court in Phoenix last week.  Last

19 month I was in federal court in Spokane, over in the Eastern

20 District.  Most cases settle, but when it comes time to

21 actually go to court, then that's when I have to appear.

22 Q.  Do you hold any certifications, Mr. VanBlaricom, and if

23 so, what certifications do you hold?

24 A.  I have a certificate in forensics from the University of

25 Washington, and I am certified as a police litigation

1  specialist by the Americans for Effective Law Enforcement.

2  Q.  What about any publications?  Have you authored any

3  articles or books and the like, or any pamphlets on the

4  subject of police training generally?

5  A.  I have written numerous articles that have been published

6  nationally.  Recently published a book "Investigation and

7  Prevention of Officer Involved Deaths."  I had coauthors --

8  one of them you know as Dr. Henry Lee.

9      But professional articles, I usually publish about one a

10 year.  That's the first and only book I have done and I had

11 three other coauthors.

12 Q.  Mr. VanBlaricom, you touched on it when you were

13 introducing yourself to the jury about the fact you were in

14 the marines.  Can you tell us what was your educational

15 background, and it sounds like you served our country as well.

16 Tell me about that.

17 A.  I graduated from West Seattle High School when I was

18 barely 17.  The Korean war was still on and I enlisted in the

19 marine corps.  I was only 20 when I got out and I started

20 applying for police jobs.

21     I didn't go back to college until I was probably around

22 30.  For the next 11 years, I was working full time as a

23 police officer, but I was also going to school.  Graduated

24 from the University of Washington with a Bachelor of Arts

25 degree, and then went to Seattle University and obtained a

1  Master in Public Administration degree, which is about the
2  same time I became Chief of Police.
3  Q.   Mr. VanBlaricom, when approximately were you contacted by
4  Mr. Roberts to review the facts in this case so that you might
5  testify to your opinions?  When were you first contacted?
6  A.   January of last year.
7  Q.   In the course of your review of the materials in this
8  case, let's first talk about that.  What materials did you
9  review, just in general, if you don't mind?
10 A.   There's a whole single-spaced page of them.  But I
11 reviewed all the reports in this matter, the policy manual for
12 the Bainbridge Island Police Department, the depositions of
13 all of the participants, and policies from the national law
14 enforcement policy center.
15 Q.   You have before you a folder of sorts.  Included in that
16 folder, is there a copy of the report that you authored,
17 articulating your various opinions this case?
18 A.   Yes, ma'am.
19 Q.   I want to ask you:  you mentioned your review of various
20 materials.  Before I do that, will you please, in the course
21 of rendering your opinions and testifying before our jury,
22 will you please respond to questions in which you offer your
23 opinion on a more probable than not basis?  In other words,
24 your opinion on a more probable than not basis?
25 A.   Yes, ma'am, that's how I do it.

Q.  I want to ask a couple more questions about your role as
Chief of Police.  I believe you said you were the chief policy
maker when you wear that title or earn that title of Chief of
Police.  As it relates to training the men and women of your
force, how important is it, again, talking about the general
orders manual or something of that ilk for your given police
department?  In your training and in your experience,
Mr. VanBlaricom, how important is it for the Chief of Police
to make sure his or her members know what is contained within
that general orders manual?
A.  Probably the most important thing you do for your officers
is to make sure that they are adequately trained.  You can't
expect them to do the job that you set forth for them if you
don't train them in how to do it.

     Policing is different than most vocations.  There are
peculiarities about the business that are not generally well
understood, but most of what police officers do is oriented
toward public safety.  That's the fundamental issue with why
you pay police officers to be out there on the streets, so
that when a public safety issue arises they will address it
intelligently.

     And the reason we put together policies, is we know
certain things are going to happen over and over again.

     Now, you can't plan in detail for every single event that
you may have to respond to, but in general you can.  You can

1   anticipate certain problems and you can think about them in

2   advance, put that into a policy manual, adopt procedures and

3   then train the officers on how to fulfill those policies and

4   procedures.  Policy without training doesn't work.  Training

5   without policy doesn't work.  You have to mesh the two.  You

6   have to have the policies.  You have to have the training.

7        And training one time and forgetting about it simply

8   doesn't work.  You have to repeat the training in those areas

9   that you are most likely to have to exercise even more good

10  judgment.

11       Use of force is a common issue.  Vehicular pursuit is

12  another issue.  These are things that are going to occur over

13  and over again.  To conduct them safely, you have to have

14  thought them out and trained your officers in how to proceed.

15  Q.  Mr. VanBlaricom, I know when you were introducing yourself

16  and your role with the Bellevue Police Department, you talked

17  about being on the cutting edge of hiring women and then also

18  on the cutting edge from your presentation of training folks

19  on domestic violence.  I want to ask you, based upon your last

20  answer, how important is it for the chief of a respective

21  department to pay attention to those recurring circumstances,

22  be it domestic violence or as you obviously mentioned the use

23  of force?  How much do you have to have the finger on the

24  pulse of hey, what's happening in our community and I want to

25  make sure my guys and gals on the force are trained

1  accordingly?  Tell us about that.

2  A.  You have to have a reporting system in place so you are

3  aware of what's going on out in the street.  If you think you

4  can sit in your office and dictate down and it's somehow going

5  to magically happen, it doesn't work that way.  You have to

6  have feedback coming back to you to let you know that what you

7  are trying to accomplish is actually being done out there.

8       Domestic violence is probably a great example.  In 1982 I

9  had two murder suicides back-to-back.  We knew they were going

10  to occur.  We couldn't prevent them, and we asked ourselves,

11  why couldn't we prevent them.  So we studied the problem and

12  we learned how you can prevent domestic violence and created a

13  program that quite frankly became a model for this state.

14       You have to know what's going on in your community.

15  Mental illness is an issue in this case.  Five percent of the

16  people out on the street, in the United States today, are

17  seriously mentally ill.  The police are going to be dealing

18  with them, you know that to an absolute certainty.  Because

19  when people are mentally ill and they act out, who gets

20  called?  We do.

21       So when the police arrive, they have to have some idea of

22  how to handle a mentally ill person and it's not the way you

23  handle every other citizen because the circumstances are

24  entirely different.

25  Q.  Mr. VanBlaricom, you mentioned the subject of mentally ill

1  persons and you gave a percentage there.  I want to ask you,

2  in the course of your work in reviewing the materials in this

3  case, did you review documentation that was gathered from the

4  city of Bainbridge Island Police Department as to how common

5  or uncommon it is for that department to come into contact

6  with mentally ill persons on either a weekly or monthly basis?

7  A.  Yes, ma'am, I did.

8  Q.  Tell us, based upon your review of those documents that we

9  gathered from the city of Bainbridge Island Police Department,

10  how common or uncommon is it or was it -- is it for the city

11  of Bainbridge Island Police Department to come into contact

12  with mentally ill persons?

13  A.  At the time of this shooting, they were having a contact

14  with a mentally ill person an average of 1.89 times a week, or

15  about twice a week.

16  Q.  Does that, again, going back to your role as a chief and a

17  chief policy maker for a department, does that constitute a

18  recurring issue that you would want to train your men and

19  women on how to deal with mentally ill persons if you are

20  having that frequency a contact with them?

21  A.  Yes, you'd want to train them initially but you'd want to

22  retrain them so you keep current on the latest tactics in

23  dealing with the issues.

24  Q.  I want to ask you about -- turn to the subject of the

25  general orders manual or the policy manual for this

1  department.  In this case you reviewed the Bainbridge Island
2  Police Department general orders manual?
3  A.  Yes, ma'am.
4  Q.  In the course of your review of that material, you
5  mentioned it in part, but it is enough to have just a policy
6  manual or do you have to make sure that folks in your
7  department know what's in the manual and know how to take
8  action based on what's in the manual?
9  A.  You have to train them on the manual and test them on the
10 training.  Back in old-fashioned police departments, they
11 handed you the manual and said "read this and ask us about
12 anything you don't understand."  That's not training.  You
13 have to sit the officer down.  In those areas which have a
14 high likelihood, or a potential for violence, you have to be
15 sure they thoroughly understand them.
16    A manual, a procedure, a policy, a general orders manual
17 is sort of like a cookbook.  If you don't follow the recipe,
18 you are probably not going to like the end result.  So you
19 have to make sure they understand the recipes and how to apply
20 that, those recipes, to the situations with which they are
21 confronted.  And that requires training.  What you want is
22 conditioned response.  If you train a person, and we certainly
23 do this in shooting, we train them over and over and over how
24 to respond and when the emergency arises, you get a
25 conditioned response.

1  Q.  Mr. VanBlaricom, I want to put on the document screen here

2  Exhibit 48 which has previously been admitted.  This is from

3  the Bainbridge Island general orders manual.  I have

4  highlighted 06.190 that relates to annual training.

5     It states, and I am summarizing, 40 hours of in-service

6  training a year will be provided to employees -- that's

7  officers in essence, that have enforcement -- responsibility

8  for enforcement of criminal laws.  Do you have a quarrel with

9  this provision of the policy of the general orders manual from

10 Bainbridge?

11 A.  No, ma'am, annual in-service training is a very good idea.

12 We had 80 hours in my department, but we had a high emphasis

13 on training.

14 Q.  Is it enough to just let your rank and file, your

15 officers, out there on the street pick and choose what they

16 want to train on?  What if, for instance, I had a particular

17 interest in boating safety.  Do I just get to pick 48 hours of

18 boating safety or should there be requirements in that

19 40 hours?

20 A.  No, the department sets the training priorities based on

21 needs.  It's not for amusement.  It's not like going to the

22 classes you like best.  It's what you need to know in order to

23 do your job.

24 Q.  As it relates to this case, did you review the training

25 records for Officer Benkert and Officer Portrey in this case?

1  A.  I did.

2  Q.  And at any point in your review of their respective

3  training records, did you see training on how to implement or

4  enact, if you will, the Bainbridge Island Police Department

5  policy on dealing with mentally ill persons?

6  A.  There was no such training.  In fact, the Chief said they

7  don't give such training.

8  Q.  I want to turn to that subject of dealing with the

9  mentally ill.  We've seen this and I will just put it up on

10  the screen; it's Exhibit 22 which has previously been

11  admitted.  It's the section -- patrol provision which relates

12  to dealing with the mentally ill.

13     Mr. VanBlaricom, are you familiar with that section of the

14  general orders manual, the section entitled "Dealing With the

15  Mentally Ill?"

16  A.  Yes, ma'am.

17  Q.  As a practical matter, the policy on that subject from the

18  general orders manual, do you have a quarrel with that policy?

19  A.  No, it's an excellent policy, very well written.

20  Q.  As it relates to knowledge of that policy, I want to ask

21  you a couple questions about that.  Is it important that the

22  rank and file at the Bainbridge Island Police Department know

23  what this policy is?

24  A.  They have to know it, they also have to understand it.

25  Q.  We have heard testimony in this case, with respect to

1  dealing with mentally ill persons, that the suggestion is that
2  it just takes "people skills."  Would you tell us in your
3  professional opinion, does it just take people skills to
4  interact with mentally ill persons as a police officer?
5          MR. JOLLEY:  Objection, foundation.
6          THE COURT:  Overruled, he can answer if he can.
7  A.  It takes more than people skills.  Dealing with the
8  mentally ill is much different than dealing with the normal
9  people that police officers interact with on a daily basis;
10 much, much different.
11 BY MS. KAYS:
12 Q.  What is the benefit, if say only a snapshot of the
13 population, be it Bellevue or on Bainbridge Island -- if only
14 a small number of the population has a mental illness or
15 suffers from a mental illness, what's the benefit to those who
16 aren't mentally ill that you serve as a police officer to
17 officers receiving training on this subject?
18 A.  Well, everyone who's mentally ill has relatives that are
19 interested in their well-being, so that's part of the
20 clientele.  If the mentally ill are handled improperly, you
21 are likely to exacerbate not only their present circumstances,
22 but their future contacts with the system.  If you can provide
23 assistance to a person who is mentally ill without having it
24 escalate into a violent confrontation you've served everyone
25 better:  the mentally ill person, their loved ones, and

1    yourself.

2        It's far better to talk for fifteen minutes than it is to

3    fight for five, I can tell you.  If when you are contacting a

4    person who's mentally ill, especially if you've just been told

5    they are mentally ill, you know you are dealing with a person

6    who has a different grasp of reality than you do.

7        So consequently, the usual officer approach to any

8    situation is take charge.  When you are dealing with a

9    mentally ill person it's shifting gears to do exactly the

10   opposite.  You have to slow it down.

11       If an officer never remembered anything else, slow it down

12   when you are dealing with the mentally ill, because they are

13   not going to respond as quickly.  If you make unreasonable

14   demands on them, from their perspective, they are going to

15   react defensively and you are going to have trouble.

16       And you don't want to have to fight them.  You don't want

17   to have to shoot them, certainly.  So if you'll just shift

18   gears and slow it down, you'll be able to work with them.

19   Q.  Mr. VanBlaricom, if I could ask you based upon your

20   training and experience in the field of police work, would a

21   reasonable police department train its officers on how to deal

22   or interact with the mentally ill?

23   A.  Absolutely.

24   Q.  We talked about having a policy isn't enough.  In the

25   course of your reviewing the materials, however, did you learn

1   as to whether or not, say, Officer Portrey was even familiar

2   with this provision on how to deal with mentally ill persons;

3   was he even familiar with that provision of the policy manual?

4           MR. JOLLEY:  Objection, comments on the credibility

5   of a witness.

6           THE COURT:  Overruled.

7   A.  He specifically said he was not familiar with it.

8   BY MS. KAYS:

9   Q.  What does that tell you about Bainbridge Island and its

10  commitment to training on this subject of dealing with

11  mentally ill persons?

12  A.  They were not trained.

13  Q.  Based upon your review of the facts in this case, the

14  actions of Officer Benkert and the actions of Officer Portrey

15  in responding to that 911 call, and let's just stop at the

16  point where they are entering the Ostling residence and

17  Mr. Ostling tells the officers, or by their account at least

18  just one officer, that his son is mentally ill, what can you

19  tell us about the training of the Bainbridge Island Police

20  Department on dealing with the mentally ill based upon how

21  Benkert and Portrey react to Bill Ostling saying "My son is

22  mentally ill"?

23  A.  Their policy tells them what they were supposed to do

24  next, which was to talk to the family and gather information

25  about the mental illness.  Unfortunately, they had no training

1  in the policy, so they totally ignored it and they went

2  forward without developing any more information on that issue

3  whatsoever, none.

4  Q.  In your opinion, Mr. VanBlaricom, is the failure to follow

5  the policy on that point, to stop and have a chat with

6  Mr. Ostling, maybe Joyce Ostling once she came downstairs, is

7  the failure to have that conversation with family about Doug

8  and his mental illness, is that directly related back to the

9  failure to train?

10  A.  It must be, because it's in the policy manual.  The

11  officers say they weren't aware of it and they didn't do it.

12  Q.  I want you to go on from that point.  There's still

13  another provision -- obviously, we are still talking about

14  dealing with the mentally ill based upon your review of

15  materials in this case in this case, but I want to put up a

16  second aspect of training that I want to ask you about.  And

17  that's Exhibit 49 which has previously been admitted.

18      Exhibit 49 is again another provision of the Bainbridge

19  Island general orders manual, and at the bottom it states

20  "07.460, arrest, search and seizure."  Employees shall not

21  make any arrest, search or seizure which they know, or should

22  know, is not in accordance with law and departmental

23  procedure."  You read this portion of the general orders

24  manual?

25  A.  Yes, ma'am.

1  Q.  Do you have a quarrel with that?

2  A.  No, ma'am.

3  Q.  Is that sound policy?

4  A.  As sound as can be.

5  Q.  Okay.  So let's talk about that.  How important is it, as

6  a chief, to train your men and women on constitutional issues,

7  such as when it is lawful to enter someone's residence?  Tell

8  me about that.

9  A.  It's absolutely fundamental.  That's the thing that

10  Americans pride themselves on, is the sanctity of their home.

11  And officers are taught to respect people's constitutional

12  rights, to not have an unreasonable search and seizure of

13  their home or their person.  It's absolutely fundamental.

14  It's one of the first thing you teach.

15  Q.  I want to ask you, based upon your review of the facts in

16  this case, the deposition of Officer Portrey, the deposition

17  of Officer Benkert, any statements that they may have made

18  during the course of the Kitsap County Sheriff's Department

19  investigation and the like, did you have any opinions about

20  the ability of the Bainbridge Island Police Department to have

21  effectively and reasonably trained its officers on the

22  constitutional issue present in this case, the entry into

23  Doug's residence?

24  A.  I saw no evidence of it.

25  Q.  Of training?

1  A.  Yes, ma'am.

2  Q.  In the course of reviewing the materials, did you review

3  Officer Portrey's deposition in which he stated that he was

4  going to take the key -- I am paraphrasing his words -- take

5  the key from William Ostling and place it in Doug's door as, I

6  am going to say, an insurance policy or maybe if he needed it,

7  he would have the key in the door to Doug's apartment?  As

8  someone who is familiar with training protocols and the like,

9  is that a technique you've ever heard of training officers on?

10  A.  You either have the authorization to make an entry or you

11  don't.

12  Q.  In this particular case, was there an exception, in your

13  opinion, to the warrant requirement or the warrant being the

14  judicial permission slip to say hey, you can go in there?  Was

15  there an exception to the warrant requirement present based

16  upon these facts?

17  A.  Not based on this case, no, ma'am.

18  Q.  In your years of law enforcement work and then your

19  subsequent work after in the field of law enforcement, have

20  you ever heard of an exception to that warrant requirement,

21  that judicial permission slip requirement, for a welfare

22  check, that if there's a welfare check it's okay for you to

23  kick the door in or go in or do something just because it's a

24  welfare check?

25  A.  Just calling something a welfare check does not obliterate

1  the constitutional guarantees.

2  Q.  The exceptions to the warrant requirement, in your

3  understanding, Mr. VanBlaricom, are what?

4  A.  Exigent circumstances.

5  Q.  Can someone consent to entry into their home?

6  A.  They can.

7  Q.  I said entry into their home.  Did Doug consent, based

8  upon your review of the facts, to entry into his residence?

9  A.  No, ma'am, he specifically rejected it.

10  Q.  I have to assume, Mr. VanBlaricom, that in your years of

11  law enforcement, that sometimes there's subjects that come up

12  where officers might have questions of hey, do I have the

13  authority to go in or not.  How do you train your officers to

14  respond to maybe shades of gray situations, where I think I

15  have consent, no, I don't.  What do you train them to do;

16  what's a reasonably prudent department train its officers to

17  do in those gray areas?

18  A.  First thing you do is have them call a supervisor.  The

19  supervisor should be able to answer the question.  But if the

20  supervisor is not able to answer the question, you go to your

21  legal advisor.

22     I had an in-house attorney that my officers could call

23  from the field.  She was always on-call and available.  If you

24  don't have that, you call the City attorney's office or if you

25  are a deputy sheriff, you call the prosecutor's office.

1    You obtain legal advice before you make the entry.  Now,

2  as I said earlier, there are exigent circumstances under which

3  you can make an entry because it's such an emergency that you

4  have no choice but to go in.  That's not the case here.

5    The legal advice is available to you, first through your

6  supervisor.  If he or she doesn't have the answer, then you

7  get an attorney on the phone and find out the answer to your

8  question.

9  Q.  Mr. VanBlaricom, based upon your review of the materials

10 in this case, and the respective testimony of Officer Portrey

11 and Officer Benkert, in your opinion was training by the

12 Bainbridge Island Police Department on that very subject of

13 entry into a residence during a welfare check, was that

14 reasonable, unreasonable, something different?  Had they

15 failed, had they done a good job?

16 A.  I didn't see anything on it, ma'am.  No training.

17 Q.  Now I want to turn back to dealing with mentally ill

18 persons.  We went through the home, now we are upstairs and

19 the like.  And you'll recall the factual scenario at that

20 point, which is Doug Ostling is expressing to officers Portrey

21 and Benkert to go away and the like.  Did you see evidence at

22 that point, be it whether Officer Benkert is having a

23 conversation with Doug or Officer Portrey, depending upon the

24 factual disputes here, did you see evidence that officers

25 Benkert and Portrey were following their general orders manual

1  in how to interact with mentally ill at this point in the
2  facts?
3  A.  They were not.
4  Q.  What does that tell you, Mr. VanBlaricom, about the
5  adequacy or the inadequacy on the training of this subject by
6  the Bainbridge Island Police Department?
7  A.  If they are not acting in accordance with their policy
8  manual, they are defacto untrained in it or else they ignored
9  it and ignored their training.  But in this case, they say --
10  Officer Portrey says I am not familiar with that part of the
11  manual.  And the Chief says they just don't train on that part
12  of the manual or dealing with the mentally ill.  They weren't
13  trained.
14  Q.  When there's a factual dispute as to who opened the door,
15  be it Doug or one of the officers, regardless, after the point
16  that the door is opened, Mr. VanBlaricom, and I want to turn
17  to the subject of the use of force and training on the use of
18  force if I could.  Which is, tell us how -- you did see in the
19  review of Officer Benkert and Officer Portrey's training
20  records, that they received use of force training, correct?
21  A.  Yes, ma'am.
22  Q.  Based upon the actions that were taken in response to Doug
23  Ostling, can you tell us if you saw any inadequacies or was it
24  adequate, the training received by these officers by the
25  Bainbridge Island Police Department on the use of force?

A.   The policy and presumably the training, going to the

firearms range and actually firing their weapon, was adequate.

They knew how to do that.

   Whether or not there was probable cause to believe they

were in jeopardy at the time the shots were fired is

ultimately an issue for you folks.  There are disputed

versions of facts as to how this actually went down.

   I obviously wasn't there.  I don't know.  But depending on

whom you believe, they either did this inappropriately or

appropriately.

Q.   I want to ask you about certain aspects of training on the

use of force, if I could, which is, we heard testimony about

something that's called a low ready position, when an officer

draws his or her firearm.  Tell us what that term "low ready"

means as it relates to training in how to use force.  Tell me

about that.

A.   Sure.  I was a firearms instructor for 13 years.  The low

ready position is you have your weapon in both hands.  You

have it pointed downward at approximately a 45-degree angle.

It means that I know there may be a threat here, but it really

hasn't identified itself yet or made itself imminent.  So I am

just ready.  And that's why they call it low and ready.

Q.   Are you trained to have a low ready position, to have it

held -- your firearm held in such a manner if there's actually

a threat, someone either threatening with a weapon or posing a

1  threat to you as an officer?

2  A.  No, ma'am.  When the threat actually identifies itself and

3  you are confronted with it, the weapon comes up like this

4  (indicating) and you are pointing right in this area

5  (indicating).

6  Q.  And right in this area is called what, in your line of

7  work?

8  A.  It's called center mass, but it's where all the stop

9  buttons are.

10  Q.  Let's turn to a different aspect here, which is you read

11  and reviewed material that Officer Portrey used a Taser.  Did

12  you read that?

13  A.  I did.

14  Q.  As it relates -- and there's a factual dispute as to what

15  position he was in on the stairway, or on the landing when he

16  used this Taser.  But regardless, was the use of the Taser

17  something that would be trained on by you; would you train a

18  force on how to use a Taser and when to use it?

19  A.  You train on how and when to use it, yes, ma'am.

20  Q.  In the facts presented in this case, did -- in your

21  opinion, was the use of the Taser appropriate given the

22  training that should have been received on when to use and how

23  to use it?

24  A.  If the decedent was presenting the axe as a weapon and was

25  perceived as a real threat, a Taser would never be introduced

1  into this scenario.  That's a deadly force situation.

2      Since the Taser was used, that indicates to me that it was

3  not a deadly force situation.

4      Officers are told that a Taser is no substitute for deadly

5  force when you are confronted with a deadly force threat.

6  That's an absolute.

7  Q.  Mr. VanBlaricom, given the use of the Taser here, does

8  that suggest to you anything about the reasonableness or

9  unreasonableness of the training by the Bainbridge Island

10  Police Department of its officers on the use of force or in

11  this case of nonlethal force?

12  A.  All I can say on that is if the officers felt threatened,

13  really threatened by this weapon, this axe, a Taser would have

14  never been introduced.  That wouldn't have even been

15  considered.

16  Q.  I have up here on the screen, the chapter on use of force.

17  Mr. VanBlaricom, you reviewed this chapter in the general

18  orders manual, it's Exhibit 21.

19  A.  Yes, ma'am.

20  Q.  And did you have any quarrels with any of the provisions

21  under use of force?

22  A.  No, ma'am.

23  Q.  Let's talk about another aspect, which is rendering aid

24  after the use of deadly force.  Did you read that provision?

25  A.  Yes, ma'am.

1  Q.  Based upon your training and experience, Mr. VanBlaricom,

2  is that policy to render aid or summon aid promptly, is that

3  an important part of an officer's authority to use deadly

4  force, that you've got to render aid as promptly as possible

5  after you use it?

6  A.  After you put them down you have to help them.

7  Q.  Now, in this particular case, we learned that aid cars

8  were not -- or an aid person, a paramedic was not permitted to

9  go up and care for Doug until an hour and 15, maybe an hour

10 and 20 minutes after the shooting.  Do you recall reviewing

11 those facts?

12 A.  An hour and 20 minutes, yes.

13 Q.  Did you see evidence that the Bainbridge Island Police

14 Department reasonably trained its officers on rendering aid

15 after the use of deadly force, based upon the facts in this

16 case?

17 A.  They knew that they were supposed to render aid.  So

18 presumably they had some training on that.  They just simply

19 didn't do it.

20 Q.  There's policy -- and you can't, I am assuming, encompass

21 every scenario in a policy, can you?

22 A.  As I first said, you deal with the generalities.

23 Q.  Based upon your experience in the field of law

24 enforcement, Mr. VanBlaricom, is it enough to just -- after

25 the use of deadly force, is it enough to say radio to dispatch

1  and say we need aid cars; is that enough to satisfy the spirit

2  of that policy?

3  A.  Well, you have to have -- you have to notify the aid cars

4  to be dispatched, but you also have to render aid to the

5  individual.  If you know they have been shot, then you are

6  required to render aid.  In this case, there was no doubt.

7  Even the officer that shot him said "I know I hit him."  He's

8  down.  He's wounded.  Now you have to render aid.

9  Q.  In your opinion, Mr. VanBlaricom, would it have been

10  prudent in accord with policy of the Bainbridge Island Police

11  Department to promptly render aid; would it have been prudent

12  and acceptable for officers to go into Doug's apartment door

13  right away?

14  A.  Sure.  They had the key.

15  Q.  I want to go back to our first question about the

16  constitutional considerations.  Remember we talked about those

17  exceptions to the warrant requirement?  After Doug was shot

18  through the door, was there an exception to the warrant

19  requirement there?  In other words, did Officers Benkert and

20  Portrey have to wait for a warrant from a judge in order to go

21  in?

22  A.  No.  Now there are exigent circumstances.  You have to

23  render aid to the person you know is injured inside the

24  premises.  Those are one of the emergencies that's an

25  exception to the warrant rule.

1  Q.  I want to talk to you related to this about Bill and Joyce

2  Ostling.  You reviewed the fact they said let us go up, let us

3  check on our son and they were begging and pleading with

4  Officers Benkert and Portrey.  In your training and your

5  experience, would you have permitted the Ostlings to go up and

6  check on their son?

7  A.  You have no authority to prohibit it.  I would have

8  provided the aid myself, but if I was unwilling to do so, you

9  have no authority to prevent their parents from doing so.

10 Q.  I want to continue and ask you about the requirements of

11 the general orders manual that requires in the case of a

12 deadly force shooting, that a statement is to be provided

13 within 24 hours.  That's what the Bainbridge Island Police

14 Department general orders manual requires; is that correct?

15 A.  Yes, ma'am.

16 Q.  Was that the same for you --

17        MR. JOLLEY:  Your Honor, we are beyond the scope.

18        THE COURT:  Where are we going?

19        MS. KAYS:  I was going to ask about training on that

20 subject.

21        THE COURT:  Training more general.  We are not going

22 to compare service agencies.

23        MS. KAYS:  That's fine.

24 BY MS. KAYS:

25 Q.  Can you tell us, is it appropriate to train your officers

1  on what -- not only we talked about rendering aid, but is it

2  appropriate to train your officers on the policies to be

3  followed after the use of deadly force?

4  A.  It's not so important to train them on that because you

5  have supervisors that are simply going to tell them to do what

6  they are required to do under the policy.  I mean, I wouldn't

7  expect every officer to know precisely what he's supposed to

8  do during a shooting investigation.  I would expect the

9  officers that conduct the shooting investigation to know what

10  has to be done and simply require the officer to comply.

11  Q.  I want to ask you about as a Chief of Police and based

12  upon your training and experience, are public statements that

13  are made by the Chief following the use of deadly force, if

14  those statements are inaccurate in any way, does the Chief

15  have an obligation to correct the record?

16          MR. JOLLEY:  Objection, relevance.

17          THE COURT:  Sustained.

18  BY MS. KAYS:

19  Q.  Do you have, on the subjects that we've covered,

20  Mr. VanBlaricom, which is dealing with mentally ill persons,

21  that provision of the general orders manual, and the

22  constitutional issues that are present in this case, entry

23  into a residence and the like; do you have an opinion as to

24  the adequacy or inadequacy of the training by the Bainbridge

25  Island Police Department on those two subjects?

1          MR. JOLLEY:  Asked and answered, Your Honor.

2          THE COURT:  Overruled.

3   A.  It was inadequate, ma'am, demonstratively.

4          MS. KAYS:  Thank you.  I have no further questions.

5          THE COURT:  Mr. Jolley.

6          MR. JOLLEY:  Thank you, Your Honor.

7                    CROSS-EXAMINATION

8   BY MR. JOLLEY:

9   Q.  Mr. VanBlaricom, good afternoon.

10  A.  Good afternoon, Mr. Jolley.

11  Q.  Now, Doug Ostling is the person who actually called 911,

12  correct?

13  A.  Yes, sir.

14  Q.  And you reviewed the autopsy report and actually

15  referenced that in your report in this case, correct?

16  A.  Yes.

17  Q.  And you know from reviewing the autopsy report, that

18  Doug's blood alcohol level was a .10, correct?

19  A.  Yes, sir.

20  Q.  And that's legally intoxicated in Washington if your blood

21  alcohol is at that level, correct?

22  A.  For purposes of driving.  It's not otherwise intoxicated.

23  Q.  Now, Doug was upset prior to a police officer ever

24  arriving at the residence, correct?

25  A.  I think that's a fair statement, yes, sir.

1    Q.   Now, Doug was a mentally ill adult male, correct?

2    A.   Yes, sir.

3    Q.   About 6-foot 1, 185 pounds, and he was diagnosed as a

4    paranoid schizophrenic, correct?

5    A.   And bipolar, yes.

6    Q.   Now, have you actually gotten to put eyes on the axe that

7    was found there in Doug's room following the incident?  Have

8    you seen the actual axe?  Have you got to touch it or look at

9    it?

10   A.   I am not sure what you are asking.  Did I witness this

11   shooting?

12   Q.   No.  Have you actually gotten to see the axe in question?

13   A.   Oh, the axe; no, sir, I haven't.  I have seen a picture of

14   it.

15   Q.   You know from the photograph it's a long-handled

16   double-bladed axe that was found in his room, correct?

17   A.   Yes, sir.

18   Q.   There's nothing in the factual record that would dispute

19   that Doug was wielding this axe when the door comes open and

20   the officers are on the stairs and the landing, correct?

21   A.   I think he had it in his hands.  He certainly could not

22   have had it in his hands in the manner it's described.  But I

23   am sure he had it in his hands.

24   Q.   We know Doug Ostling had the axe in his hands when that

25   door opened, correct?

1   A.   I believe that's correct, yes.

2   Q.   We don't know how long Doug Ostling had that axe in his

3   hand before the door swung open, correct?

4   A.   We have no way of knowing.

5   Q.   In fact he could have been holding the axe when he called

6   911 earlier?

7   A.   It would be pure speculation either way.

8   Q.   Now, nobody knows what Doug intended to do with that axe,

9   correct?

10  A.   I would think that's a fair statement.

11  Q.   And we know that Doug ignored warnings to drop the axe,

12  correct?

13  A.   I understand that the officers say they gave warnings to

14  drop it, yes, sir.

15  Q.   Now, at some point prior to Officer Benkert firing his

16  weapon, the officers attempted to use less than lethal force;

17  correct?

18  A.   That's the use of the Taser; yes, sir.

19  Q.   Now, we know at some point Doug is moving closer to the

20  door, because at some point the door closes, correct?

21  A.   At some point the door closes because they shot through

22  it.

23  Q.   That's not a very precise question.  We know for Doug to

24  close the door he had to move forward from the position he was

25  in where he was Tased, correct?

A.   I don't think that we know that at all.   The door swings
inward.   The officer described him as stepping back in the
room when he saw the officers outside.   I don't know if the
door was within reach or not.   But it would be a simple matter
of slamming it closed if he chose to do that.

Q.   So you are disputing that Doug would have been advancing
towards the police officers prior to shots being fired?

A.   At one point they say he was retreating.   At another point
they say he was advancing.   I obviously don't know which it
is.

Q.   Now Doug was approximately five feet from Officer Benkert
when the shots were fired, correct?

A.   I am not certain of that distance either.

Q.   Put it this way:   you wouldn't put it at 10 feet, correct?

A.   I think that's unlikely.

Q.   There's nothing you can point to in the factual record
that would actually dispute that Doug was five feet when shots
were fired?

A.   You simply can't -- from the trajectories there's no way
that you can calculate the distance.   It's just not possible
to do so.

Q.   And we know that one shot went through an open door,
correct?

A.   Correct, the first one.

            MR. JOLLEY:   Your Honor, may I approach

1  Mr. VanBlaricom?

2          THE COURT:  A-171?

3          MR. JOLLY:  That's correct, Your Honor.

4  BY MR. JOLLEY:

5  Q.  Mr. VanBlaricom, that's Exhibit A-171 that's been admitted

6  into evidence.  That's a study guide provided by Officer

7  Portrey related to his training that he received at the basic

8  law enforcement academy.  Now, would you take a look at what's

9  marked as number 5 on page 1 of A-171?

10 A.  Okay.

11 Q.  Now, number 5 references "How to handle an angry person."

12 Correct?

13 A.  Correct.

14 Q.  Now, how to handle an angry person would be training that

15 could prove useful in dealing with someone that is mentally

16 ill, correct?

17 A.  If it's directed towards mental illness.  If you are

18 talking about crisis intervention with a person who's not

19 mentally ill, it would be totally different.

20 Q.  But knowing how to deal with an angry person could be

21 useful if a police officer is confronted with someone who's

22 mentally ill, correct?

23 A.  No, sir, because the way you deal with an angry person

24 who's not mentally ill is totally different than you would

25 from one who you know is mentally ill.

1   Q.   Mr. VanBlaricom, there are times that mentally ill people

2   are angry, correct?

3   A.   Sure.

4   Q.   And you actually listened to the 911 tape where Doug

5   Ostling is calling in, and the call receiver respond at Kitsap

6   Central Communications?

7   A.   Yes, sir.

8   Q.   And Doug Ostling sounds really angry, doesn't he?

9   A.   She described it as sounded like it's an excited delirium

10  case, and I would tend to agree with that.

11  Q.   She also described him as being "very irate," didn't she?

12  A.   She did.

13  Q.   Now, we can gather from number 5, that Officer Portrey

14  received training on how to deal with an angry person when he

15  was in the basic law enforcement academy?

16  A.   If he was simply angry, yes, sir, I would agree with that.

17  Q.   Now, number 6 reads "Differences between neurotic,

18  psychotic, and sociopathic behaviors," correct?

19  A.   Correct.

20  Q.   Now, knowing the differences between those types of

21  behaviors could be useful in dealing with someone who is

22  mentally ill, correct?

23  A.   I don't think it's useful at all, sir.  You are not

24  expected to diagnose them.  You are expected to handle them.

25  Q.   Now, number 7 indicates "Different types of crimes

1    associated with the mentally ill we may contact."  Correct?

2    A.   Which one was that?

3    Q.   Number 7?

4    A.   Number 7, yes.

5    Q.   And looking at number 8, it appears that Officer Portrey

6    got training on something called the Mental Health Treatment

7    Act and related information as to who can commit mentally ill

8    or suicidal subjects, correct?

9    A.   That's standard basic training, yes, sir.

10   Q.   Now, number 9 references "How to approach and interview a

11   mentally ill person," correct?

12   A.   Correct.

13   Q.   So it appears from this study guide that Officer Portrey,

14   at the basic law enforcement academy, got training on how to

15   approach and interview a mentally ill person, correct?

16   A.   It's listed on this study guide.  Whether he received the

17   training or what it is, I don't know.  But it's certainly

18   listed as a bullet point.

19   Q.   And how to approach and interview a mentally ill person

20   can be useful out on the street if a police officer is

21   confronted with someone who's mentally ill, correct?

22   A.   I agree completely.

23   Q.   We know from looking at this exhibit, or at least looking

24   at the first page with the twenty-some-odd bullet points that

25   Officer Portrey received training at the basic law enforcement

1  academy on subjects that relate to dealing with the mentally

2  ill, correct?

3  A.  At the basic academy, yes, sir, for a reserve, I might

4  add.

5  Q.  You are aware that Officer Benkert received training on

6  dealing with the mentally ill when he went to the police

7  academy in Los Angeles, correct?

8  A.  Yes, sir.

9  Q.  Now, let's take a look at Exhibit 22.

10  A.  Is it part of what I have?

11  Q.  My apologies.  It's going to be up on the screen and I

12  think you and plaintiffs' counsel talked about this a little

13  bit.

14  A.  This is exactly the wrong range for my bifocals.

15  Q.  We are going to blow that up for you, Mr. VanBlaricom.

16        MR. JOLLEY:  Mr. Augenthaler, can you blow up 3.135

17  where it says "purpose"?

18  A.  And I have my own copy now, so I can see it.

19  BY MR. JOLLEY:

20  Q.  It's going to be really easy there on the screen.

21  A.  Thank you.

22  Q.  Now, the introductory paragraph on the section dealing

23  with the mentally ill says "That the purpose of this policy is

24  to provide guidance to officers when dealing with suspected

25  mentally ill persons," correct?

1  A.  Correct.

2  Q.  Now, the stated purpose of this policy is to provide

3  guidance; isn't that true?

4  A.  That's what it says.

5  Q.  Right.  And guidance indicates that police officers have

6  some discretion in the application of the policy, correct?

7  A.  As long as they stay within the guidelines, sure.

8  Q.  Now, let's go specifically to the section that's entitled,

9  Dealing with the Mentally Ill.  It's a subsection there,

10  under -- let's blow up the part that says "Mental illness."

11      Actually, if we can blow up, Mr. Augenthaler, this section

12  here (indicating).

13          MR. AUGENTHALER:  Yes.

14          MR. JOLLEY:  Actually, let's go down one -- start

15  with -- we will come back to that, just looking at the section

16  that says "regarding the following responses."  We will come

17  back to that.

18          MR. AUGENTHALER:  Okay.

19  BY MR. JOLLEY:

20  Q.  Now, you know from looking at the photographs -- you can

21  put that down for now, Mr. VanBlaricom, I will have to come

22  back to that during the break.  My apologies.

23      You know from looking at the photographs that this axe had

24  two blades on it, correct?

25  A.  Correct.

1  Q.  One blade pointing -- two blades, each pointing opposite

2  directions?

3  A.  Yes, it's a double-bitted axe.

4  Q.  And the axe can be described in police parlance as an

5  edged weapon, right?

6  A.  Yes, sir.

7  Q.  And an edged weapon like this axe is certainly capable of

8  inflicting a deadly blow?

9  A.  No question about it.

10  Q.  Now, if the axe is held at shoulder height, with two

11  hands, that's a position from which the axe can be swung

12  quickly, correct?

13  A.  If you got the room to do it, yes, sir.

14  Q.  And if the axe is within reach of a human target, a fatal

15  blow can be quickly delivered from this shoulder height

16  position, right?

17  A.  I would agree with that.

18  Q.  In fact, if the axe is held at shoulder height, it would

19  be fair to call that a striking position, correct?

20  A.  I suppose you could call it that.

21  Q.  And if the axe is held with two hands it can be swung with

22  more force than one hand, correct?

23  A.  I never thought about it, but I suppose by definition

24  that's true.  If you swing a baseball bat with two hands, it's

25  better than one.

1  Q.  Don't see a lot of guys swinging a bat one hand

2  intentionally?

3  A.  No, sir.

4  Q.  Now, in your document review of this case there's nothing

5  in the record that indicates the plaintiff was holding the axe

6  with one hand, correct?

7  A.  Not that I am aware of.

8  Q.  And Officer Portrey and Officer Benkert always described

9  plaintiff as holding the axe with two hands, correct?

10  A.  They described different positions but they all say two

11  hands, yes.

12  Q.  Now, if plaintiff was holding the axe here at shoulder

13  height, and the officers tell him to drop the axe and he

14  refuses to do so, when the officers are assessing the

15  situation, the way he's holding it under those circumstances

16  could be construed as holding it in a threatening fashion,

17  correct?

18  A.  I would agree with that.

19  Q.  Just based on your review, how far do you think Doug

20  Ostling was with the axe -- let me rephrase that.  How far

21  away do you think Doug Ostling was when Officer Benkert fired

22  his weapon?

23  A.  I don't know.

24  Q.  Assuming for the purpose of this question that Doug is

25  five feet away from Officer Benkert at the time shots were

1  fired, an axe held at shoulder height can be utilized to

2  strike a deadly blow quickly from five feet away?

3  A.  Well, if he advanced with it from five feet away and was

4  striking a blow, that would be true.  But the physical

5  evidence indicates he had gone behind the door and the door

6  was between him and the shooter.

7  Q.  If an axe is held in a striking position, let's say at

8  shoulder height, how quickly can someone deliver a blow at a

9  police officer even if they are 10 feet away?

10  A.  Well, they could probably cross that distance in less than

11  a second.

12  Q.  How many steps does it take to advance 10 feet, based on

13  your training?

14  A.  About three steps.

15  Q.  And how quickly can somebody do that if they are motivated

16  to get from point A to point B quickly?

17  A.  Less than a second.

18  Q.  Now, how far do you think the handle of the axe was, based

19  on your review of the photographs?

20  A.  It looks to me like it's about three to four feet.

21  Q.  And assuming that Doug Ostling is the average sized person

22  that's 6-foot 1, with the average wing span, how far away can

23  he be from a subject with his arms extended and strike them

24  with the axe, if the handle is three to four feet long and

25  he's 6-foot 1 and has an average wing span?

1  A.  I would say to make sure you are going to strike a blow it

2  would probably be about four to five feet.

3  Q.  Now, assuming that Officer Benkert thought that Doug was

4  moving forward, and wanted to attack him, but Doug was

5  actually moving forward to close the door, how much time would

6  Officer Benkert have to react and make that decision either to

7  fire or not to fire if Doug Ostling is, let's say, six or

8  seven feet away?

9  A.  It only takes a third of a second to make that decision.

10  Q.  Now, we know that the Taser is considered to be less force

11  than a firearm, correct?

12  A.  Yes, sir.

13  Q.  That's why it's considered to be less lethal, correct?

14  A.  Yes.

15  Q.  Now, before Officer Benkert ultimately used deadly force,

16  the police officers did attempt to deploy this Taser, right?

17  A.  Obviously did.

18  Q.  So we know that the officers at some point tried to use

19  less force than ultimately was applied, correct?

20  A.  I think that goes without saying.  It's lesser and it was

21  used.

22  Q.  Now, the police officers also used commands in an effort

23  to get Doug to drop the axe, correct?

24  A.  Correct.

25  Q.  So since they attempted to use the Taser and they

1    attempted to use verbal warnings and commands, they attempted

2    multiple methods to disarm Doug before shots were fired,

3    correct?

4    A.   Those occurred before the shots were fired.

5    Q.   Now, Officer Benkert didn't rummage through the Ostling

6    house to obtain a key to the garage apartment, correct?

7    A.   Correct.

8    Q.   And Officer Portrey didn't go rooting around in the

9    drawers to find the key to Doug's apartment, correct?

10   A.   Correct.

11   Q.   Mr. Ostling went inside to retrieve the key for them?

12   A.   He did.

13   Q.   And when Mr. Ostling was asked to go get the key, he

14   didn't tell the police officers "I don't want to do that"

15   based on your review of the records?

16   A.   No, he did not.

17   Q.   And you didn't see anything in your review that would

18   indicate that he was trying to communicate with the officers

19   through his demeanor or physical gestures that he was

20   reluctant to go get the key?

21   A.   I don't know that one way or the other.

22   Q.   When Officer Benkert or Officer Portrey, whoever it was,

23   actually took the key from Mr. Ostling, Mr. Ostling didn't

24   protest and say "I don't want you to have this"?

25   A.   No, sir, I don't believe he did.

1  Q.  And Mr. Ostling didn't tell either Officer Benkert or

2  Officer Portrey "whatever you do, don't open that door"?

3  A.  I don't believe that was said.

4  Q.  Now, you made a site visit to the Ostling residence?

5  A.  Yes, sir.

6  Q.  And you actually saw the door to this garage apartment?

7  A.  Yes, sir.

8  Q.  Did it have the "Welcome" sign on it when you looked at

9  it?

10  A.  I don't recall if it did or not.  It's not something that

11  I would have paid any attention to.

12  Q.  You didn't see anything on the apartment door such as a

13  separate address, 7710 Springridge Road, correct?

14  A.  It's the same address, just different living quarters.

15  Q.  So there wasn't anything that had a house number on the

16  apartment, correct?

17  A.  No, sir.

18  Q.  It didn't say A-2, or Doug Ostling's apartment, no signage

19  like that?

20  A.  No.

21  Q.  It would have been reasonable to conclude that most owned

22  the house and also owned that room out in the garage when the

23  officers were interacting with him, correct?

24  A.  I don't think it would be reasonable to conclude that

25  without asking.

1  Q.  When Mr. Ostling says that's where my son lives or words

2  to that effect, wouldn't that be reasonable -- wouldn't it be

3  a reasonable conclusion for the officers to draw that most

4  owned both the house and the apartment?

5  A.  Well he may have owned in fact the house and the

6  apartment, but it's separate living quarters.  That's what the

7  constitutional provision requires.

8  Q.  Mr. Ostling didn't say "My tenant is upstairs," correct?

9  A.  No, he said his son is upstairs and that's where he lives.

10  Q.  Now, you reviewed Detective Blankenship's interview of the

11  parents following the day of the incident?

12  A.  Yes.

13  Q.  And Detective Blankenship is the person from Kitsap County

14  that sat down with mom and dad and other people there at the

15  Ostling residence and interviewed them the day after, correct?

16  A.  Correct.

17  Q.  Now, according to Detective Blankenship, based on what she

18  reported in her summary, Mr. Ostling told her that when Doug

19  did drink, he was even harder to deal with, correct?

20  A.  I don't remember that, but that's typical.  That's

21  information you would have wanted before you tried to contact

22  him and was available simply by asking.

23  Q.  And we will get to that here in a minute, Mr. VanBlaricom,

24  but a subject who is intoxicated may be more unpredictable,

25  correct?

1  A.   I think human experience shows that to be the case.

2  Q.   And a subject who's been drinking is less likely to make

3  rational decisions, right?

4  A.   Depends on the person's tolerance for alcohol.  Some

5  people that are drunk make very rational decisions.  Others do

6  everything wrong.  I don't think you can speculate in sort of

7  a generality on that.

8  Q.   Put it this way, intoxication is not going to help a

9  mentally ill person like Doug Ostling make better decisions.

10 A.   I think that's a fair assessment.

11 Q.   In fact, intoxication is likely to further impair a

12 mentally ill person's ability to make rational decisions?

13 A.   It's conceivable, certainly.

14 Q.   Now, plaintiff's intoxication could have been a factor in

15 his actions when interacting with the police on the night in

16 question; isn't that true?

17 A.   It could have been a factor in calling 911.

18 Q.   And it would be difficult to separate without more

19 information what behaviors of Doug Ostling's were driven by

20 alcohol and what behavior's were driven by mental illness,

21 correct?

22 A.   I am certainly not qualified to make that analysis.

23 Q.   Now, I understand that it is your opinion that you believe

24 that the officers should have requested additional information

25 from Mr. Ostling about his son's mental illness, correct?

1   A.  Yes, sir.

2   Q.  Now, that step only assists the officers in assessing the

3   situation if Mr. Ostling provides accurate information to

4   them, correct?

5   A.  Well, I guess my emphasis was that they would have to ask

6   before they get any information.  I don't know why he would be

7   presumed to provide other than accurate information.  But

8   their own policy and the police practice universally is when

9   you are dealing with a mentally ill person, to inquire of the

10  family what you may expect.

11  Q.  But Mr. VanBlaricom, isn't it true that asking questions

12  of Mr. Ostling at the scene only helps the officers if

13  Mr. Ostling is willing to provide full and accurate

14  information?

15  A.  I suppose if he didn't respond to their questions, there

16  would be no useful information.

17  Q.  Or if he responded in a way that was inaccurate, that

18  wouldn't help either, would it?

19  A.  By definition it would not.  I don't know why he would do

20  that.  But...

21  Q.  You are aware of your review of the records, that Doug

22  Ostling was diagnosed as a paranoid schizophrenic?

23  A.  Yes, sir.

24  Q.  You know from reviewing the deposition testimony of

25  Mr. Ostling that he doesn't necessarily agree with that

1  diagnosis, correct?

2  A.  I believe he said that that was in question, yes.  And

3  that's certainly not unusual in psychiatric diagnoses.

4  Q.  So Mr. Ostling, if asked, may not have told the officers

5  that his son was a paranoid schizophrenic?

6  A.  I don't know if it would have made much difference if he

7  told them he was a paranoid schizophrenic or a bipolar in a

8  manic phase.  The important thing to know is he is mentally

9  ill, how does he react to the police presence.  They had been

10  there numerous times before.

11  Q.  And we will get to that, Mr. VanBlaricom.

12      Now, the long-handled double-bladed axe is potentially a

13  deadly weapon, correct?

14  A.  Yes, sir.

15  Q.  Now, Mr. Ostling indicated in his deposition that he did

16  not consider this double-bladed axe to be a weapon, correct?

17  A.  I don't remember that, but I wouldn't have paid any

18  attention to it anyway.

19  Q.  Mr. VanBlaricom, would you like to take a look at

20  Mr. Ostling's deposition and see what he said about that?

21  A.  No, if you say that's what he said, that's fine with me.

22  It has no significance to me.

23  Q.  Now, the officers indicate in their depositions that they

24  specifically asked Mr. Ostling if he had weapons, correct?

25  A.  Yes, sir.

1  Q.  And the officers indicate that he most specifically told

2  them no to that question?

3  A.  That's also correct.

4  Q.  If Mr. Ostling indicated he didn't think the axe was a

5  weapon, attempting to obtain information about whether Doug

6  had weapons or whether he was a threat might not have really

7  helped the officers very much, given what Mr. Ostling was

8  willing to convey on that subject, correct?

9  A.  I don't think I can make that stretch, counsel.

10  Q.  Now, you know from your review of the records that at some

11  point there was an incident where Doug poked his mom in the

12  chest, correct?

13  A.  I have heard of that, yes.

14  Q.  You would agree that an adult male poking their mother in

15  the chest is an act of aggression?

16  A.  I would call it an assault.

17  Q.  Now, you were a police chief and before that a patrol

18  officer for nearly 30 years, right?

19  A.  Yes, sir.

20  Q.  And you've dealt with violent felons during the course of

21  your career?

22  A.  Yes, sir.

23  Q.  And many of those violent felons would draw the line at

24  committing an act of aggression directed at their mother;

25  isn't that true?

1  A.  Not if they are mentally ill.

2  Q.  That's not my question, Mr. VanBlaricom.  Many of those

3  violent felons that you dealt with during the course of your

4  career would draw the line at engaging in an act of violence

5  or aggression that was directed at their mother, correct?

6  A.  I can't remember the issue ever coming up, but I suppose

7  that would be the case.  Most sons love their mothers.

8  Q.  An adult male willing to poke their mom in the chest

9  indicates a potential for violence; isn't that true?

10  A.  I think there was a potential for violence.  That's why

11  it's important to handle them appropriately.

12  Q.  Now you know that Bainbridge Island PD had other

13  encounters with Doug over the years?

14  A.  Yes, sir.

15  Q.  In 2009 there was an incident where police attempted to

16  contact Doug, where he brandished something that looked like a

17  club or a bat at them, correct?

18  A.  Correct.  Since there was no crime, they just went away

19  and left him.

20  Q.  Now, you indicated that the police officers not only

21  should have sought information from Mr. Ostling but from

22  Mrs. Ostling as well?

23  A.  If she's available, sure.

24  Q.  Now, you know from Mrs. Ostling's deposition, that she

25  didn't believe that Doug was a paranoid schizophrenic,

1   correct?

2   A.   She may not have believed that as well.

3   Q.   So had she been asked, it's unlikely that that's what she

4   would have told the police, that "my son is a paranoid

5   schizophrenic phrenic," correct?

6   A.   As I already pointed, out it doesn't make any difference

7   what the diagnosis is.   The fact is he's mentally ill and

8   there's a different way to approach people that are mentally

9   ill that's not dependent upon being a diagnostician.   It isn't

10   relevant.

11   Q.   Mr. VanBlaricom, from an officer safety perspective,

12   knowing that somebody is depressed or has attention deficit

13   disorder is different than knowing that someone is a paranoid

14   schizophrenic; isn't that correct?

15   A.   Well, ADD is certainly different than being a paranoid

16   schizophrenic.   But it depends again on whether they are on

17   their meds or off their meds.   You gather intelligence so you

18   know what you are dealing with.   The information is there and

19   available to be had if you only ask.

20   Q.   And you know from the review of the depositions of Mr. and

21   Mrs. Ostling that had the police officers said to either one

22   of them, "is your son taking medication," their likely

23   response would have been "he doesn't need it."   Isn't that

24   true?

25   A.   I don't know what their likely response would be.

1  Q.  And you know that Doug Ostling wasn't taking medication,

2  correct?

3  A.  To the best of my knowledge, he was not.

4  Q.  And he wasn't getting any treatment either, was he?

5  A.  To the best of my knowledge he was not.

6  Q.  Now based on your review of Mrs. Ostling's deposition, you

7  know she didn't consider Doug to be a violent person, correct?

8  A.  I don't recall her saying that, but if that's what she

9  said, so be it.

10  Q.  If the police had asked her on the night in question,

11  Mrs. Ostling, is there anything about your son that would

12  indicate he's violent, her response would have been "no,"

13  correct?

14  A.  I don't know what her response would have been, but if

15  they would have asked her, we'd have known.

16  Q.  Based on your review of Mr. and Mrs. Ostling's

17  depositions, based on your review of their statements that

18  they provided to Detective Blankenship, it's unlikely that

19  either Mr. or Mrs. Ostling would have told the police officers

20  that Doug was violent; isn't that true?

21  A.  That is absolute speculation and I can't speculate one way

22  or the other.

23  Q.  Now, the police went to the house because Doug called 911,

24  correct?

25  A.  Correct.

1  Q.  And once the officers were dispatched to the house, they

2  had an obligation to go to the residence and confirm that

3  nobody was in distress?

4  A.  They had an obligation to find out what was going on, yes,

5  sir.

6  Q.  Once the officers got to the residence, they were able to

7  determine that nobody was in distress there in the main house,

8  right?

9  A.  They were able to determine nobody was in distress

10  anywhere.

11  Q.  When they got to the house, they could tell that nobody

12  was in distress in the main area there in the living room or

13  from what they could see when they first walked in, correct?

14  A.  They certainly were able to do that, yes, sir.

15  Q.  And after confirming that nobody in the main house had

16  called 911 and were told by Mr. Ostling that his son may have

17  called 911, the police had a responsibility to actually check

18  on Doug's welfare; isn't that true?

19  A.  It is not true that they had an absolute responsibility to

20  check on his welfare.

21  Q.  Mr. VanBlaricom, if the police had failed to check on Doug

22  and Doug committed suicide or committed some sort of violent

23  act at his parents, after he had called 911, you would be

24  critical of that; isn't that true?

25  A.  That is not true.  There would be no liability for that

1  whatsoever.

2  Q.  Mr. VanBlaricom, one way to confirm that somebody is not

3  in danger or distress is actually to put eyes on them, right?

4  A.  It's certainly one way.

5  Q.  Now, making a physical observation of Doug would have

6  allowed the police officers to confirm that he wasn't hurt or

7  injured, correct?

8  A.  If it was necessary for them to do so, which it was not.

9  Q.  Actually looking at Doug would have allowed the police

10  officers to confirm that he hadn't engaged in some sort of act

11  of self harm or that he wasn't suffering some medical

12  emergency; isn't that true?

13  A.  There was no reason to believe that he was and there's no

14  requirement that they look at him and he told them to

15  specifically go away and he was within his own home.

16  Q.  If he's behind the door and he tells these police officers

17  to go away after he's slit his wrist, and they don't check on

18  him, they have failed to do their jobs; isn't that true?

19  A.  No, sir, that's not true under those circumstances, and in

20  a prior contact, under very similar circumstances, the police

21  said there's no crime here and they went away.  And there was

22  no crime in this case, because your own Chief of Police said

23  so.

24  Q.  Now, Mr. VanBlaricom, in that prior contact, Doug Ostling

25  wasn't the person that called 911, correct?

1  A.  That's correct.

2  Q.  It was a woman down the street that was concerned --

3        MS. KAYS:  Excuse me, Your Honor, I am going to

4  object to the form of the question and the content behind it

5  under Evidence Rule 404(b).

6        THE COURT:  I am going to overrule.

7  A.  She was called --

8        THE COURT:  Wait for a question.

9  BY MR. JOLLEY:

10 Q.  A woman down the street had called 911 because she was

11 concerned that Doug had attempted to communicate with her

12 six-year-old daughter and get her to watch a movie; isn't that

13 true?

14 A.  That's true.

15 Q.  And Doug was inside his house where the police officers

16 could actually see him, correct?

17 A.  They did.

18 Q.  And they see him and he's got a bat and he's yelling at

19 them to get off his property?

20 A.  That's what he did.

21 Q.  But he wasn't the one that called 911?

22 A.  He was not.

23 Q.  And they could look at him through the door, and see that

24 he wasn't in any sort of physical distress in that prior

25 occasion?

1  A.  Correct, and they said there was no crime so they went

2  away rather than escalate the situation into a violent

3  confrontation.

4  Q.  It's your position that in this case, if the officers had

5  left after Doug had called 911 and they had not seen him

6  face-to-face and Doug would have later either harmed himself

7  or harmed a family member, that you wouldn't be critical of

8  that?

9  A.  You are exactly right, that's correct.

10          THE COURT:  All right, we are going to take our

11  mid-afternoon break.  Ladies and gentlemen, if you will return

12  to the jury room and we will see you back in a moment.

13      (Jury not present.)

14          THE COURT:  Mr. VanBlaricom, you may stand down.

15  Anything before we recess?  All right.  Court will be in

16  recess.

17      (Afternoon recess.)

18          THE COURT:  Okay.  Ready?  Mr. VanBlaricom, if you

19  could resume the stand, sir.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Mr. Jolley, you can proceed when the jury

22  comes back.

23      (Jury present.)

24          THE COURT:  Welcome back.  Please be seated.

25  Mr. Jolley, you may proceed.

1          MR. JOLLEY:  Thank you, Your Honor.

2     BY MR. JOLLEY:

3     Q.   Now, Mr. VanBlaricom, we know that Doug Ostling had lived

4     there at the residence at 7700 Springridge Road for

5     approximately five years prior to this incident; is that

6     correct?

7     A.   Yes, sir.

8     Q.   And during that time, Doug wasn't someone who was calling

9     911 frequently, correct?

10    A.   No, sir.

11    Q.   Now, you are aware from your work that there are people

12    who call 911 habitually, right?

13    A.   There are.

14    Q.   There are people, not many, but there are some who abuse

15    the system, correct?

16    A.   Yes, sir.

17    Q.   They call because they want to talk to a police officer or

18    because they are playing a prank or for reasons that have

19    nothing to do with them actually needing help, correct?

20    A.   That occurs.

21    Q.   But Doug Ostling, from what we know, wasn't one of those

22    people, right?

23    A.   No, sir.

24    Q.   Now, you'd agree it was unusual for Doug to call 911?

25    A.   I would say so.

1    Q.   Now, we know from Mrs. Ostling's deposition testimony that

2    she believed Doug to be leery of police, correct?

3    A.   Yes, sir.

4    Q.   Now, someone who is leery of police may still call 911 if

5    they believe they actually need help or assistance, right?

6    A.   It's not been my experience but I suppose it's possible.

7    Q.   If someone believes there's something that's threatening

8    enough to them or that they are worried enough, even if they

9    don't want contact with the police, they may still dial 911,

10   right?

11   A.   It's not been my experience, but it's possible.

12   Q.   One conclusion that we can draw from the fact that Doug

13   called 911 on this night is that he actually believed that he

14   needed help, right?

15   A.   I think he thought there were space aliens or something of

16   that nature, yes, sir.

17   Q.   Now, Mr. VanBlaricom, can you take a look at the screen

18   here of Exhibit 290, which has been admitted?

19   A.   Mine is off.  Okay, it just came on.  Sure.

20   Q.   There's a little kindling box that's got firewood in it,

21   correct?

22   A.   Yes, sir.

23   Q.   And you don't see any sort of tool such as an axe or a

24   hatchet or a splitting maul there in this photograph, right?

25   A.   No, sir.

1  Q.  Now, I am going to show you a blow up of what's been

2  admitted; this is Plaintiffs' Exhibit No. 338.  Now, this is a

3  photograph of the interior of Doug's apartment.  Can you see

4  it from there, Mr. VanBlaricom?

5  A.  Yes, sir.

6  Q.  And you see we have got a wood stove right here, correct?

7  A.  Correct.

8  Q.  And you see that there's some dust or some sort of film on

9  the wood stove?

10  A.  Something, I don't know what it is.

11  Q.  Now, in this photograph, we don't see any sort of wood

12  shards or wood chips or any evidence that anybody has been

13  splitting wood or splitting kindling in this area, correct?

14  A.  There's nothing I can see.

15  Q.  And you can agree this is a relatively cramped space,

16  correct?

17  A.  I would agree with that.

18  Q.  Looking at the firewood box downstairs, compared to what

19  we see here in 338, there's a lot more room to split wood or

20  to chop kindling or do work to that effect downstairs than in

21  this little cramped area, right?

22  A.  If you are limited to that little area, sure.

23  Q.  Now, you know that Doug had gone in and out of the house

24  several times earlier in the evening before the police

25  arrived, correct?

1  A.  I don't really remember that, but if you say so.

2  Q.  At one point in time, Doug had slammed the door when he

3  was going in and out of the house, correct?

4  A.  I think that did occur earlier, yes, sir.

5  Q.  And we know that Doug had been yelling in his room before

6  the police got there, right?

7  A.  He was yelling on the phone.  I don't know about that was

8  in his room.  Other than that, I don't know of any.

9  Q.  We know that Doug was yelling because he was yelling into

10  the phone before the police arrived?

11  A.  Right.

12  Q.  We know according to Doug's mom and the statement she gave

13  Detective Blankenship, that Doug may have been angry or

14  slamming the door because he hadn't been invited to dinner

15  that night, correct?

16  A.  I recall that, yes.

17  Q.  And we know that both Doug's mom and dad had seen Doug

18  chopping wood or splitting wood earlier that day, correct?

19  A.  Correct.

20  Q.  And given there's no sign of wood chopping or kindling

21  splitting or anything like that up in his room, it's possible

22  that Doug brought that axe upstairs sometime that evening

23  before the police arrived, correct?

24  A.  It's not the kind of axe I'd use to split kindling.  It

25  would be a most inconvenient sort of axe to use for that.

1  Q.  You are critical of Officer Portrey because he didn't know

2  the clinical definition of excited delirium, correct?

3  A.  I am critical of him because when the dispatcher told him

4  that's what it sounded like, he didn't have any idea what it

5  is and he never asked.

6  Q.  You didn't see anything in the record that would indicate

7  that Officer Benkert didn't know the definition of excited

8  delirium, correct?

9  A.  I don't believe it was ever discussed.

10  Q.  Now, excited delirium can be fatal, right?

11  A.  Excited delirium, if it results in restraint asphyxia, can

12  be fatal.  There's a totally separate method for handling

13  excited delirium.  But it's the prolonged struggle and then

14  the restraint that causes lethality in the case of excited

15  delirium.

16  Q.  If Doug Ostling had actually been suffering excited

17  delirium on this night, then it would have been -- or time

18  would have been of the essence to actually check on him behind

19  that door, isn't that true?

20  A.  No, absolutely not true.  Excited delirium is temporary

21  and the only time it ever results in a fatality is when the

22  police are called, they engage in a struggle with the suspect

23  and he dies as a result of the struggle.  People have excited

24  delirium in many cases in hotel rooms by themselves.  The

25  police never arrive.  They recover and everything goes back to

1  normal.  It's not terminal.

2  Q.  Now, when the officers got to the house, Officer Portrey

3  asked Mr. Ostling if he had called 911, correct?

4  A.  Yes, sir.

5  Q.  That would be an appropriate step under the circumstances?

6  A.  Sure.

7  Q.  And Officer Portrey also asked if anyone else was home,

8  right?

9  A.  Yes.

10 Q.  And that also would be an appropriate step?

11 A.  Yes, sir.

12 Q.  And during this discussion, at some point Mr. Ostling says

13 to Officer Portrey, "let's go talk to Doug" or words to that

14 effect, right?

15 A.  I think he said my's son is mentally ill and he may have

16 called 911."

17 Q.  Did you see somewhere in the record, that according to

18 Officer Portrey, Mr. Ostling said "let's go talk to Doug"?

19 A.  I don't recall that specifically.

20 Q.  Now, at that juncture when Officer Portrey is asking

21 questions about anyone calling 911, Mr. Ostling could have

22 volunteered right then that his son had been yelling and was

23 agitated earlier that evening, correct?

24 A.  I suppose he could have volunteered anything.

25 Q.  Now, Mr. Ostling didn't inform Officer Portrey or Officer

1  Benkert that Doug had been yelling previously, correct?

2  A.  Not that I am aware of.

3  Q.  At no point did Mr. Ostling indicate to the officers that

4  talking to Doug could antagonize or provoke him, correct?

5  A.  I think the extent of the conversation was "he's mentally

6  ill."  It's only 4 minutes and 50 seconds from when they

7  arrived till he shot.

8  Q.  It's also 10 minutes plus after the 911 call had been made

9  where Doug was yelling and agitated, right?

10  A.  But of course the father didn't even know he'd made the

11  911 call.

12  Q.  When Mr. Ostling turns to lead the officers into the

13  house, he didn't tell either Officer Portrey or Officer

14  Benkert that contact with Doug could provoke or antagonize

15  him, correct?

16  A.  Not that I remember.

17  Q.  And we know that neither Officer Portrey nor Officer

18  Benkert pushed past Mr. Ostling to get up the stairs, right?

19  A.  I don't recall the order they went up the stairs, but the

20  stairs are so narrow that only one person at a time would be

21  able to go up and I believe Mr. Ostling was at the head.  I

22  think he's the one that knocked at the door.

23  Q.  We don't see anything in the factual record you reviewed

24  that would indicate either officer pushed past Mr. Ostling to

25  get up the stairs?

1  A.  I don't think they could have physically done so.

2  Q.  And they didn't try to push past him when they were down

3  in the garage before getting to the stairs, right?

4  A.  Not that I know of.

5  Q.  And neither police officer ran over Mr. Ostling to get

6  into the house or to get into the garage, correct?

7  A.  Not that I remember.

8  Q.  There's nothing in the actual record that Mr. Ostling

9  protested whatsoever when Officer Portrey followed him into

10  the garage and up the stairs, right?

11  A.  Not that I know of.

12  Q.  Now, a standard question that police will ask, on any sort

13  of call when they are in a residence, is whether someone has

14  access to weapons, correct?

15  A.  It's pretty standard.

16  Q.  And a question such as "does he have weapons" or "does he

17  have access to weapons," that would be pretty much consistent

18  with police training, not only in Washington, but throughout

19  the United States, right?

20  A.  It's universal, yes, sir.

21  Q.  Now, asking solely about firearms rather than weapons

22  would be something inconsistent, based on your knowledge of

23  police training, in these circumstances?

24  A.  Everybody knows that every police officer knows there's

25  weapons in the house, there's knives in every house.  Axes, I

1  suppose, in probably half of them.

2      What you are specifically concerned with are firearms.

3  And at least I typically ask, "are there any guns in the

4  house" and "does the person have access to them?"  That's what

5  I was worried about.  I know there's knives around.

6  Q.  And speaking of guns, you believe that it's safe to assume

7  as a police officer or from a police officer's perspective,

8  that half of the houses that you are dealing with have

9  firearms in them?

10  A.  At least half.

11  Q.  That's an assumption that is reasonable for police

12  officers to make?

13  A.  Sure.  In fact you'd be better off to assume they all do.

14  Q.  But police officers are trained to ask about weapons, not

15  just to ask about firearms, right?

16  A.  No, I think there they are more trained to ask about

17  firearms.  As I say, every house has weapons in it.  That's

18  why the home is the most dangerous place to contact people.

19  Q.  At no point did Mr. Ostling volunteer his son had a

20  double-bladed axe in his room?

21  A.  Not that I know of.

22  Q.  Now have you seen a photograph that shows this club-like

23  object that was underneath Doug's legs next to the axe when

24  the detectives from Kitsap County were processing the scene?

25  A.  You know, I don't remember that, Mr. Jolley; I just don't.

1  Q.  The fact that Doug had access to this axe, that might have

2  been useful information to the police officers as they were

3  assessing the scene, correct?

4  A.  If they had reason to believe he was up there with an axe,

5  ready to use it, I would think they would have probably told

6  the officers that.

7  Q.  But had Mr. Ostling volunteered that particular piece of

8  information, that would be useful for the police officers as

9  they were assessing the scene, right?

10  A.  If he knew it, sure.

11  Q.  Mr. Ostling also didn't volunteer that Doug might have

12  been intoxicated, correct?

13  A.  I don't recall that coming up.

14  Q.  And the fact that Doug had been drinking, that would have

15  been a useful piece of information for the police officers as

16  they were assessing the circumstances, correct?

17  A.  Somewhat, perhaps.

18  Q.  Information that a subject is intoxicated may heighten

19  officer safety concerns, right?

20  A.  Well, .10 is not intoxicated.

21  Q.  Now, Mr. VanBlaricom, the legislature here in the state of

22  Washington has deemed that if somebody is over a .08 it's not

23  safe for them to operate an automobile because they are

24  impaired, correct?

25  A.  You are exactly right in the way you state it.  That's

1  exactly what it is and no more.

2  Q.  If the officers had been told that Doug was a paranoid

3  schizophrenic, had access to an axe and to a club, and also

4  may be intoxicated, that information would have heightened

5  their concerns about their safety, right?

6  A.  They could have certainly asked about those questions.  If

7  they had known the answers to them, perhaps it would have

8  given them more caution.

9  Q.  Now, you indicated you reviewed records related to

10  Bainbridge Island police officers' contact with the mentally

11  ill?

12  A.  Yes, sir.

13  Q.  Now, you didn't see anything in that records review that

14  indicated that Officer Benkert had ever had any sort of

15  previous problem in dealing with a mentally ill subject that

16  you could be critical of, correct?

17  A.  It wasn't part of that report.  It was merely contacts.  I

18  know of no more beyond; it simply reported the number of what

19  they call mental contacts.

20  Q.  You didn't see anything, and you weren't informed of

21  anything, that would indicate that Officer Benkert had ever

22  had problems previously in interacting with mentally ill

23  subjects, correct?

24  A.  I don't know of anything.

25  Q.  And you didn't see anything and you weren't informed of

1  anything that would indicate that Officer Portrey had ever had

2  previous problems in dealing with mentally ill subjects,

3  correct?

4  A.  I don't know of anything.

5  Q.  And you indicated earlier that it was a frequent

6  occurrence for Bainbridge Island police officers to come into

7  contact with folks that were mentally ill, correct?

8  A.  1.89 a week, yes, sir.

9  Q.  If Officer Portrey had been working for some 14 years,

10 15 years at that point for Bainbridge Island, he would have

11 come into contact with mentally ill subjects prior to coming

12 into contact with Doug Ostling on the night in question,

13 right?

14 A.  I would expect so.

15 Q.  And Officer Benkert had been there for a few years.  You

16 would have expected for him to come into contact with mentally

17 ill subjects prior to the night in question?

18 A.  I would expect so.

19 Q.  Now, you know what crisis intervention training is?

20 A.  Yes, sir.

21 Q.  That's where police officers are specifically trained to

22 deal with subjects that are not just mentally ill but people

23 who are in crisis, correct?

24 A.  Correct.

25 Q.  And that could be they are suffering some sort of

1  emotional issue that's unrelated to mental illness, right?

2  A.  It could.  That's actually what this lesson plan was, that

3  you introduced earlier.

4  Q.  It overlaps sometimes, there's -- people who are

5  emotionally disturbed are emotionally disturbed for a lot of

6  reasons, correct?

7  A.  That's correct.

8  Q.  Now, crisis intervention training, that hadn't really come

9  on line when you were the Chief at Bellevue, correct?

10  A.  Actually we were training the same thing Memphis did

11  almost 20 years later.

12  Q.  The Memphis model, as we know it, that came into play in

13  the late '80s?

14  A.  Yes, sir.

15  Q.  And you retired from Bainbridge Island(sic) in 1985?

16  A.  I retired from Bellevue in 1985.  We were treating crisis

17  intervention long before it was popular.  We actually did role

18  playing with college students.

19  Q.  It wasn't called crisis intervention training?

20  A.  It's what we called it.

21  Q.  Did you hand out lesson plans to your officers that had a

22  title on it that was called crisis intervention training?

23  A.  There was a lesson plan for crisis intervention, and I

24  don't have access to it any more, but I know we trained them

25  because we had a portable classroom.  We brought in students

1  from Bellevue Community College -- now Bellevue College -- and

2  used them as role players.  That's how we trained it.  We were

3  doing it back in the 1970s.

4  Q.  You are aware of over 30 percent of Bainbridge Island's

5  officers are trained in crisis intervention?

6  A.  Yes, they should have called a couple of them that night.

7  Q.  You are aware that Bainbridge Island has gotten over

8  30 percent of its officers trained in crisis intervention?

9  A.  Yes, sir, that's what I said.  They should have called one

10  of them.

11  Q.  Mr. VanBlaricom, I am just asking you, you are aware that

12  Bainbridge Island had over 30 percent of its officers trained

13  in what we refer to as CIT training?

14  A.  I just answered you three times; yes, sir.

15  Q.  And that percentage is a lot higher than typically what we

16  see here in the state of Washington, correct?

17  A.  King County is recently training all officers in crisis

18  intervention training.

19  Q.  There's not a lot of departments in this state that have

20  over 30 percent of their officers trained in CIT training.

21  A.  I would agree with that.  The more metropolitan area, the

22  more you need it.

23  Q.  Mr. VanBlaricom, let's go back to Exhibit 22.  We can now

24  blow up what I wanted to look at earlier.  And my apologies

25  for the confusion.

1       Now, here in Exhibit 22, it indicates in dealing with the
2   mentally ill the following responses may be taken.  It's on
3   your screen there.
4   A.  It's easier for me to read it off here.  I have it, yes,
5   sir.
6   Q.  It says the following responses may be taken?
7   A.  Correct.
8   Q.  It doesn't say that the following responses must be taken,
9   correct?
10  A.  No, sir, it's best practice, but it's discretionary
11  depending on the circumstances.
12  Q.  It doesn't say that the following responses will or shall
13  be taken, either, does it?
14  A.  No, sir.
15  Q.  That reenforces what we talked about earlier, that these
16  policies are guidelines based on the facts and circumstances
17  that are presented to a patrol officer on an individual case,
18  correct?
19  A.  Yes, sir.  My analogy they are a recipe.  If you don't
20  follow the recipe, you may not like the outcome, but that's
21  what they are.
22  Q.  Recipe will actually tell you put two cups of flour and
23  bake at 350, correct?
24  A.  That's not the way my grandma read them, but a pinch of
25  salt and a dip of flour, that sort of thing.

1  Q.  A recipe actually says -- or it's the intent of a recipe

2  is not guidance; that's how you are going to do something?

3  A.  I am sorry?

4  Q.  If you don't bake it for 30 minutes you are going to get a

5  disaster, correct; it doesn't say you can bake it for 15 to 45

6  depending on the circumstances, right?

7  A.  No, it tells you how to do it.

8  Q.  This says that the following steps or the following

9  responses may be taken, and that's different, isn't it?

10 A.  Yes, sir, it's best practice.

11 Q.  Now, in evaluating whether the officers followed the

12 guidance that's suggested by the department, we know that

13 neither officer ever threatened Doug with arrest, correct?

14 A.  They didn't threaten him with arrest, no, sir.

15 Q.  Now, not threatening Doug with arrest was consistent with

16 the department's guidance on dealing with the mentally ill,

17 correct?

18 A.  Well, yeah, but there was nothing to arrest him for.  He

19 hadn't committed any crime.

20 Q.  Mr. VanBlaricom, all I am asking you is this:  Not

21 threatening him with arrest was consistent with the

22 department's guidance on dealing with the mentally ill?

23 A.  Yes, sir, I will give you that.

24 Q.  Now, neither officer told Doug if he didn't open the door

25 they were going to come in and get him?

1  A.  They told him to open the door or they wouldn't go away.

2  Q.  Neither officer told Doug that if he didn't open the door

3  that they were going to do something to extricate him?

4  A.  They didn't say it in that many words, no, sir.

5  Q.  They didn't say that at all, did they?

6  A.  They said they weren't going away until he opened the

7  door.

8  Q.  Neither officer said they were going to come in and get

9  him; isn't that true?

10 A.  They did not say they were going to come in and get him,

11 no, sir.

12 Q.  And not giving Doug an ultimatum like I am going to count

13 to 10 and then I am going to come in and get you, that's

14 consistent with the department's guidance on dealing with the

15 mentally ill, correct?

16 A.  Consistent?

17 Q.  That's the question.

18 A.  If you put it in the context of may or should, that would

19 be consistent.

20 Q.  Now, neither officer placed any sort of time limits on

21 Doug telling him when he had to open the door, correct?

22 A.  No, sir, they just wouldn't go away until he did.

23 Q.  They didn't say you've got ten seconds or we are going to

24 take steps A and B to get you to open the door?

25 A.  No, they didn't do that.

1  Q.  And not placing some sort of time limit on Doug coming out

2  was consistent with the department's guidance on dealing with

3  the mentally ill?

4  A.  It would be consistent, yes, sir.

5  Q.  Now, we know Officer Portrey actually allowed Doug to

6  ventilate his feelings, correct?

7  A.  Allowed him?

8  Q.  Yes.

9  A.  I don't understand how they allowed him.  Doug was

10 ventilating his feelings saying "go away and leave me alone."

11 Q.  If Doug is on the other side of the door saying "you are

12 not intelligent, and you have nothing intelligent to say,"

13 Officer Portrey was allowing him to vent; isn't that true?

14 A.  I don't think he allowed him one way or another.  Doug was

15 saying what he was saying.  And the officer was on the other

16 side of the door.  I don't know what he can do about it one

17 way or the other.

18 Q.  Officer Portrey didn't tell him to shut up, or interrupt

19 him, or try to shout him down; isn't that true?

20 A.  Didn't tell him to shut up or shout him down, just said

21 they weren't going to go away until they opened the door.

22 Q.  One interpretation of Officer Portrey's actions by him not

23 interrupting Doug and not shouting him down and allowing Doug

24 to state things such as "you are not intelligent, you have

25 nothing intelligent to say," one interpretation of that is

1  that Officer Portrey was allowing Doug to vent his feelings;

2  isn't that true?

3  A.  I guess if you want to interpret it that way, you can.  I

4  don't know what he could have done about it one way or the

5  other; just indicated that the situation was escalating, and

6  it was time to go away.

7  Q.  Allowing Doug to ventilate his feelings would be something

8  consistent with the department's guidance on dealing with the

9  mentally ill, correct?

10  A.  If he were allowing him to vent his feelings, however you

11  define that, that would be consistent, yes, sir.

12  Q.  Now, neither police officer used any sort of demeaning

13  language directed at Doug such as "you are crazy" or "you are

14  nuts" or anything like that, correct?

15  A.  No, didn't do that.

16  Q.  And the fact that neither officer engaged in that kind of

17  conduct is also consistent with the department's guidance on

18  dealing with the mentally ill, correct?

19  A.  It's consistent with being a professional police officer.

20  Q.  And it's also consistent with the department's guidance on

21  dealing with the mentally ill, correct?

22  A.  I don't see where it says in here not to tell them they

23  are crazy.

24  Q.  It also doesn't say in there they are not to make

25  face-to-face contact with the subjects on the other side of

1  the door; isn't that true?

2  A.  I am sorry, I missed that.  I was looking at this.

3  Q.  It also doesn't say in there "Don't make face-to-face

4  contact with someone who's on the other side of the door";

5  isn't that true?

6  A.  It doesn't prohibit that, no.

7  Q.  Now, Officer Portrey did tell Doug that the police were

8  there to check on him or to make sure he was okay, correct?

9  A.  Correct.  And he said I'm okay.

10 Q.  Telling Doug that they were there to check on him or to

11 see that he was okay was consistent with the department's

12 guidelines on dealing with the mentally ill, correct?

13 A.  Yes, sir.

14 Q.  Now, neither police officer attempted some sort of ruse or

15 deception to get Doug to come out of the room, correct?

16 A.  Nope.

17 Q.  And the fact they didn't do that is also consistent with

18 the department's guidance on dealing with the mentally ill,

19 right?

20 A.  Yes, sir.

21 Q.  Now, here in this case we are dealing with something known

22 as the enhanced 911 system, correct?

23 A.  Correct.

24 Q.  Now, explain for the jury what the enhanced 911 system is.

25 A.  When you call 911, your address comes up on the screen for

1    the dispatcher.  It also gives you access to who lives there;

2    if you have a computer aided dispatch system, all the prior

3    calls to that residence and the history of what's occurred

4    there.

5    Q.   Now, the 911 system in King County went in effect in 1985,

6    correct?

7    A.   I was on the committee that established it after I helped

8    lobby it through the legislature.

9    Q.   The 911 system, as we know it today, was implemented in

10   King County in 1985?

11   A.   Yes, sir, you are correct.

12   Q.   That's the same year you actually retired as police chief?

13   A.   Right after I was on the committee that implemented it for

14   the County Executive, who happened to be Ron Dunlap at the

15   time.

16   Q.   Mr. VanBlaricom, you started working at Bellevue PD in

17   what year?

18   A.   1956.

19   Q.   And so you were an active police officer for 29 years,

20   correct?

21   A.   Yes, sir.

22   Q.   And you've now been a litigation consultant for

23   approximately 27 years?

24   A.   26.

25   Q.   So you are sneaking up on the point chronologically where

1  you'll be working as long as an expert witness as you had as a

2  police officer, correct?

3  A.   That would be about right, sir; sort of like a senior

4  acting.

5  Q.   Now, you last worked patrol in the late 1960s?

6  A.   I was last sergeant in a patrol in about 1968, 1969.

7  Q.   Now, when you were actually working patrol, there was no

8  enhanced 911 system, right?

9  A.   There wasn't even a 911 system.

10  Q.   Was there a period of time when you were working patrol

11  that your car wasn't equipped with a radio?

12  A.   No, we always had radios when I was there.

13  Q.   But you were actually -- for a period of time, you were

14  tied to your car if you wanted to communicate, right?

15  A.   We didn't have portable radios.

16  Q.   And for a time when you were working patrol, did you

17  actually have to go or utilize what's known as a call box; did

18  you ever have to do that?

19  A.   No, we didn't do that.  Fire department had call boxes.

20  Q.   Now, when you were working patrol, the Taser, the

21  implement that was used here in this case, that hadn't been

22  invented yet, correct?

23  A.   No, we adopted the electric stun gun but it didn't project

24  the probes like the Taser.  The only people that were using

25  that were LAPD and the LA Sheriff's Office.

1  Q.  Now Mr. VanBlaricom, you've testified on behalf of

2  plaintiffs, people actually suing for money damages in cases

3  against the city of Seattle, correct?

4  A.  Yes, sir.

5  Q.  And you've also testified on behalf of plaintiffs who are

6  suing in cases against King County, right?

7  A.  Yes, sir.

8  Q.  And you've testified on behalf of plaintiffs who are suing

9  Snohomish County, correct?

10  A.  Yes, sir.

11  Q.  And you've testified on behalf of plaintiffs suing the

12  city of Tacoma, correct?

13  A.  Yes, sir.

14  Q.  And you've testified on behalf of plaintiffs suing Pierce

15  County, correct?

16  A.  Yes, sir.

17  Q.  And you've testified on behalf of plaintiffs suing the

18  city of Portland, Oregon?

19  A.  Yes, sir.

20  Q.  And you've also testified on behalf of plaintiffs suing

21  Multnomah County, the county there where Portland is located?

22  A.  I don't believe so.  I was on their use of force committee

23  to correct their use of force practices, but I don't think I

24  ever testified against Multnomah County.

25  Q.  And you've testified on behalf of plaintiffs suing the

1  city of Boise, correct?

2  A.  Yes, sir.

3  Q.  Now, as you referenced earlier, and it may be obvious now,

4  we are here in federal court today, right?

5  A.  Yes, sir.

6  Q.  Now, you are providing testimony in federal court on

7  behalf of the plaintiffs in a lawsuit for money damages,

8  right?

9  A.  It's a lawsuit.  I assume it's for money damages.  It

10  always is.

11  Q.  Now, when is the last time you actually took the stand in

12  federal court in a lawsuit for money damages where you weren't

13  testifying on behalf of plaintiffs, but instead were

14  testifying on behalf of the defendant, the one being sued for

15  money?

16  A.  I think it was in Coeur d'Alene, Idaho, earlier this year,

17  or late last year.  And I just completed a report for the city

18  of Honolulu on an officer involved shooting last week.

19  Q.  I am not asking you about --

20  A.  That was in federal court.

21  Q.  I am sorry, Mr. VanBlaricom.  I didn't mean to interrupt

22  you.  I am not asking when you provided reports or when you

23  provided deposition testimony, but I am asking you about when

24  you actually sat down in a box, in a courtroom, and provided

25  testimony in federal court, correct?

1  A.   I know the environment, counsel, you don't have to

2  describe it to me.

3  Q.   Right.

4  A.   I think the last time was in Spokane, for the city of

5  Spokane, probably.  I can't remember if it was last year or

6  the year before.

7  Q.   You are here today offering opinions that the city of

8  Bainbridge Island failed to train its officers?

9  A.   Yes, sir.

10  Q.   You were retained in a case called *Billington v. Smith;* do

11  you recall that?

12  A.   I do.

13  Q.   In that case you were hired by the plaintiffs who were

14  suing the city of Boise and a police officer, correct?

15  A.   Correct.

16  Q.   And you offered opinions in that case that were in support

17  of plaintiffs' failure to train claim, correct?

18  A.   I don't remember failure to train being an issue in that

19  case.

20  Q.   Do you recall the judge in that case finding that you had

21  "padded your numbers" to support a failure to train claim?

22  A.   No, sir, and he didn't say I had padded my numbers.  He

23  said he may have padded his numbers.  And I don't recall it

24  having anything to do with failure to train.

25  Q.   Now, to simply open your file and start work on this case,

1  how much did you charge Mr. Roberts in this case?

2  A.  $3,000.

3  Q.  And at this point, how much have you billed -- I should

4  say, how much do they owe you, all total, for your work done

5  on this case?

6  A.  I couldn't tell you an exact amount, because I bill on the

7  23rd of each month.  But if you are looking for total, and I

8  suspect that's what you are, I think it's probably around

9  $20,000.

10  Q.  Mr. VanBlaricom, I believe that's all I have for you, but

11  let me just check with Mr. Estes and with Officer Benkert.

12      (Pause.)

13          MR. JOLLEY:  Mr. VanBlaricom, thank you.

14          THE COURT:  Redirect?

15          MS. KAYS:  Thank you.

16                    REDIRECT EXAMINATION

17  BY MS. KAYS:

18  Q.  Mr. VanBlaricom, Mr. Jolley asked you about this notion of

19  alcohol and what constitutes intoxication.  Do you remember

20  that line of questioning?

21  A.  Yes, ma'am.

22  Q.  In your careful review of the materials in this case, did

23  you review Officer Benkert's deposition testimony?

24  A.  I did.

25  Q.  Officer Portrey's statement made within, I believe,

1  48 hours or so after the shooting?

2  A.  I think about three days later, something like that.

3  Q.  Thank you.  And then Officer Portrey's deposition

4  testimony as well?

5  A.  Yes, sir -- yes, ma'am.  I know the difference.

6  Q.  You only get that once.

7      At any point during those statements, the officers

8  involved in this case, Benkert and Officer Portrey, did they

9  mention anything about Doug and the consumption of alcohol or

10  slurred words or anything like that?

11  A.  No, ma'am.

12  Q.  You were asked several questions by counsel about this

13  issue of Bill Ostling's -- Doug's dad -- and whether by virtue

14  of bringing the key to the officers, if that in essence

15  amounted to consent for them to go into Doug's apartment.

16  A.  Right.

17  Q.  Can you tell us about your opinion on that?  If someone

18  just hands an officer a key, does that mean they get to go

19  into a room; or is it more incumbent upon the officer before

20  they use a key to enter into a residence?

21  A.  He can't give consent to enter his son's primary place of

22  residence, because that's where he lives.  It's not accessible

23  to the rest of the family, as a general rule.  It's like your

24  son or your daughter giving a key to your home and telling the

25  police it's okay to go in there.  They can't do that.

1  Q.  Mr. Jolley also asked you, I believe his phrase was

2  volunteering information, not only in the context of what we

3  just talked about, whether Mr. Ostling volunteered information

4  that this was Doug's apartment, but also in the context of

5  whether Bill Ostling volunteered information to the police

6  concerning his son about his mental illness and the like.  And

7  my question to you is this:  When it comes to training police

8  officers, is it proper training to train your officers to,

9  say, don't ask questions, let people volunteer information?

10 A.  No, ma'am.  The primary things police officers do is

11 collect information.  The way you do that is by interviewing

12 people and you ask questions.  If I expected a witness in the

13 field of armed robbery to volunteer all the information I

14 expected to get, I wouldn't get out very good suspect

15 descriptions.  You ask questions and you ask questions and you

16 require answers.

17 Q.  Is the failure by Officers Benkert and Portrey to ask

18 questions concerning what Bill meant by mental illness and

19 what Bill meant by saying "my son is mentally ill," is that

20 failure to ask questions by these two officers related in any

21 way to the failure to train on how to interact with mentally

22 ill persons?

23 A.  It would certainly seem so to me, because if you look at

24 recipe how to deal with the mentally ill, those are issues you

25 want to know about.

1    Q.  Mr. Jolley also asked you, and I wanted to probe you a

2    little bit on that, he asked you specifically -- he took

3    quarrel with your notion of the general orders manual, the

4    manual being a recipe, if you will, for how you interact with

5    mentally ill persons.  And he was pressuring you on, well,

6    this says it's guidance; and you kept saying it's best

7    practices.

8            MR. JOLLEY:  Your Honor, we are going to object,

9    counsel is testifying.

10           THE COURT:  Overruled.

11   BY MS. KAYS:

12   Q.  He kept saying it was guidance; you responded consistently

13   by saying it's best practices.  Do you train your officers

14   that this is just guidance in the policy manual or do you

15   train it's best practices?

16   A.  You train them that this is the way you most likely

17   achieve success under difficult circumstances.  And the reason

18   they are called general orders is because they are orders.

19   Q.  Mr. Jolley asked you about -- followed up on a question

20   that I had asked you, which is you reviewed the -- I believe

21   it was called mental contacts or mental reports documentation

22   that we gained during our investigation from the Bainbridge

23   Island Police Department.  And he asked you whether or not in

24   that documentation, if you saw whether Officer Portrey or

25   Officer Benkert had a failure or a bad encounter with a

1  mentally ill person.  And remind me again what your answer

2  was.

3  A.  It's just simply not information that's in that report.

4  Q.  This report -- I want to ask the flip side of that.  You

5  said, when you are talking about domestic violence in your

6  introduction to our jurors, you talked about, I believe, two

7  homicides that occurred while you were an active officer or

8  the Chief, and that you went back and said how do these

9  domestic violence homicides occur, and what did we do wrong

10  and how can we fix it?

11  A.  That's absolutely right.

12  Q.  Does the absence of any particular problem showing up in

13  this review of mental contacts by the Bainbridge Island Police

14  Department, does the absence of a homicide or anything like

15  that mean there isn't a problem with respect to training?

16  A.  No, it absolutely doesn't mean that.  You have to think of

17  it from a chief's perspective.  You as a citizen, as a

18  potential victim, would far rather I prevented you from

19  becoming a homicide victim and I did a real great

20  investigation after the fact.  That's what we are trying to

21  accomplish.

22  Q.  In your review of the depositions in this case, including

23  your review of Chief Fehlman and the review of Portrey's and

24  Benkert's deposition, following the shooting of Doug Ostling,

25  has any training on how to interact with mentally ill persons

1   occurred at the Bainbridge Island Police Department for its

2   officers?

3   A.   Not as far as I know and the Chief in his deposition said

4   they did everything exactly right.

5   Q.   One last question.  We heard -- two last questions, sorry.

6        We heard quite a bit about this term "excited delirium."

7   A.   Yes.

8   Q.   Are you familiar with what that term means?

9   A.   Yes, ma'am, I am trained in it.

10  Q.   I apologize for interrupting.  Tell us generally what it

11  means.

12  A.   Excited delirium is typically a person who is high on meth

13  or crack cocaine.  And because of their body's reaction to the

14  drug, they go in an -- they become in a highly excited state.

15  Their temperature sky rockets, it goes as high as 106, 107.

16  They rip off their clothes.  They jump in water to try to cool

17  off.  They are terribly violent.  They hallucinate.  It takes

18  about four officers to hold them down.  And in the course of

19  the struggle, when they are finally restrained, they just

20  simply quit struggling because they die.  And they think it's

21  because of acidosis, but I am not medically qualified to say

22  that.

23  But it has nothing to do with this case.

24  Q.   Well, you say that it has nothing to do with this case and

25  yet you were asked by defense counsel about the dispatch

1  operator telling Officers Portrey and Benkert, well this

2  sounds like an instance of excited delirium?

3  A.  Correct.

4  Q.  What is the relevance of that comment by the dispatcher,

5  as far as you are concerned, in terms of the response to this

6  call?

7  A.  The relevance to me was first of all, I think the

8  dispatcher had some training, because she recognized that

9  hallucinating is part of an excited delirium syndrome.  So she

10  was doing a good job of getting this information out to the

11  officers.  The problem is Officer Portrey takes the

12  information, he doesn't have a clue what it is, and he never

13  asks, and yet he's going to a call that he's told is an

14  excited delirium call.  In fact, he thinks it's people who

15  were attracted to shiny objects.  Now, where he got that, I

16  have no idea; but that's not excited delirium.

17  Q.  Mr. Jolley asked you and pointed out to you the notes and

18  the like, in fact I think you have the deposition before you,

19  A-171, Officer Portrey's academy notes.  I apologize if I got

20  that number wrong.  Have you had an opportunity to review

21  those notes prior to testifying?

22  A.  I looked over them very, very briefly.

23  Q.  In your opinion, Mr. VanBlaricom, is your review of those

24  notes and the training that it purports to have offered to

25  Officer Portrey, is that sufficient in and of itself for a

1  Bainbridge Island Police Department to just rely upon the fact

2  that there might have been training of my officers at the

3  basic academy or the reserve academy?

4  A.  No.  Once you adopt a policy on responding to the mentally

5  ill as part of your policy manual, you have an obligation to

6  provide in-house training.  In other words, you've written and

7  adopted the policy, now you have to train your officers on

8  what it means and how you go about fulfilling it.

9  Q.  Mr. VanBlaricom, in your opinion, would Doug be alive

10  today if the Bainbridge Island Police Department had properly

11  trained its officers on how to interact with mentally ill

12  persons?

13          MR. JOLLY:  Objection, competency, foundation.

14          THE COURT:  Overruled.

15  A.  I think that's more probably than not because this would

16  not have escalated into a shooting.

17          MS. KAYS:  Thank you.  No further questions.

18          THE COURT:  Recross?

19      Mr. VanBlaricom, you are excused.  Thank you very much.

20          THE WITNESS:  Thank you, Your Honor.

21      (That concludes the testimony of D.P. VanBlaricom.)

22                  *   *   *   *   *
                    C E R T I F I C A T E

23

        I certify that the foregoing is a correct transcript from
24  the record of proceedings in the above-entitled matter.

25  /S/  Teri Hendrix                    May 23, 2012
    Teri Hendrix, Court Reporter            Date