HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WILLIAM OSTLING, individually and as personal representative of the ESTATE OF DOUGLAS OSTLING, deceased; JOYCE OSTLING; and TAMARA OSTLING<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BAINBRIDGE ISLAND, a political subdivision of the State of Washington; JON FEHLMAN; and JEFF BENKERT,<br><br>Defendants. | No.  11-cv-5219 RBL<br><br>ORDER<br><br>(Dkt. #148) |

This case arises out of the death of Douglas Ostling, a mentally ill man who was shot by Bainbridge Island police officers in his home.  Following trial, a jury awarded Plaintiffs one million dollars in damages on a failure-to-train claim and a claim of deprivation of familial companionship.  Defendants have renewed their motion for judgment as a matter of law (Dkt. #148).  For the reasons stated below, the Court must deny both motions.

**I.     BACKGROUND**

This case presented differing factual stories; this Order is limited to those facts necessary to resolve the questions at hand.

**A. Douglas Ostling Calls 9-1-1**

At 8:40 p.m., on October 26, 2010, Douglas Ostling called 911.  The call log reveals that Douglas, who suffered from schizophrenia, repeatedly shouted confused questions: "What are

you!" "What is that!"  Apparently recognizing the source, the dispatcher asked "if it was Douglas."

Officers Portrey and Benkert arrived at the Ostling home within 15 minutes.  Douglas' father, William Ostling met them at the door, unaware that Douglas had called 911.  William advised the officers that his son Douglas was mentally ill and was likely the source of the call.  He then led the officers through the house, into the garage, and up a staircase that led to Douglas's apartment.  As would be important at trial, the officers did not further inquire into the nature of Douglas's mental-health issues, how he might respond to the officers, or his mood on that particular evening.

### B.  Officers Benkert and Portrey Confront Douglas

Douglas did not respond to his father knocking or speaking, which alarmed William who feared that Douglas might have hurt himself.  Similarly, the officers worried that Douglas and his father might have had some sort of altercation.  Officer Portrey then knocked repeatedly and announced that the police were present.

#### 1.    Account of William Ostling

William Ostling stated that he then fetched a key to the room, which one of the officers grabbed from his hand and used to try and open the locked door.  Douglas then informed them that he did not need help, that "9-1-1 [was] bugged," and yelled multiple times that he was fine and that the officers should leave.  Judging from the sound of his son's voice, William concluded that Douglas was just behind the door.  Officer Benkert tried to turn the doorknob and met resistance, presumably from Douglas holding it.  After a few seconds, Benkert succeeded in opening the door and began peering into Doug's room, moving his head from side-to-side, as though he were trying to see around the partially-opened door trying to locate Doug.  Benkert then said "double-bladed axe . . . taser."  Officer Portrey then tased Douglas.  Firing the taser apparently caused Officer Portrey to take a step back, and he stumbled against the wall; but neither of the officers fell or was otherwise vulnerable.  Douglas then came forward, still holding the axe and began closing the door.  Officer Benkert said, "stop or I'll shoot," and without hesitation, fired three shots—two of which passed through the lower section of the door.

According to William, at the instant Benkert fired, the officer was separated from Douglas by the door, the landing, and a banister.

Under this version of events, the officers precipitated the interaction by forcing their way into Douglas's room and by tasering him instead of simply retreating. The story according to Officer Benkert was quite different.

### 2. Account of Officer Benkert

Officer Benkert stated that after Douglas did not respond to his father, Officer Portrey addressed Douglas directly. Douglas yelled at the officers to leave. At that point, one of the officers asked William for a key to the room, which he then retrieved for the officers. Then, while Officer *Portrey* was inserting the key, Douglas—and not the officers—opened the door. Douglas was holding a double-bitted axe. The officers drew their weapons, and Douglas moved back into the apartment. Officer Benkert stated that he repeatedly instructed Douglas to drop the axe. Portrey then requested "emergency traffic" from dispatch.

Officer Benkert stated that he advised Portrey to use a taser. Officer Portrey then tased Douglas and entered the apartment to obtain the axe. But the barbs failed to make proper contact, and Douglas kept hold of the axe. Officer Benkert was providing "firearm cover," but told Officer Portrey that he needed to back out of the apartment because the taser was ineffective and Portrey was blocking his own cover. Officer Portrey backed up, and in doing so, stumbled. Officer Benkert believed he might have fallen. Douglas then "took an aggressive step" towards Benkert, who fired. It is undisputed that the second and third shots, the shots that struck Douglas in the leg, passed through the door itself.

Although the officers' account and William Ostling's account differ in many respects, the overarching dispute lies in whether the officers themselves opened the door themselves or whether Douglas threw the door open. In finding for Plaintiffs, the jury appears to have accepted William Ostling's account—the officers forced their way into Douglas's apartment.

**C. Post-Shooting**

Although paramedics arrived within nine minutes of the shooting, no one rendered aid until approximately 10:20 p.m.—one hour and twenty minutes later. Douglas had been struck in

the femoral artery and had bled to death by that time.  In that hour and twenty minutes, police cordoned off the room, called in SWAT officers, and prevented William from using a ladder to check on Douglas through a skylight.  Plaintiffs presented expert testimony suggesting that medics would have been able to save Douglas if given access within 25 minutes of the injury—i.e., within 16 minutes of their arrival.  Defendants presented expert testimony that Douglas could not have been saved.

**D.  Training**

Because the failure-to-train claim was the basis for the verdict, the facts surrounding the officers' training are of particular importance to the pending motions.  Officer Benkert testified that he received no training on how to deal with the mentally ill from the Bainbridge Island Police Department and could not remember if he had a class from the Washington State Equivalency Academy.  (Benkert Testimony, 12:14–22, Dkt. #115, May 15, 2012.)  Officer Benkert did, however, take a "course dealing with the mentally ill" at the Los Angeles Police Academy sometime in 2002.  (*See id.*, 86:5.)  He further testified that he did not "think special police skills and abilities are required to effectively deal with people who are mentally ill . . . ." (*Id.* at 33:19–22.)

Similarly, Officer Portrey could not recall any training on mental illness from the Bainbridge Island Police department.  (Portrey Testimony, 19:20–24; 21:3–9, Dkt. #117, May 17, 2012) ("I believe I hadn't received any . . . training since the academy [on] dealing with [the] mentally ill.").  Officer Portrey remembered a "training block" at the policy academy that taught "crisis intervention" that "entailed dealing with anything crisis in nature, be it mentally ill [sic], a domestic violence situation, a person just being angry, on drugs or alcohol."  (*Id.* at 18:8–14.)  That training—occurring in 1996—taught "people skills."  (*Id.* at 18:21–22.)

Plaintiffs presented evidence suggesting that the officers' conduct at Douglas Ostling's apartment was directly counter to what a properly trained officer would have done.  Bainbridge Island's "General Orders Manual" (Pl.'s Exs. 21–22, 24) indicated that when confronted with a mentally ill person, an officer should "assess information on the subject" and speak with acquaintances or family members regarding the illness (Benkert Testimony, 34:8–12, Dkt. #115).

"[W]here violence or destructive acts have not occurred," an officer should "avoid physical contact and take time to assess the situation" (*id.*, 35:3–6).[1] The manual suggests that an officer should request professional assistance if available to assist in communicating with the person. (*Id.*, 41:20–23.) Plaintiffs also presented expert testimony on the importance of these policies and the necessity of training to implement them. (*See* Van Blaricom Testimony, 11:7–14, Dkt. #123.) Further, Plaintiffs presented evidence that the Bainbridge Island Police confronted mentally ill persons regularly—on average almost twice per week. (*Id.*, 14:13–15.)

Officer Benkert testified that he did not ask the Ostlings anything about the nature or degree of Douglas's illness. (Benkert Testimony, 34:20–35:2, Dkt. #115.) Further, Officer Benkert stated that he had no reason to believe any "violent or destructive act had occurred," and yet still sought to enter the apartment and confront Douglas. (*Id.*, 35:14–16.) He explained that he believed entering Douglas Ostling's apartment was the "only way to tell what the situation was" (*id.*, 38:15.), and it "did not occur to [him]" that entering the apartment might frighten Douglas (*id.*, 41:5.) The officers did not seek professional assistance.

**E.  Defendants' Assignments of Error**

**1.  Permitting Liability of the City and Chief Fehlman Without Liability for Officer Benkert**

Based on the facts above, Defendants argue that "Chief Fehlman and the City cannot be held liable under *Monell* because Officer Benkert inflicted no constitutional harm." (Defs.' Mot. for J. at 5, Dkt. #148.) As a matter of law, Defendants state, an exoneration of Officer Benkert mandates exoneration of the City and the Chief.

**2.  Jury Instructions**

Defendants fault jury instruction no. 18, which read in relevant part:

In their fourth § 1983 claim, the plaintiffs allege that Chief Jon Fehlman and the City of Bainbridge Island failed to train its police officers, causing the damages alleged. The plaintiffs must prove each of the following elements by a preponderance of the evidence:

(1) The acts of ***Bainbridge Island Police Officers*** deprived the plaintiffs of their rights under the United State Constitution as explained in other instructions; . . . .

---

[1] Defendants objected to the exhibits because "they don't state the constitutional standard." (Benkert Testimony, 32:14–16; 33:13–14, Dkt. #115.) The Court overruled the objection.

(Jury Instruction No. 18, Dkt. #135) (emphasis added).  The instruction deviates from the Ninth Circuit's Model Jury Instruction 9.7, which reads:

> In order to prevail on [his] [her] § 1983 claim against defendant [*name of local governing body*] alleging liability based on a policy of failure to train its [police officers] [employees], the plaintiff must prove each of the following elements by a preponderance of the evidence:
>
> (1)   the act[s] of ***[name of defendant's [police officer[s]] [employee[s]]]*** deprived the plaintiff of [his] [her] particular rights under [the laws of the United States] [the United States Constitution] as explained in later instructions; . . . .

(Ninth Circuit Model Civil Jury Instructions § 9.7) ("Section 1983 Claim Against Local Governing Body Defendants Based on Policy of Failure to Train—Elements and Burden of Proof") (emphasis added).  Defendants properly objected to this instruction.  (*See* Minute Entry, Dkt. #132; Tr. Trans. 2:17–24, Dkt. #143, May 30, 2012.)

Defendants argue that the Court was "fundamentally mistaken in deviating from the model instructions" by using the generic "Bainbridge Island Police Officers" rather than "Officer Benkert." (Defs.' Mot. for J. at 11, Dkt. #148.)  This error "led the jury to render a verdict against Chief Fehlman and the City without also finding [that] Officer Benkert deprived Douglas Ostling of his rights." (*Id.*)

### 3.   Jury Disregarded Instructions

Defendants argue that the jury disregarded the instructions by finding the City liable without finding that Defendants had "deprived plaintiffs of their rights under the United States Constitution *as explained in other instructions*." (Defs.' Mot. for J. at 11, Dkt. #148; Jury Instruction No. 18, Dkt. #135 (emphasis added)).  In short, Jury Instruction No. 18 (cited above) stated that Plaintiff had to prove that an act of Bainbridge Island police officers deprived Plaintiffs of their rights "as explained in other instructions." (Jury Instruction No. 18, Dkt. #135) (emphasis added).  But, the instructions on unreasonable search (No. 14), excessive force (No. 16), and failure to aid (No. 17) all name Officer Benkert specifically. (*See* Jury Instructions No. 14, 16, 17, Dkt. #135.)  Thus, without finding Officer Benkert liable, the jury could not have found a deprivation of rights "as explained in other instructions."

### 4. Verdict Form

Defendants argue that the verdict form presented an improper standard for a *Monell* claim. (Defs.' Mot. for J. at 12.) The verdict form stated: "Do you find that Chief Fehlman and the City of Bainbridge Island violated Douglas Ostling's constitutional rights by failing to train their officers?" (Verdict Form at 2, Dkt. #140.) At trial, Defendants requested that the verdict form be changed from "violated Douglas Ostling's constitutional rights" to "caused the violation of their officers." (Tr. Trans. 9:25–10:6, Dkt. #144.) Defense counsel reasoned that the verdict form as written "suggests that the City and the Chief violated the rights directly, as opposed to causing someone else to violate those rights." (*Id.*) In their Motion, Defendants now argue that the form should have read "defendants' failure to train is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused the ultimate injury"—essentially paraphrasing the jury instructions. (Defs.' Mot. for J. at 12 (citing Jury Instruction No. 18)).

## II. DISCUSSION

A court may grant a renewed motion for judgment as a matter of law only if "the evidence permits a reasonable jury to reach only one conclusion and that conclusion is contrary to the jury's verdict." *Martin v. Calif. Dep't of Veterans Affairs*, 560 F.3d 1042, 1046 (9th Cir. 2009) (citing *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002)). In examining the record, a court must view evidence "in the light most favorable to the nonmoving party"—Plaintiffs here—"and draw all reasonable inferences in that party's favor." *Id.* (citing *Horphas Research Ltd. v. Pellegrini*, 337 F.3d 1036, 1040 (9th Cir. 2003)).

Further, a court may grant a new trial "only if the verdict is against the clear weight of the evidence, and may not grant it simply because the court would have arrived at a different verdict." *Id.* (citing *Pavao*, 307 F.3d at 918).

**A. Liability of the City of Bainbridge Island and Chief Fehlman**

First and foremost, Defendants argue that "[w]ithout finding Officer Benkert violated Douglas Ostling's constitutional rights, Chief Fehlman and the City cannot be liable under *Monell* because they could not have *caused* the (nonexistent) violation." (Defs.' Mot. for J. at 5, Dkt. #148.)

### 1. Case Law on Municipal Liability Where Individual Officers Are Exonerated

This issue—whether and where municipal liability may exist in the ***absence*** of individual liability—has provided stumbling blocks for courts since they first tackled the subject. It is best to start with first principles: A municipality may be liable under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *see also Levine v. City of Alameda*, 525 F.3d 903 (9th Cir. 2008) ("A city can be sued for monetary damages under 42 U.S.C. § 1983 if the constitutional violation was a product of a policy, practice, or custom adopted and promulgated by the city's officials."). But a "municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id.* at 691.

Defendants argue that the Court need look no further than *Monell*—the jury exonerated Officer Benkert, thus any finding against the City would have to be based on *respondeat superior* liability. Indeed, this was precisely what the Supreme Court held in *City of Los Angeles v. Heller*, 475 U.S. 796 (1986), a case upon which Defendants heavily rely. There, officers were accused of using excessive force after stopping Heller on suspicion of driving while intoxicated. *Id.* at 797. During the stop, Heller "became belligerent," there was "an altercation," and Heller "fell through a plate glass window." *Id.* Heller brought an excessive force claim against the individual officers and asserted municipal liability against the city. *Id.* A jury exonerated the individual officers, and the district court dismissed claims against the city, concluding that "if the police officer had been exonerated by the jury there could be no basis for assertion of liability against the city . . . ." *Id.* at 798. The Supreme Court agreed: "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point." *Id.* at 799 (emphasis in original). This is the conclusion that Defendants urge here: if the individual officer (Officer Benkert) is exonerated of the excessive force claim, the city (Bainbridge Island) must likewise be absolved of wrongdoing. But unlike *Heller*, Plaintiffs here

argue that the City of Bainbridge Island's liability results from its failure to train its officers, not Officer Benkert's use of excessive force.

The Supreme Court first addressed the distinction between a claim that a municipal entity *failed to train* its employees from a claim that a municipal employee *acted pursuant to a policy* in *City of Canton v. Harris*, 489 U.S. 378 (1989). The case followed Mr. Harris's arrest and detention by Canton police. *Id.* at 381. On arrival at a local police station, officers found Mrs. Harris sitting on the floor of the patrol wagon. *Id.* Officers asked if she needed medical attention but received only an "incoherent" response. *Id.* Mrs. Harris was twice left slumped on the floor, and police never summoned medical attention. She was released an hour later, and her family had her taken to the hospital where she would remain for a week "suffering from several emotional ailments." *Id.*

At trial, Mrs. Harris succeeded on only one claim: a failure-to-train claim against the city. *Id.* at 382. The Supreme Court concluded that despite the rule against *respondeat superior* liability in *Monell*, "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Id.* at 387. Those circumstances are narrow: "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. That standard—deliberate indifference—is "consistent with [the Supreme Court's] admonition in *Monell*," i.e., that a municipality is liable only where its actions are the "moving force behind the constitutional violation." *Id.* (internal punctuation omitted).

The Supreme Court highlighted the obvious danger in allowing failure-to-train claims: they may be used to circumvent *Monell*'s bar on vicarious liability. In "virtually every instance where a person has had his or her constitutional right violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Id.* at 392 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). For example, nearly every excessive force claim can be reformulated from "the officer used excessive force pursuant to policy" to "the officer used excessive force because the municipality failed to train him not to use excessive force." The Court therefore imposed the high bar of deliberate

Order - 9

indifference to deter plaintiffs from re-framing every municipal-liability claim into a failure-to-train claim. "[P]ermitting cases against cities for their 'failure to train' employees to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability—a result [the Court] rejected in *Monell*." *Id.* at 392. Despite this danger, and the difficulty inherent in "[p]redicting how a hypothetically well-trained officer would have acted," the Court reasoned that "judge[s] and jur[ies], doing their respective jobs, will be adequate to the task." *Id.* at 391. Thus, the Supreme Court has set different standards for claims under *Heller* (i.e., that a municipal employee acted pursuant to a policy) and claims under *City of Canton* (i.e., that a municipality failed to train its employees).

In the wake of *City of Canton*, the Ninth Circuit recognized that a failure-to-train claim may lie against a municipality despite exoneration of the individual officer—even in excessive force cases. In *Hopkins v. Andaya*, 958 F.2d 881 (9th Cir. 1992), an officer lost control of his baton to a "mentally deranged man" and ultimately shot and killed him. The Ninth Circuit reversed the district court's grant of summary judgment in favor of the officer because an eyewitness disputed the officer's version of events. *Id.* at 884 (noting that eyewitness stated that the deceased had never taken the baton and did not strike the officer with it; rather, the officer fell and immediately began firing). Likewise, the court of appeals reversed summary judgment in favor of the city. *Id.* at 888. The court recognized that even if the officer were exonerated, the city might be liable under *City of Canton*:

> [T]he police chief and city might be held liable for improper training or improper procedure even if Andaya is exonerated, since they put an officer on the street who is so badly trained and instructed he lets his baton be taken away from him and then has to kill an unarmed civilian to save his own life. . . . These facts would certainly bear on whether the city properly trained Andaya, and whether they should have sent him out on the streets carrying a weapon.

*Id.* at 888.

It is worth noting that *Hopkins* presents an interesting difference from *City of Canton*: there does not appear to be an underlying due process claim. In *City of Canton*, Mrs. Harris established that the city's failure to train led to a deprivation of her due process right to medical attention. *City of Canton*, 489 U.S. at 381. Her failure-to-train claim thus rested on that

underlying constitutional violation. In *Hopkins*, there was no due process claim that might support the failure-to-train claim in the absence of the officer's liability. But in *Hopkins*, the court's comments come after it has already reversed the district court, and the discussion of independent municipal liability is merely dicta. *Hopkins* suggests, however, that the Ostlings' claim—a claim against a city for improperly training an officer who later puts himself into a position where he must use force—is viable.

The Ninth Circuit addressed the issue again in *Scott v. Heinrich*, 39 F.3d 912 (9th Cir. 1994). In *Scott*, officers shot and killed a gun-wielding suspect, Mr. Scott, in the doorway of an apartment. *Id.* at 914. The Ninth Circuit held that the officers acted reasonably and affirmed summary judgment in their favor. *Id.* at 915. Plaintiffs (Mr. Scott's widow and estate) argued that the officers violated department guidelines by failing to "develop[] a tactical plan" and "try[ing] to get Scott to surrender" before confronting him (an argument strikingly similar to Plaintiffs' argument here). *Id.* at 915. The Ninth Circuit held that municipal liability failed as a matter of law: "the actions of [the officers] at all times were reasonable and proper," and thus, there was "no basis for finding the officers inadequately trained." *Id.* at 916. Like *Hopkins*, there was no underlying due-process violation to support the failure-to-train claim against the municipality. But unlike *Hopkins*, the court made clear that a failure-to-train claim requires an underlying constitutional violation to support municipal liability.

The Ninth Circuit attempted to clarify these claims in *Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002), a case each party cites in its favor. In *Fairley*, officers of the City of Long Beach held the plaintiff for twelve days on outstanding warrants for the plaintiff's twin brother. *Id.* at 915. During those twelve days, officers ignored the plaintiff's claims of mistaken identity, despite police knowing that the plaintiff had a twin brother, that the plaintiff's driver's license number did not match the warrant, and that the plaintiff weighed substantially different than the warrant's description. *Id.* The plaintiff was eventually released after filing a citizen's complaint, and a subsequent internal-affairs investigation found that the city's "policies and procedures had been fully complied with" in the case. *Id.* at 916. The plaintiff filed suit against the individual officers for use of excessive force and arrest without probable cause. *Id.* In addition, Plaintiff

alleged that the city was liable under *Monell*. A jury determined that "the individual officers had inflicted no constitutional injury" and thus "exonerated the individual officers." *Id.*

The question then arose whether the City of Long Beach could be liable once the individual officers were exonerated. The Ninth Circuit reasoned that "*Heller*, *Scott*, and *Quintanilla* [*v. City of Downey*, 84 F.3d 353 (9th Cir. 1996)] control [plaintiff's] excessive force claim." *Id.* at 916. Thus, "[e]xoneration of [the officer] of the charge of excessive force precludes municipal liability for the alleged unconstitutional use of such force." *Id.* But, those decisions had "no bearing" on the plaintiff's remaining claims—arrest without probable cause and deprivation of liberty without due process. *Id.* at 916–17. The Ninth Circuit reiterated the key point: The city could be liable "for improper training or improper procedure even if the individual officer charged with violating the plaintiff's constitutional rights was exonerated." *Id.* at 917 (citing *Hopkins* 958 F.2d at 888). Thus, the "district court did not err by denying the City's motion for judgment as a matter of law . . . based on the jury's exoneration of the individual officers alone." *Id.*

The Ninth Circuit has distilled these cases (and others) into four elements:

> To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (4) that the policy is the "moving force behind the constitutional violation."

*Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton*, 489 U.S. at 389–91).

### 2. Analysis of the City of Bainbridge Island's Liability

The Court must conclude that the facts bear sufficient similarities to *City of Canton*, *Hopkins*, and *Fairley* to support the jury's verdict of municipal liability independent of Officer Benkert's individual liability. Plaintiffs presented evidence at trial that the City of Bainbridge Island confronts the mentally ill regularly—almost twice a week. (*See* Van Blaricom Testimony, 14:13–15, Dkt. #123) (noting that Bainbridge Island police officers confronted a mentally ill person 1.89 times per week). These confrontations were sufficiently regular that the City created policies on how to deal with the mentally ill in its police manual. Unfortunately, the City does

not appear to have ever trained its officers on those policies.  (Benkert Testimony, 12:14–22, Dkt. #115; Portrey Testimony, 19:20–24; 21:3–9, Dkt. #117.)  Plaintiffs argued, and the jury agreed, that the City's failure to train its officers was the moving force behind officers Benkert and Portrey causing an unnecessary—but very predictable—confrontation with a schizophrenic man, Douglas Ostling.  At the time he was shot, Douglas was in his own home, had committed no crime, and was yelling to be left alone.  A reasonable jury would be well entitled to believe that if Bainbridge Island police had been trained in their own policies—even minimally—that the confrontation would have been avoided.  Instead, the officers apparently forced their way into Douglas Ostling's apartment, precipitating the events that led to his death.

Defendants argue that *Fairley* (and presumably *City of Canton* as well) is inapplicable because it is a due process case involving the collective action of many officers.  (Defs.' Mot. for J. at 7–9, Dkt. #148.)  But Defendants fail to acknowledge the nature of the constitutional violation alleged by Plaintiffs.  Plaintiffs argued that it was the institutional failure of the City of Bainbridge Island to train its officers on policies that it already had in place—i.e., how to confront the mentally ill—that ultimately caused Douglas's death.  The City put untrained officers in a position where they unnecessarily precipitated a violent confrontation.  The Ninth Circuit endorsed just such a claim in *Hopkins* (a case cited favorably in *Fairley*).

It is Defendants' reliance on *Heller* that is misplaced.  The plaintiff in *Heller* presented no failure-to-train claim, and there was no underlying constitutional violation on which the failure-to-train claim might rest.  Indeed, *Heller* presents the prototypical § 1983 claim: "the officer acted pursuant to a municipal policy."  Quite simply, that was not Plaintiffs' claim here.

Moreover, unlike *Heller* and *Scott*, there ***is*** a due process claim underlying Plaintiffs' failure-to-train claim.  The Court must "reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence," *Pierce v. Southern Pacific Transp. Co.*, 823 F.2d 1366, 1370 (9th Cir. 1987) (citations omitted), and it can do so here.  The jury found that the City failed to train its officers to deal with the mentally ill, and that failure deprived William and Joyce Ostling of their substantive due process right to the companionship of their son.  (*See* Jury Verdict, Question 6, Dkt. #140; *see also* Jury Instruction No. 19, Dkt. #135.)

In sum, the jury concluded that the City of Bainbridge Island failed to provide any training to its officers on how to deal with the mentally ill. That failure led Officers Benkert and Portrey to confront Douglas Ostling without any pressing need and without any forethought as to how the schizophrenic man might react. The jury was entitled to believe that just such a confrontation was foreseeable, avoidable, and ultimately caused the deprivation of William and Joyce Ostling's substantive due process right to the society of their son.

**B. Jury Instructions**

Defendants argue that the Court erred in Jury Instruction No. 18 by replacing "the act[s] of [name of defendant's [police officer[s]] [employee[s]]]" with "the acts of Bainbridge Island Police Officers." (*Compare* Ninth Circuit Model Civil Jury Instructions § 9.7 *with* Jury Instruction No. 18, Dkt. #148.) According to Defendants, this permitted the jury to "render a verdict against Chief Fehlman and the City without also finding Officer Benkert deprived Douglas Ostling of his rights." (Defs.' Mot. for J. at 11, Dkt. #148.)

A court must formulate jury instructions that "fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Mockler v. Multnomah County*, 140 F.3d 808, 812 (9th Cir. 1998) (quoting *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996)). In doing so, the "district court has substantial latitude in tailoring" the instructions. *Id.*

Here, Defendants' argument is a corollary of their argument that City cannot be liable absent Officer Benkert's liability. As discussed above, that position is incorrect. The Court opted to use the generic "Bainbridge Island Police Officers" rather than naming Officer Benkert specifically because the jury properly should have included Officer Portrey (a non-party) in the calculus. Indeed, a failure to train claim is "systemic" in nature, suggesting that many municipal employees may be at fault "even though no individual defendants were sued." *Fairley*, 281 F.3d at 917 (citing *City of Canton*, 489 U.S. 378.) In any event, the arguments and testimony at trial made clear to the jury that Plaintiffs sought to hold the City accountable for failing to train officers Benkert and Portrey, not any other unnamed employee. As such, Defendants have not identified any prejudice or possible confusion that might arise by the use of "police officers" rather than "officers Benkert and Portrey."

**C. Disregard of Instructions by Jury**

Defendants argue that the jury disregarded the instructions. (Defs.' Mot. for J. at 11, Dkt. #148). This does not appear to be the case. Jury Instruction No. 18 stated that "[t]he acts of Bainbridge Island Police Officers deprived the plaintiffs of their rights under the United States Constitution *as explained in other instructions*." (Jury Instruction No. 18, Dkt. #135 (emphasis added)). Of the "other instructions" referenced, the jury was able to choose from unreasonable search (No. 14), excessive force (No. 16), failure to aid (No. 17), or deprivation of the due process right to companionship (No. 19). Jury Instruction No. 19 stated that William and Joyce Ostling claimed that Defendants "violated their substantive due process right to the companionship and society of their son Douglas Ostling." (Jury Instruction No. 19, Dkt. #135.)

The jury issued a verdict finding that the Defendants failed to train their officers, which ultimately led to the death of Douglas Ostling and the deprivation William and Joyce Ostling's substantive due process right. The Court recognizes that the substantive due process right to companionship of a child is not the typical right underlying a failure-to-train claim. More frequently, Plaintiffs establish constitutional violations of due process rights related to medical attention (e.g., *City of Canton*; *Gibson v. County of Washoe*, 290 F.3d 1175 (9th Cir. 2002); *Clouthier v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010)) or relating to detention procedures (e.g., *Fairley*, *Mortimer v. Baca*, 594 F.3d 714 (9th Cir. 2010)). But neither party has cited case law limiting failure-to-train claims to such violations.[2] If a deprivation of a party's due process right to familial companionship is too remote such that it cannot underlie a failure-to-train claim, it should be the Ninth Circuit that so holds.

---

[2] Indeed, *Fairley* illustrates the danger of failure-to-train claims: the possibility of an orphaned municipal liability verdict, detached from an underlying constitutional violation. Specifically, the jury in *Fairley* exonerated the individual officers but "***did not specify the constitutional deprivation*** upon which it based its finding of municipal liability." *Id.* at 917 (emphasis added). In other words, the jury found that the individual officers had probable cause to arrest and did not use excessive force, but that the city was still liable for a violation of constitutional rights—without naming the violation. Similarly, Officer Benkert was cleared of wrongdoing, but the jury nevertheless found the City of Bainbridge Island had caused a violation of constitutional rights. The City argues that the rights in question could only have been Doug Ostling's. More rights were at stake though: William and Joyce Ostling's substantive due process right to the companionship of their child. It is this right, and its violation, that underlies the failure-to-train claim.

**D.  Verdict Form**

Defendants argue that Question 4 of the verdict form presented an improper standard for a *Monell* claim. (Defs.' Mot. for J. at 12.)  Although their argument has changed since trial, the Court will address Defendants' position.  As written, Question 4 stated "Do you find that Chief Fehlman and the City of Bainbridge Island violated Douglas Ostling's constitutional rights by failing to train their officers?" (Jury Verdict, Dkt. #140.)  Defendants now argue that the verdict form should have paraphrased the jury instructions by asking if "defendants' failure to train is so closely related to the deprivation of the plaintiffs' rights as to be the moving force that caused the ultimate injury." (Defs.' Mot. for J. at 12, Dkt. #148.)

The Court seeks to draft accurate and concise verdict forms that do not omit, emphasize, or otherwise skew the jury instructions.   Jury Instruction No. 18 properly stated the standard for a failure to train claim, and the verdict form properly asks the jury whether the Defendants violated constitutional rights by their conduct.  Further elaboration would needlessly risk emphasizing parts of the jury instruction while omitting others.

**E.  Error in Verdict Form**

Although neither party addressed it in briefing, the Court has discovered an error in the verdict form.  Jury Instruction No. 18 makes clear that liability may result where a failure to train causes a violation of the rights of *any* Plaintiff—Douglas, Joyce, or William: "The plaintiffs must prove each of the following elements by a preponderance of the evidence: (1) The acts of Bainbridge Island Police Officers deprived *the plaintiffs* of their rights . . . ." (Jury Instruction No. 18, Dkt. #135) (emphasis added).  On the verdict form, however, Question 4 is improperly constrained to Douglas: "Do you find that Chief Fehlman and the City of Bainbridge Island *violated Douglas Ostling's* constitutional rights by failing to train their officers?" (Jury Verdict, Dkt. #140) (emphasis added).  Question 4 should have read, "violated Plaintiffs' constitutional rights . . . ," thereby including William and Joyce.

As noted above, the Court must "reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence." *Pierce v. Southern Pacific Transp. Co.*, 823 F.2d 1366, 1370 (9th Cir. 1987) (citing *Gallick v. Baltimore & O.R.R.*, 372 U.S. 108, 119–22

(1963)); *see also Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."). Although the verdict form contains an error, the jury followed the instructions, which permitted municipal liability based on a violation of *any* Plaintiff's constitutional rights, not merely Douglas's.

### F.  Failure to Train on Aiding Suspects

The parties for the first time dispute whether the jury could have found that the City was liable for failing to train its officers to aid suspects who had been shot. (Defs.' Mot. for J. at 15, Dkt. #148; Pls.' Resp. at 19.) Plaintiffs failed to present that claim in the Complaint or at trial. (*See* Am. Compl. ¶ 43, Dkt. #6.) Indeed, Plaintiffs presented no evidence that the Bainbridge Island Police Department failed to train its officers on how to respond to shootings, wounded persons, or generally in rendering aid. Thus, the failure-to-train claim cannot rest on an implicit finding that the officers failed to aid Douglas Ostling.

### III.  CONCLUSION

Defendants' remaining arguments follow mainly from their erroneous premise—that the City and Chief Fehlman cannot be liable absent a determination that Officer Benkert was individually liable. (*See* Defs.' Mot. for J. at 16–23). The Court must reject these arguments en masse. As the foregoing discussion indicates, the evidence presented at trial was sufficient to permit the jury to find that the City and Chief Fehlman failed to train their officers in their own policies on confronting the mentally ill. That failure led Officers Benkert and Portrey to forcibly and needlessly confront a schizophrenic man, creating a situation in which they were forced to shoot him. Defendants' Renewed Motion for Judgment (Dkt. #148) is **DENIED**.

**IT IS SO ORDERED.**

Dated this 28th day of September 2012.

Ronald B. Leighton
United States District Judge